## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SUNIVA, INC.,[1] | ) Case No. 17-10837 (KG) |
| Debtor. | ) |
| | ) |

### DEBTOR'S MOTION FOR
### INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO (A) INCUR POSTPETITION DEBT ON AN EMERGENCY BASIS PENDING A FINAL HEARING; AND (B) PROVIDE SECURITY AND OTHER RELATED RELIEF

Suniva, Inc., as debtor and debtor in possession (the "*Debtor*"), by and through its proposed undersigned counsel, hereby moves (the "*Motion*") the Court for entry of interim and final orders:

(a) authorizing the Debtor to obtain secured, superpriority postpetition financing (the "*DIP Credit Facility*")[2] consisting of a $4 million revolving credit facility, with the sum of $1,417,102 being available to the Debtor on an interim basis, subject to the terms and conditions set forth herein and in that certain Debtor in Possession Credit Facility Term Sheet attached hereto as **Exhibit B** (as may be amended, supplemented, restated, or otherwise modified from time to time, only consistent with the terms of this Interim Order, the "*DIP Agreement*")[3] by and among the Debtor and SQN Asset Servicing, LLC (the "*DIP Lender*,") and the financial institutions or other entities from time to time parties thereto, each as a DIP Lender, all as more fully set forth in the interim DIP order attached hereto as **Exhibit A** (the "*Interim Order*");

(b) authorizing the Debtor to execute and deliver the DIP Agreement and other related loan documents, including the Credit Agreement consistent therewith (collectively, with all documents comprising the DIP Credit Facility, the "*Financing Documents*") and to perform such other acts as may be necessary or desirable in connection with the Financing Documents and pursuant to the provisions of the Interim Order;

---

[1]     The last four digits of the Debtor's federal tax identification number is 2418.  The Debtor's corporate headquarters is located at 5765 Peachtree Industrial Blvd, Norcross, Georgia 30092.

[2]     Capitalized terms not defined herein shall have the meaning ascribed to such terms in the DIP Agreement or the First Day Declaration (as defined below), as applicable.

[3]     Following entry of the Interim Order, the Debtor intends to work with the DIP Lender and its counsel to negotiate a DIP Credit Agreement (the "*Credit Agreement*") that will be annexed to the form of the proposed Final Order.

(c) authorizing the Debtor to grant SQN Asset Servicing, LLC (the "*DIP Agent*") and the DIP Lender allowed superpriority administrative expense claims in this chapter 11 case and any successor case for the DIP Credit Facility and all obligations owing thereunder and under the Financing Documents (collectively, and including all "*Obligations*" as described in the DIP Agreement, the "*DIP Loan Outstandings*"), all as more fully set forth in the Interim Order;

(d) authorizing the Debtor to grant the DIP Agent, for the benefit of itself and the DIP Lender, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" (as defined in section 363(a) of the Bankruptcy Code, "*Cash Collateral*"), *provided, however*, that such security interest shall be junior in payment and priority to the Carve Out (as defined herein) and Permitted Prior Liens, including without limitation those of the SQN Prepetition Lender (as defined herein) and Wanxiang America Corporation ("*Wanxiang*");

(e) authorizing the accrual of all fees and expenses payable to the DIP Agent and the DIP Lender under the Financing Documents;

(f) vacating and modifying the automatic stay pursuant to section 363 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the Financing Documents;

(g) effective upon entry of a final order approving the relief requested herein (the "*Final Order*"), waiving the Debtor's ability to surcharge against the DIP Collateral or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(h) effective upon entry of the Final Order, waiving the Debtor's ability to assert any "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(i) effective upon entry of the Final Order, granting liens to the DIP Lender on the claims and proceeds of the Debtor's claims and causes of action arising under sections 544, 547, 548, 549, 550, and 553 of Bankruptcy Code to secure the DIP Loan Outstandings;

(j) granting the DIP Lender, effective upon entry of the Final Order: (a) warrants representing no less than forty percent (40%) of the outstanding shares of the Debtor (or the reorganized Debtor pursuant to a confirmed plan of reorganization under the Bankruptcy Code) on a fully diluted basis in form and substance acceptable to DIP Agent and its counsel; and (b) if a successful determination of that certain Section 201 trade case seeking United States government protection for the US solar industry (the "*Trade Case*") is made in favor of the Borrower, then a fee, in an amount equal to 50% of the increase in the value of the stock and other equity interests of the Borrower resulting from such successful determination of the Trade Case;

2

(k) scheduling a final hearing (the "*Final Hearing*") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on this Motion; and

(l) granting the Debtor such other and further relief as is just and proper.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "*Bankruptcy Code*"), Rules 2002, 4001, 6003 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Local Rules 4001-2 and 9013-1(m).

## PRELIMINARY STATEMENT

3.      As set forth more fully in the First Day Declaration, Chinese manufacturers of solar cells have benefited from favorable, state-sponsored financing and lower labor costs, allowing them to flood the United States market for solar cells and modules with cheap imports. This has negatively impacted manufacturers based in the United States, such as the Debtor.  In 2012, the United States Department of Commerce began to impose tariffs on imports of solar cells from China with many Chinese solar manufacturing companies being subject to tariffs of

approximately 30%. Notwithstanding these protections, solar cell manufacturers in the United States continue to face steep price competition from non-China-based overseas manufacturers not subject to United States tariffs, particularly from countries in southeast Asia, including from Chinese manufacturers that have moved production from mainland China to southeast Asia and elsewhere to avoid the United States tariffs. As a result, these tariffs have not been effective in preventing dumping of Chinese solar products in the United States. These pressures have been exacerbated by a recent drop in demand in the Chinese market resulting from the Chinese government announcing, in 2016, that it was lowering subsidies for solar energy purchases. This has resulted in a production glut, further driving down global prices. Unfortunately, this downturn in solar cell prices coincided with the Debtor's expansion and incurrence of significant additional debt.

4. Domestic industries seriously injured or threatened with serious injury by increased imports may petition the United States International Trade Commission (the "*USITC*") under section 201 of the Trade Act of 1974, 19 U.S.C. § 2251 ("*Section 201*") for import relief. After being petitioned, the USITC determines whether an article is being imported in such increased quantities that it is a substantial cause of serious injury, or threat thereof, to the U.S. industry producing an article like or directly competitive with the imported article. If the Commission makes an affirmative determination, it recommends to the President of the United States relief that would prevent or remedy injury and facilitate industry adjustment to import competition. The President makes the final decision whether to provide relief and the amount of relief. The USITC must generally make its finding within 120 days of receipt of a Section 201 petition and must transmit its report to the President, together with any relief recommendations, within 180 days after receipt of the petition. If the USITC finding is affirmative, it must

recommend a remedy to the President, who determines what relief, if any, will be imposed. Such relief may be in the form of a tariff increase, quantitative restrictions, or orderly marketing agreements. Importantly, such relief, if found applicable to U.S. solar cell manufacturers, could protect U.S.-based manufacturers against imports of solar cells manufactured in southeast Asia as well as Japan, Germany, South Korea, and Canada.

5.      As discussed herein, the proceeds of the DIP Credit Facility will be used for working capital and other general corporate purposes and pay for the Debtor's budgeted administrative expenses incurred during the Chapter 11 Case and most importantly, to prosecute the Trade Case under Section 201. The Trade Case is of paramount importance in preserving (and enhancing) the value of this estate. Indeed, if the prosecution of the Trade Case is successful, it could resuscitate the Debtor's business, allow the Debtor to compete with the lower cost imports currently flooding the U.S. market, and dramatically increase the value of Debtor's substantial equipment.

## BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 CONCISE STATEMENTS AND HIGHLIGHTED PROVISIONS

6.      Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rules 4001-2(a)(i) and (ii), the Debtor submits the following concise statements of the relief requested and the materials terms of the Interim Order and highlighted provisions:[4]

| Required Disclosure | Description of Relief/Provisions |
| --- | --- |
| DIP Borrower | Suniva, Inc.<br><br>*See* Interim Order Preamble; DIP Agreement at pg. 1 |
| DIP Agent | SQN Asset Servicing, LLC |

---

[4]      This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a) and is qualified in its entirety by reference to the provisions of the DIP Agreement and the Interim Order. To the extent there exists any inconsistency between this summary and the provisions of the DIP Agreement, the Interim Order, the Credit Agreement or the Final Order, the provisions of the DIP Agreement, the Interim Order, the Credit Agreement and the Final Order, as applicable, shall control.

| Required Disclosure | Description of Relief/Provisions |
|---|---|
| | DIP Agreement at pg. 1 |
| **DIP Lender** | SQN Asset Servicing, LLC<br><br>*See* Interim Order Preamble; DIP Agreement at pg. 1 |
| **DIP Credit Facility Amount** | $4 million revolving credit facility, with the sum of $1,417,102 being available on an interim basis.<br><br>*See* Interim Order Preamble; DIP Agreement at pg. 1 |
| **Interest Rate** | The DIP Credit Facility will bear PIK interest at a rate per annum equal to 12%   provided that, upon exercise by the Borrower of the Extension Period (defined below), such rate per annum shall increase to thirteen percent 13%<br><br>*See* DIP Agreement at pg. 2 |
| **Default Interest** | The default rate will be the rate otherwise in effect plus 2%, payable on demand.<br><br>*See* DIP Agreement at pg. 2 |
| **Fees** | *Closing Fee*:  $100,000, payable to SQN Asset Servicing at closing, which fee shall be deemed earned on the DIP Close Date,[5] and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility on the DIP Close Date (in-lieu of being paid in cash on such date).<br><br>*Arrangement Fee*:  3% of the maximum principal amount of the DIP Credit Facility, payable to SQN Asset Servicing at closing, which fee shall be deemed earned on the DIP Close Date, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility on the DIP Close Date (in-lieu of being paid in cash on such date).<br><br>*Unused Line Fee*:  2.0% payable in kind monthly in arrears on the average daily unused portion of the DIP Credit Facility, which fee shall be deemed earned in accordance with the terms of the DIP Loan Documentation, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility from time to time in accordance with the terms of the DIP Loan Documentation.<br><br>*Plan of Reorganization Success Fees*:  If a plan of reorganization is confirmed in respect of this chapter 11 case and SQN Asset Servicing does not provide exit financing to the emerging entities, then a fee in the amount of $100,000 |

---

[5]      The "***DIP Close Date***" shall be the date on which the initial funding of the DIP Credit Facility occurs, which shall be no later than April 18, 2017.

IMPAC 5089810v.1

| Required Disclosure | Description of Relief/Provisions |
|---|---|
| | will be payable upon the date of confirmation of such plan. If a plan of reorganization is confirmed in respect of the chapter 11 case and SQN Asset Servicing provides exit financing to the emerging entities, then a fee in the amount of $75,000 will be payable upon the date of confirmation of such plan. *Section 363 Sale Success Fees:* If all or substantially all of the assets of the Borrower are sold pursuant to Section 363 of the Bankruptcy Code and SQN Asset Servicing does not provide financing to the purchaser to finance such sale, then a fee in the amount of $100,000 will be payable upon the closing date of such sale. If all or substantially all of the assets of the Borrower are sold pursuant to Section 363 of the Bankruptcy Code and SQN Asset Servicing provides financing to the purchaser to finance such sale, then a fee in the amount of $75,000 will be payable upon the closing date of such sale. *Trade Case Success Fee:* If a successful determination in the Trade Case is made in favor of the Borrower, then a fee in an amount equal to 50% of the increase in the value of the stock and other equity interests of the Borrower resulting from such successful determination of the Trade Case will be payable (in cash or equity) upon the later of (x) the effective date of a Plan and (y) ten (10) days after the final determination of the calculation of such fees by DIP Agent (such later date the "*Subject Payment Date*"). For the avoidance of doubt, the Trade Case Success Fees shall be (a) measured by the difference between (to the extent a positive number) (i) the value of the stock and other equity interests of the Borrower on the Petition Date (as defined below) and (ii) the value of the stock and other equity interests of the Borrower on the Subject Payment Date and (b) subject to the terms of the final DIP order. *Exit Fee:* If the obligations in respect of the DIP Credit Facility are paid in full at any time, including, without limitation, on the Maturity Date, then a fee equal to 3% of the maximum principal amount of the DIP Credit Facility will be payable (in cash) contemporaneously with such payoff. For the avoidance of doubt, the Exit Fee shall be subject to the terms of the Final Order. *See* Interim Order at ¶9; DIP Agreement at pp. 2-3. |
| **Approved Budget** | The Borrower shall not pay any expenses other than those set forth in the Approved Budget. The Approved Budget reflects, on a line-item basis, anticipated cash receipts and |

| Required Disclosure | Description of Relief/Provisions |
|---|---|
| | expenditures on a weekly basis and includes all necessary and required expenses that the Borrower expects to incur during each month of the Approved Budget. The Borrower shall be authorized to use the proceeds of the DIP Credit Facility only for payment of such items as are set forth in the Approved Budget and subject to the terms and conditions set forth in the Financing Documents. The Approved Budget shall be revised by the end of each month during the term of the Credit Facility, and which shall remain subject to the consent of the DIP Agent each month. The Approved Budget is subject to certain variances and variance reports, all of which are discussed in the DIP Agreement attached hereto.<br><br>The Approved Budget is attached as **Exhibit C.**<br><br>*See* DIP Agreement at pp. 7-8. |
| **Use of DIP Credit Facility** | DIP Agent and DIP Lenders are providing the DIP Facilities to fund the Debtor's filing and the administration of its Case and the prosecution of the Trade Case and required operations of the Debtor during the prosecution of the Trade Case and the administration of the Debtor's Case. As a condition to the entry into the DIP Agreement and the extension of credit under the DIP Credit Facility, the DIP Agent and DIP Lender requires, and the Debtor has agreed, that proceeds of the DIP Credit Facility shall be used, in each case in a manner consistent with the terms and conditions of the Financing Documents, this Interim Order and the Budget (defined below and as the same may be modified from time to time) solely for (1) working capital and other general corporate purposes, (2) permitted payment of costs of administration of the Case (subject to the limitations of the Carve Out defined below), (3) payment of fees and expenses due under the DIP Credit Facility, and as approved by the Court.<br><br>*See* Interim DIP Order at ¶F(iii). |
| **Case Milestones** | A Plan in form and substance acceptable to the DIP Agent must be confirmed by order of the Bankruptcy court on or before November 1, 2017.<br><br>Other usual and customary milestones to be agreed upon.<br><br>*See* DIP Agreement at pg. 5. |
| **Credit Bid** | The DIP Agent shall have the right to "credit bid" the amount of the DIP Loan Outstandings as of the date of such bid during any sale of all or substantially all of the Debtor's assets to the extent it includes the sale of any collateral, |

IMPAC 5089810v.1

| Required Disclosure | Description of Relief/Provisions |
|---|---|
| | including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.<br><br>*See* Interim Order at ¶22. |
| **Termination Date of DIP and Cash Collateral** | The earliest of: (a) the date on which the DIP Agent provides the Debtor and the Statutory Committee of written notice of Event(s) of Default, subject to the applicable remedies notice period; (b) January 30, 2018, provided, however, that the Borrower will have the right to extend such date to no later than April 30, 2018 by exercising one (1) three-month extension period (the "***Extension Period***"); or (c) confirmation of the Plan (as defined below) (the "***Maturity Date***"). For purposes hereof, the "***Plan***" shall mean a plan of reorganization of the Borrower, the terms and conditions of which are acceptable to the DIP Agent and its counsel.<br><br>*See* Interim Order at ¶21; DIP Agreement at 1. |
| **Security to DIP Lender** | DIP Agent is hereby granted, for the benefit of itself and the DIP Lender, continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens on (the "***DIP Liens***") any and all presently owned and hereafter acquired personal property, real property and other assets of the Debtor, whether owned or consigned by or to, or leased from or to the Debtor, including, without limitation, the following (collectively, the "***DIP Collateral***"): all (i) property of the Debtor; (ii) all proceeds and products of the foregoing; (iii) commercial tort claims, including, without limitation, the Trade Claim, and (iv) upon entry of a Final Order, liens on avoidance actions and claims arising under chapter 5 of the Bankruptcy Code, and all of the proceeds of (i) through (iv).<br><br>The DIP Liens securing the DIP Loan Outstandings shall be junior in payment and priority to the (a) Carve Out, and (b) Permitted Prior Liens (including without limitation those of the SQN Prepetition Lender and Wanxiang (the Debtor's prepetition secured lenders)), and shall otherwise be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral.<br><br>*See* Interim Order at ¶¶6 and 7. |
| **DIP Superpriority Claims** | Upon entry of the Interim Order, the DIP Agent and DIP Lender are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Case and any Successor Case |

| Required Disclosure | Description of Relief/Provisions |
|---|---|
|  | (collectively, the "*DIP Superpriority Claims*") for all DIP Loan Outstandings. The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtor or its estate in the Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtor and its estate, and any successor trustee or other estate representative to the extent permitted by law. In addition, upon entry of a Final Order, the DIP Superpriority Claims shall extend to (i) commercial tort claims or (ii) any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code, or any of the proceeds of (i) and (ii).<br><br>*See* Interim Order at ¶8. |
| **Adequate Protection to Prepetition Lenders** | N/A.<br><br>*See* Interim Order at ¶7. |
| **Carve Out** | "*Carve Out*" shall encompass the following expenses: (a) following the occurrence of a Triggering Event, (i) allowed fees, and reimbursement for disbursements of professionals retained by the Debtor (the "*Debtor's Professional Fee Payments*") accrued in accordance with the Budget in an aggregate amount for all the Debtor's Professional Fee Payments not to exceed $75,000 (less the aggregate amount of all unapplied retainers of such professionals as of the Petition Date); (ii) allowed fees and reimbursements for disbursements of professionals retained by the Statutory Committee (the "*Committee's Professional Fee Payments*") accrued in accordance with the Budget in an aggregate amount for all of the Committee's Professional Fee Payments not to exceed an amount to be determined upon the retention of the Committee's counsel (collectively, (i) and (ii), the "*Carve Out Amount*"); (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $10,000 and (b) without reducing the Carve Out Amount, all Debtor's Professional Fee Payments and Committee Professional Fee |

| **Required Disclosure** | **Description of Relief/Provisions** |
|---|---|
| | Payments accrued in accordance with the Budget, and payable under sections 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event.<br><br>*See* Interim Order at ¶27(a). |
| **Relief from Automatic Stay** | Any automatic stay otherwise applicable to the DIP Agent, DIP Lender, is hereby modified so that the DIP Agent and the DIP Lender shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the Financing Documents and this Interim Order and shall be permitted to satisfy the DIP Loan Outstandings and DIP Superpriority Claims, subject to the Carve Out; provided, however, that the DIP Agent and the DIP Lender shall not be entitled to exercise any remedies with respect to the DIP Collateral until five (5) business days after the Termination Date.  Notwithstanding anything to the contrary, the Debtor and the Statutory Committee shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.  Unless the Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end without further notice or order, and the DIP Agent and the DIP Lender, shall be permitted to exercise all remedies set forth herein, in the DIP Agreement, the Financing Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Agent and DIP Lender with respect thereto pursuant to the DIP Agreement, Financing Documents, or this Interim Order.<br><br>*See* Interim Order at ¶21. |
| **Events of Default** | Usual and customary events of default  including, without limitation, (i) if the Trade Case is no longer deemed a viable cause of action (as determined in the reasonable discretion of the DIP Agent) and (ii) if there is a final determination of the Trade Case not in favor of the Debtor.<br><br>*See* DIP Agreement at 5. |
| **Avoidance Actions** | Upon entry of a Final Order, liens on avoidance actions and claims arising under chapter 5 of the Bankruptcy Code and all the proceeds thereof. |

IMPAC 5089810v.1

| Required Disclosure | Description of Relief/Provisions |
|---|---|
| | *See* Interim Order at ¶¶ 6 and 8. |
| **Indemnification** | The Debtor shall indemnify and hold harmless the DIP Agent and each DIP Lender and their respective shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the Financing Documents, or the DIP Credit Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the Financing Documents and as further described therein and herein, *except* to the extent resulting from such indemnified party's gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.

*See* Interim Order at ¶6. |
| **Covenants** | Usual and customary negative covenants for financings of this kind and subject to customary exceptions for facilities of this type.

*See* DIP Agreement at 6. |
| **Stipulations** | The Debtor makes certain customary admissions and stipulations with respect to the amounts outstanding under the prepetition financing documents and the Debtor's prepetition defaults under the prepetition financing documents.

*See* Interim Order at ¶E. |
| **Releases** | N/A |
| **Challenge Deadline** | N/A |
| **506(c) Waiver** | Effective upon entry of the Final Order, the Debtor shall be deemed to have waived any rights, benefits or causes of action under Code § 506(c) of the Bankruptcy Code.

*See* Interim Order at ¶31. |
| **Applicability of "equities of the case" exception to Section 552(b); No Marshalling** | The DIP Agent, DIP Lender, Prepetition Agent, and Prepetition Lender, shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with |

| Required Disclosure | Description of Relief/Provisions |
|---|---|
| | respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to the Financing Documents.<br><br>Effective upon entry of the Final Order, the DIP Agent, DIP Lender, Prepetition Agent and Prepetition Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of them with respect to proceeds, product, offspring or profits of any of their respective collateral.<br><br>*See* Interim Order at ¶¶ 32 and 33. |

7.     In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtor also draws the Court's attention to certain material provisions of the DIP Credit Facility and the relief set forth in the Interim Order:

(i)     Provisions that Grant Cross-Collateralization Protection (Other than Replacement Liens or Other Adequate Protection) to the Prepetition Secured Creditors (Local Rule 4001-2(a)(i)(A)). Not applicable.

(ii)     Binding the Estate to Validity, Perfection or Amount of Secured Debt or Limitations on Investigation (Local Rule 4001-2(a)(i)(B)). The Debtor has stipulated to the validity of the SQN Prepetition Lender's claim, but the Interim Order does not make such stipulation binding on any other party. *See* definition of "Debtor's Stipulations" at Interim Order ¶E.

(iii)     Waiver of Section 506(c) Rights (Local Rule 4001-2(a)(i)(C)). Subject to entry of the Final Order, the Debtor shall be deemed to have waived any rights, benefits or causes of action under Code § 506(c) of the Bankruptcy Code. *See* Interim Order at ¶31.

(iv)     Liens on the Debtor's Claims and Causes of Action Arising Under Chapter 5 of the Bankruptcy Code (Local Rule 4001-2(a)(i)(D)). Subject to entry of the Final Order, the DIP Lender will receive liens on claims and proceeds under Code §§ 544, 547, 548, 549, 550 and 553. *See* Interim Order at ¶¶6 and 8.

(v)     Repayment Provisions (Local Rule 4001-2(a)(i)(E)). Not Applicable.

(vi)     Disparate Treatment of Professionals (Local Rule 4001-2(a)(i)(F)). The Approved Budget does not currently contemplate a professional fee budget for the Committee. The DIP Agent expects to negotiate a budget with the Committee

and its counsel once formed.   With respect to the Carve Out, following the occurrence of a Triggering Event: (i) the Debtor's Professional Fee Payments accrued in accordance with the Approved Budget will share in an amount not to exceed $75,000; and (ii) the Committee's Professional Fee Payments accrued in accordance with the Approved Budget will share in an amount to be determined upon the retention of the Committee's counsel. *See* Interim Order at ¶27(a).

(vii)    Priming Lien (Local Rule 4001-2(a)(i)(G)). Not applicable. *See* Interim Order at ¶7.

(viii)    Waiver of 552(b) Arguments (Local Rule 4001-2(a)(i)(H)). Subject to entry of the Final Order, the Debtor will waive any "equities of the case" arguments, objections, or claims that could be made under section 552(b) of the Bankruptcy Code. *See* Interim Order at ¶33.

8.    As discussed in greater detail below, the DIP Lender would not provide the DIP Credit Facility without the inclusion of the provisions listed above, each of which was heavily negotiated among the parties.   Moreover, given that the provision of the DIP Credit Facility will enable the Debtor to administer this chapter 11 case for the interest of all stakeholders, these provisions will not unduly harm the Debtor's estate and are justified under the circumstances for the reasons set forth below.   Finally, the Debtor has determined in its sound business judgment that agreeing to such provisions was appropriate under the circumstances of this case to afford the Debtor immediate and much needed liquidity on the most competitive terms available to the Debtor.

## BACKGROUND

### A.    General Background

9.    On April 17, 2017 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Case***").   The Debtor continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   To date, no trustee, examiner or statutory committee has been appointed in this Chapter 11 Case.

10.     Additional information regarding the circumstances leading to the commencement of the Chapter 11 Case and regarding the Debtor's business and capital structure is set forth in the *Declaration of David M. Baker in Support of First Day Motions* (the "**First Day Declaration**"), which is incorporated by reference herein.

**B.     The Wells Fargo and Wanxiang Indebtedness**

11.     As noted in the First Day Declaration, the Debtor is a party to a certain Credit and Security Agreement with Wells Fargo Bank, N.A. ("**WF**") dated May 25, 2012, and as amended, by which WF had extended a revolving line of credit to the Debtor (the "**WF Credit Facility**") secured by first liens on substantially all of the Debtor's assets.[6] The WF Credit Agreement was supported by a Standby Credit Support and Security Agreement dated November 22, 2013, by which Wanxiang provided a $15,000,000 standby letter of credit in favor of WF (the "**WX LOC**"). Wanxiang was also granted a security interest in all of the Debtor's assets and such lien was expressly subordinated to WF's liens pursuant to that certain Subordination Agreement, dated November 22, 2013. As of the Petition Date, the amount due and owing to Wanxiang, the successor to WF (as discussed below), is approximately $15,000,000.

**C.     The SQN Indebtedness**

12.     The Debtor is party to that certain Equipment Loan and Security Agreement, dated as of April 24, 2015 (the "**April SQN Facility**"), by and between the Debtor and SQN Venture Partners, LLC. The Debtor's obligations under the April SQN Facility is secured by a lien in certain equipment together with any proceeds thereof. As of the Petition Date, the amount outstanding under the April SQN Facility is approximately $1,825,100.

---

[6]     As discussed below, as a result of certain letter agreements, the scope of WF's collateral package was amended to subordinate, among other things, certain of the Debtor's equipment.

IMPAC 5089810v.1

13.     In addition, pursuant to that certain Credit Agreement, dated as of November 17, 2015 by and among the Debtor, SQN Asset Servicing, LLC, as agent (the "***Prepetition Agent***"), and certain affiliates of the Prepetition Agent as the lenders party thereto (collectively, the "***SQN Prepetition Lender***" and whichever of the foregoing may be relevant as the context requires "***SQN***"), the SQN Prepetition Lender made certain loans, extensions of credit and other financial accommodations to the Debtor on the terms and conditions set forth therein.  As of the Petition Date, the SQN Prepetition Lender was owed approximately $49,100,000 in principal obligations, plus interest, fees, costs and expenses (the "***SQN Prepetition Obligations***").

14.     As discussed below, as result of certain letter agreements, the SQN Prepetition Obligations are secured by first priority perfected security interests in certain equipment, certain deposit and security accounts, all intellectual property of the Debtor and proceeds of all of the foregoing of the Debtor and a junior priority perfected security interest in substantially all other assets of the Debtor (the "***SQN Subordinate Collateral***"). Furthermore, Shunfeng International Clean Energy Ltd. ("***Shunfeng***"), the majority shareholder of the Debtor, guaranteed, on a limited basis, certain of the SQN Prepetition Obligations pursuant to that certain Shareholder Guaranty dated as of November 17, 2015.

**D.     Subordination and Other Agreements by and Among the Debtor, WF, Wanxiang and SQN**

15.     Pursuant to the terms and conditions of that certain letter agreement, dated as of April 24, 2015, by and between the SQN and WF, (i) WF expressly subordinated its liens in certain equipment and related proceeds (the "***April SQN Priority Collateral***") to the liens of SQN under the April SQN Facility and (ii) SQN confirmed to WF that it had no liens under the April SQN Facility in any of the Debtor's assets other than the April SQN Priority Collateral.

IMPAC 5089810v.1

16.     Pursuant to the terms and conditions of that certain letter agreement, dated as of November 17, 2015, by and between SQN and WF, (i) WF expressly subordinated its liens in certain equipment, certain deposit and securities accounts and the funds on deposit thereon, and all intellectual property of the Debtor and the proceeds of all of the foregoing (the *"November SQN Priority Collateral"*) to the liens of SQN under the November SQN Facility and (ii) SQN expressly subordinated its liens under the November SQN Facility in all of the assets of the Debtor other than the November SQN Priority Collateral to the liens of WF.

17.     Pursuant to the terms and conditions of that certain letter agreement, dated as of November 17, 2015, by and between SQN and Wanxiang, (i) Wanxiang expressly subordinated its liens in the November SQN Priority Collateral to the liens of SQN under the November SQN Facility and (ii) SQN expressly subordinated its liens under the November SQN Facility in all of the assets of the Debtor other than the November SQN Priority Collateral to the liens of Wanxiang.

18.     As part of a forbearance agreement dated February 8, 2017, WF insisted that the Debtor raise at least $6.7 million of additional equity by February 24, 2017.  Unfortunately, the Debtor was unable to raise the equity, either from its majority shareholder, or elsewhere— ultimately, leading to a default under the Debtor's credit facility with WF.  On March 15, 2017, WF, in connection with an acceleration under the WF Credit Facility, (i) drew on the WX LOC in the full $15,000,000, (ii) terminated the Debtor's right to further advances under the WF Credit Facility, (iii) declared any outstanding amounts under the WF Credit Facility due and payable, and (iv) applied the proceeds from the WX LOC to WF's then outstanding balance, which WF determined to be $13,321,203.31 and outstanding letters of credit of $945,383.00.  Subsequently, Wanxiang provided notice that it was succeeding to WF's rights

under the WF Credit Agreement and that the Debtor's inventory and proceeds of the Debtor's accounts receivable should be turned over to Wanxiang. WF asserted that, after application of fees and reserves, its draw on the WX LOC may have only exceeded the amounts owed under the WF Credit Facility by $372,238.42. WF has continued to collect proceeds of the Debtor's accounts receivable, and as of March 30, 2017, WF had collected at least $757,603.39. On March 23, 2017, the Debtor provided notice to WF that the Debtor was entitled to the proceeds of the Debtor's accounts receivable. As a result, these funds have not been released by WF.

### E.    Collateral Summary

19.    Prior to Wanxiang providing notice that it was succeeding to WF's rights under the WF Credit Agreement: (i) WF had a first-priority security interest in substantially all of the Debtor's assets, but not including the April SQN Priority Collateral and the November SQN Priority Collateral, in which WF's security interests were subordinate to those of SQN; and (ii) Wanxiang had a second priority security interest in substantially all of the Debtor's assets, but not including the April SQN Priority Collateral and the November SQN Priority Collateral, in which Wanxiang's security interests were subordinate to those of SQN and WF.

20.    As of the Petition Date, Wanxiang, as successor to WF, has: (i) a first priority security interest in substantially all of the Debtor's assets, but not including the April SQN Priority Collateral and the November SQN Priority Collateral; and (ii) a second priority security interest on the April SQN Priority Collateral and the November SQN Priority Collateral.

21.    Also as of the Petition Date, SQN's debt under: (i) the April SQN Facility is secured solely by a first-priority security interest in the April SQN Priority Collateral; (ii) the November SQN Facility is secured by a first-priority security interest in the November SQN Priority Collateral and a second priority security interest in the Debtor's other assets.

## F.    The Debtor's Efforts to Obtain DIP Financing

22.    By early February 2017, the Debtor had begun exploring strategic alternatives in an effort to manage the Debtor's severe liquidity constraints, looming maturity dates and mounting indebtedness.   As discussed above, those efforts were unsuccessful and as a result, trigged a default under the WF Credit Facility. At the same time the Debtor was attempting to raise additional equity, the Debtor also explored the possibility of filing for bankruptcy and, with the assistance of its advisors, engaged discussions with a variety of lenders, both within and outside the Debtor's capital structure, regarding the possibility of providing the Debtor with additional liquidity through a debtor-in-possession financing facility.   The negotiations on both fronts were active and intensive, given the Debtor's urgent need for capital in the near term. Despite these efforts, however, none of the parties contacted by the Debtor outside of its capital structure were willing to provide DIP financing due to several factors, including: (i) the Debtor's decision to cease manufacturing pending the filing and resolution of the Trade Case; (ii) the absence of unencumbered assets of the Debtor; (iii) the Debtor's recent history of negative cash flows; and (iv) if such DIP financing did not include a payoff of its prepetition indebtedness, the likely necessity to engage in a costly "priming fight" with the Debtor's prepetition lenders.

23.    Given the inability to secure longer term liquidity solutions with a third party lender, the Debtor engaged all parties within its capital structure, namely Wanxiang, Shunfeng and SQN regarding the terms of a DIP facility that would allow the Debtor to administer a chapter 11 proceeding, prosecute the Trade Case and preserve (and enhance) the value of the Debtor's estate for the benefit of its stakeholders.  For disclosure purposes, the Debtor highlights that Jim Modak currently serves as Chief Financial Officer of SQN Capital Management, LLC ("*SQN Capital*"), an affiliate of SQN.  Mr. Modak served as Chief Financial Officer of Suniva until March 18, 2016.  After such time, Mr. Modak worked under contract with Suniva to help

Suniva raise additional capital.    Suniva terminated its contract with Mr. Modak after approximately six months.  Except in his capacity as an officer of SQN Capital, Mr. Modak no longer has any relationship with Suniva.

24.    On April 11, 2017, the Debtor received a letter from the DIP Agent stating that it reached a determination to support the Debtor by way of a debtor-in-possession financing facility in a chapter 11 bankruptcy proceeding.  Following the receipt of this letter, the Debtor and its advisors engaged the DIP Agent and the DIP Lender regarding the terms of such financing.  On April 17, 2017, the Debtor and the DIP Lender, an affiliate of SQN, agreed on the terms of the DIP Credit Facility that will permit the Debtor to fund the administration of this case, which is vital to (a) the prosecution of the Trade Case, and (b) the preservation and maintenance of the going-concern value of the Debtor.  Without Court approval of the DIP Credit Facility, the Debtor will not have sufficient cash to make timely payments to employees or prosecute the Trade Case, which is an integral component to preserving the go-forward value of the Debtor and its operations.  Indeed, absent the DIP Credit Facility, there would be no choice but to immediately liquidate the Debtor's remaining assets to the detriment of all its creditors, employees, customers, and other interested parties.

25.    Subject to the terms of the Financing Documents, the DIP Lender has agreed to make certain advances that will allow the Debtor to pay certain expenditures in accordance with the Approved Budget satisfactory to the DIP Lender, a copy of which is attached hereto as **Exhibit C**.  The proceeds of the DIP Credit Facility will be used for working capital and other general corporate purposes and pay for the Debtor's budgeted administrative expenses incurred during the Chapter 11 Case and most importantly, prosecute the aforementioned Trade Case.

IMPAC 5089810v.1

Each of these expenditures is critical in preserving the value of this estate for the benefit of the Debtor's stakeholders throughout these chapter 11 proceedings.

## BASIS FOR RELIEF

26.     For the following reasons, the Debtor respectfully submits that it has satisfied the standards applicable for the Court's approval of the DIP Credit Facility and entry of the Interim Order.

**I.      The Debtor Satisfies the Requirements for Entering into the DIP Credit Facility Under Section 364(c) of the Bankruptcy Code.**

27.     The Debtor proposes to obtain the DIP Credit Facility by providing to the DIP Lender security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]. . . ." 11 U.S.C. § 364(c).

28.     Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense).

29.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> (a) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.,* by allowing a lender only an administrative claim;
>
> (b) the credit transaction is necessary to preserve the assets of the estate; and
>
> (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

30.    *L.A. Dodgers*, 457 B.R. at 312 (applying three factors); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (same).  For the reasons discussed below, the Debtor satisfies the standards required to obtain postpetition financing under section 364(c) of the Bankruptcy Code.

### 1.    The Debtor Does Not Have an Alternative to the DIP Credit Facility.

31.    The required showing under section 364 of the Bankruptcy Code that other credit was not available to the Debtor is not rigorous.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Says. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (finding that the debtor satisfied its burden to show an inability to obtain credit on other terms through time and effort).  Indeed, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *See Snowshoe*, 789 F.2d at 1088; *see also In re Antico Mfg. Co.*, 31 B.R. 103, 105 (Bankr. E.D.N.Y. 1983).  Moreover, whereas here, there are few lenders likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

32.    As discussed herein, all of the Debtor's assets are subject to valid and enforceable prepetition liens granted in favor of the SQN Prepetition Lender and other financial institutions (*i.e.*, Wanxiang) in their respective capacities as prepetition secured lenders.  Accordingly, and after assessing its financial condition and reaching out to other potential financing parties, the Debtor determined that adequate financing on an unsecured or junior priority basis to the existing

prepetition liens was simply not available, particularly once the Debtor determined to cease manufacturing pending the filing and resolution of the Trade Case. As a result, the DIP Lender – an affiliate of the SQN Prepetition Lender (the Debtor's largest creditor with liens on certain of the Debtor's valuable assets)—is the only party that offered to provide the Debtor with postpetition financing and was only willing to lend to the Debtor on the terms set forth in the Financing Documents and the Interim Order. For these reasons, the Debtor has determined that, under the circumstances, the DIP Credit Facility is the best postpetition financing option available to it and its estate and is a prudent exercise of the Debtor's business judgment. *See e.g.*, *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties").

### 2. The DIP Credit Facility is Necessary to Preserve the Assets of the Debtor's Estate.

33.    It is imperative that the Debtor promptly obtain access to financing to preserve and protect the value of its estate. Access to substantial credit is necessary to meet the day-to-day costs associated with administering this Chapter 11 Case, including funding for employee wages and other costs necessary for preservation of the Debtor's assets (the cost basis of the Debtor's equipment in its plants is approximately $60 million) and the prosecution of the Trade Case. Immediate access to sufficient cash is therefore critical to the Debtor. In the absence of immediate liquidity, the Debtor's employees and servicers may refuse to continue providing services to the Debtor, rendering the Debtor unable to administer this Chapter 11 Case. Indeed, loss of confidence among employees and other interested parties in the Debtor's ability to access credit at this crucial time would have a material adverse impact on the Debtor and its estate. Accordingly, the DIP Credit Facility is necessary to maximize the value of the Debtor's estate,

pending prosecution of the Trade Case and, ultimately, confirmation of a plan of reorganization. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to maximize their estates' assets).

> **2.    The Terms of the DIP Credit Facility are Fair, Reasonable and Appropriate Under the Circumstances.**

34.    The Debtor's request to enter into the DIP Credit Facility reflects the exercise of the Debtor's sound and prudent business judgment. As described above, the Debtor was not able to obtain alternative financing on an unsecured basis, nor were they able to obtain any financing on terms as favorable to them as the terms negotiated with the DIP Lender. The DIP Credit Facility will support the Debtor through this Chapter 11 Case, fund administrative costs of the Debtor's estates, and preserve and promote the viability of the business by way of, among other things, prosecuting the Trade Case.

35.    Specific to this case, the Debtor proposes to grant the DIP Lender, upon entry of the Final Order: (a) on the DIP Close Date, warrants representing no less than 40% of the outstanding shares of the Borrower (or the reorganized Debtor pursuant to a confirmed plan of reorganization under the Bankruptcy Code) on a fully diluted basis in form and substance reasonably acceptable to DIP Agent (the "*Warrant Pledge*"); and (b) an exit fee of fifty percent (50%) of the increase in the value of the equity interests of the Debtor resulting from a successful determination of the Trade Case (the "*Exit Fee*"). As discussed in the First Day Declaration, prosecution of the Trade Case is of paramount importance in preserving (and enhancing) the value of this estate. Indeed, absent the Debtor's ability to prosecute the Trade Case, the going concern value of the Debtor would be severely impaired, if not completely eviscerated. Given that most of the Debtor's value resides in successfully prosecuting the Trade Case, the outcome of which is uncertain, and given the DIP Lender's willingness to provide the DIP Credit Facility

under such circumstances, the Debtor believes that the Warrant Pledge and Exit Fee features, both of which will be subject in all respects to entry of a Final Order, are a sound exercise of the Debtor's business judgement.

36.    The Financing Documents also provide that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve out. In *Ames Department Stores,* the bankruptcy court found that such "carve outs" are not only reasonable, but are necessary to ensure that official committees and debtors' estates will be assured of the assistance of counsel. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.

37.    Accordingly, the Debtor submits that the terms and conditions of the Financing Documents and the Interim Order are fair and reasonable and were negotiated by the parties in good faith and at arm's-length.

### B.    The Debtor Has Exercised Sound Business Judgement in Determining That the DIP Credit Facility is Necessary.

38.    As described above, after appropriate investigation and analysis, and given the exigencies of the circumstances, the Debtor has concluded that alternative credit of the type and in the amount required by the Debtor is not available on an unsecured basis. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See Trans World Airlines, Inc. v. Travelers Intl AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment. . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."); *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (stating that debtor "is entitled to some free reign in fulfilling its perceived mission of. . . keeping an ongoing business afloat. . .").  Indeed, "[m]ore

exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

39.     The Debtor, with the assistance of its advisors, has exercised sound business judgment in determining that the DIP Credit Facility is not only appropriate, but that it is absolutely necessary.  Without the liquidity provided by the DIP Credit Facility, the Debtor would be unable to pay employees and other constituencies that are essential to preserving the going concern value of this estate. Furthermore, the Debtor believes that it will satisfy the prerequisites to borrow under the Financing Documents. The terms of the Financing Documents, including the DIP Agreement and the proposed Interim Order are fair and reasonable under the circumstances and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the Financing Documents to borrow funds on the secured basis described above, and to take the other actions contemplated by the Financing Documents and as requested herein.

**C.      Request for Modification of the Automatic Stay for the DIP Lender and DIP Agent.**

40.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Financing Documents contemplate a modification of the automatic stay, to the extent applicable, to permit the DIP Lender to exercise of all its rights and remedies provided for in the Financing Documents upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Agreement), provided that neither the DIP Agent nor the DIP Lender shall be entitled to exercise any remedies with respect to the DIP Collateral until five (5) business after the Termination Date (as defined in the Interim Order), as

provided for at paragraph 21 of the Interim Order. Furthermore, following the occurrence of an Event of Default, the Debtor and the Committee are entitled to seek an emergency hearing seeking an order of the Court determining that an Event of Default alleged to have given rise to the Termination Date did not occur and/or is not continuing. The Debtor submits that the provisions allowing for a modification of the automatic stay are an appropriate feature of the DIP Credit Facility and, in the Debtor's business judgment, are reasonable under the present circumstances.

### D.    Request for Immediate Interim Relief.

41.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen (14) days after the service of such motion. *See* Bankruptcy Rules 4001(b)(2), 4001(c)(2). Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining and use of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. *See* Local Rule 4001-2(b). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985). After the fourteen-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. *See, e.g., id.* at 449; *Ames Dep't Stores*, 115 B.R. at 36.

42.    Pending the Final Hearing, the Debtor will be permitted to use up to $1,417,102 million of the $4 million DIP Credit Facility commitment for, among other things, payment of employee wages, rent and other working capital needs. It is essential that the Debtor

immediately have the ability to pay for postpetition operating expenses, as well as the prepetition expenses approved in the various first-day orders pending before the Court, to minimize the damage occasioned by its constrained liquidity and to preserve and enhance the going concern value of the Debtor's estate.

43.     Absent immediate use of the DIP Credit Facility, the Debtor will be unable to pay ongoing operational expenses and will not be able to continue to make payments to key constituencies, such as its employees, who are integral to ensuring a smooth transition into chapter 11.  Consequently, if interim relief is not obtained, the Debtor's efforts in this case will be jeopardized immediately and irreparably harmed to the detriment of the Debtor's estate, its creditors, and other parties in interest.

44.     As noted above, the Debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or credit on a non-priming basis that would be sufficient to maintain their operations.   Without the DIP Credit Facility, the Debtor's objective of stabilizing operations and prosecuting the Trade Case will be severely jeopardized. The terms and conditions of the Financing Documents are fair and reasonable, and were negotiated by well-represented parties in good faith and at arm's-length. In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtor's operations, the Debtor respectfully submits that granting the relief requested by this Motion is warranted.

### E.     The Financing Documents Should be Accorded the Benefits of Section 364(e) of the Bankruptcy Code.

45.     Because the Financing Documents are fair and reasonable and have been negotiated in good faith and at arm's-length, and no consideration is being provided to any party for obligations arising under the DIP Agreement or the other Financing Documents, other than as

disclosed therein, the Debtor requests that the Financing Documents be accorded the benefits of section 364(e) of the Bankruptcy Code.

**F.     The Payment of Fees and Other Costs are Reasonable and Appropriate.**

46.    As described above, the Debtor has agreed, subject to Bankruptcy Court approval, to accrue certain fees to the DIP Agent and DIP Lender in connection with the DIP Credit Facility.  The Debtor believes that the proposed fees are reasonable and appropriate and give the Debtor access to financing on the most favorable terms on which the DIP Lender would agree to make the DIP Credit Facility available. The Debtor considered these fees when determining in the exercise of its sound business judgment that the DIP Credit Facility constitutes the best terms on which the Debtor could obtain the postpetition financing necessary to commence this case and, among other things, prosecute the Trade Case for the benefit of its stakeholders. As a result, accruing such fees in order to obtain the DIP Credit Facility is in the best interests of the Debtor, its estate and its creditors.  Further, the Interim Order provides the Debtor, any Committee, and the Office of the United States Trustee with an opportunity to review and object to invoices documenting any professional fees and/or costs incurred by the DIP Agent's or the DIP Lender's attorneys, advisors, accountants and other consultants in connection with this Chapter 11 Case. *See* Interim Order ¶ 3(b).

**The Requirements of Bankruptcy Rule 6003(b) are Satisfied**

47.    Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ." *See* Fed. R. Bankr. P. 6003. As described herein, the Debtor's estate will suffer immediate and irreparable harm if it is not granted immediate use of the DIP Credit Facility in order to pay ongoing operational expenses.   Accordingly, the Debtor submits that the relief requested herein is

IMPAC 5089810v.1

necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

48.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### NOTICE

49.     No trustee, examiner, or statutory committee of creditors has been appointed in this Chapter 11 Case.  Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) each of the Debtor's thirty (30) largest unsecured creditors; (iii) counsel to Wanxiang America Corporation; (iv) counsel to the DIP Agent for itself and for the DIP Lender; (v) the Georgia Department of Revenue; (vi) counsel to Wells Fargo Bank, N.A.; (vii) Shunfeng International Clean Energy Ltd., (viii) the Internal Revenue Service; (ix) applicable state and local taxing authorities; and (x) any other party entitled to notice pursuant to Local Rule 9013-1(m).

50.     Notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtor respectfully submits that no further notice is required.

### NO PREVIOUS REQUEST

51.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court: (a) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion on an interim basis; (b) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (c) grant such other and further relief as may be just and proper.

Dated: April 17, 2017  
       Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ Jeremy W. Ryan*  
Jeremy W. Ryan (DE Bar No. 4057)  
R. Stephen McNeill (DE Bar No. 5210)  
D. Ryan Slaugh (DE Bar No. 6325)  
1313 North Market Street, Sixth Floor  
P.O. Box 951  
Wilmington, DE 19801  
Telephone: (302) 984-6000  
Facsimile: (302) 658-1192  

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**  
Todd C. Meyers  
(Georgia Bar No. 503756)  
Colin M. Bernardino  
(Georgia Bar No. 054879)  
1100 Peachtree Street NE  
Suite 2800  
Atlanta, GA 30309  
Telephone: (404) 815-6500  
Facsimile: (404) 815-6555  

*Proposed Counsel to the Debtor and Debtor in Possession*

IMPAC 5089810v.1

**Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNIVA, INC.,[1] | ) | Case No. 17-10837 (KG) |
| Debtor. | ) |  |
|  | ) | **Re: Docket No. __** |

### INTERIM ORDER (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §364, AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

Upon the motion (the "***Motion***") of SUNIVA, INC. (in its prepetition capacity "***Borrower,***" and in its postpetition capacity, "***Debtor***") in the above-referenced Chapter 11 case (the "***Case***"), pursuant to sections 105, 362, 363(c), 364(c), 364(d)(1), 364(e) and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), seeking, *inter alia*, entry of an Interim Order (this "***Interim Order***") and a Final Order (the "***Final Order***"):

(i)    authorizing the Debtor to obtain secured, superpriority postpetition financing (the "***DIP Facility***") consisting of a $4 million revolving credit facility, with the sum of $1,417,102 being available to the Debtor on an interim basis pursuant to this Interim Order pending entry of a Final Order, subject to the terms and conditions set forth herein and in that certain Debtor in Possession Credit Facility Term Sheet (attached hereto as **Exhibit B**) (as may be amended, supplemented, restated, or otherwise modified from time to time, only consistent with the terms of this Interim Order, the "***DIP Agreement***") by and among the Debtor and SQN Asset

---

[1]    The last four digits of the Debtor's federal tax identification number is 2418.  The Debtor's corporate headquarters is located at 5765 Peachtree Industrial Blvd, Norcross, Georgia 30092.

Servicing, LLC ("**DIP Lender**,"[2]) and as the DIP Agent, and the financial institutions or other entities from time to time parties thereto, each as a DIP Lender, substantially in the form of **Exhibit A** attached to the Motion;

(ii)    authorizing the Debtor to execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the "***DIP Financing Documents***") and to perform such other acts as may be necessary or desirable in connection with the Financing Documents and pursuant to the provisions of this Interim Order;

(iii)    authorizing the Debtor to grant the DIP Agent and DIP Lender allowed superpriority administrative expense claims in the Case and any successor case (as defined herein) for the DIP Facility and all obligations owing thereunder and under the Financing Documents (collectively, and including all "***Obligations***" as described in the DIP Agreement, the "***DIP Loan Outstandings***"), as more fully set forth in this Interim Order;

(iv)    authorizing the Debtor to grant the DIP Agent, for the benefit of itself and the DIP Lender, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" (as defined in section 363(a) of the Bankruptcy Code, "***Cash Collateral***");

(v)    authorizing and directing the Debtor to accrue the principal, interest, fees, expenses and other amounts payable under each of the DIP Financing Documents as they become due (subject to the provisions of paragraphs 3(a) and 3(b) of this Interim Order), including, without limitation, those fees set forth in the DIP Agreement, the fees and disbursements of DIP Agent's attorneys, advisors, accountants, and other consultants, and the

---

[2]    Capitalized terms not defined herein shall have the meaning ascribed to such terms in the DIP Agreement.

-2-

legal expenses of the DIP Lender, all to the extent provided by and in accordance with the terms of the DIP Financing Documents;

(vi)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Financing Documents and this Interim Order; and

(vii)    scheduling a final hearing (the "*Final Hearing*") on the Motion to consider the entry of the Final Order authorizing the borrowings under the Financing Documents on a final basis and approve the form of notice procedures with respect thereto.

The Court having considered the Motion, the exhibits attached thereto, the DIP Financing Documents, the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on April [_____], 2017 (the "*Interim Hearing*"); notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014 and the Local Rules for the United States Bankruptcy Court for the District of Delaware; the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders, and is essential for the continued operation of the Debtor's businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, THE DEBTOR AND DIP LENDER STIPULATE AND THE COURT

HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date*:  On April 17, 2017 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, commencing this Case (the "***Court***").

B.    *Debtor in Possession*.  The Debtor is continuing in the management and operation of its businesses and properties as Debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Case.

C.    *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Statutory Committee*.  The United States Trustee (the "***U.S. Trustee***") has not appointed an official committee of unsecured creditors in this Case pursuant to section 1102 of the Bankruptcy Code (the "***Statutory Committee***").

E.    *Debtor's Stipulations*.  After consultation with their attorneys and financial advisors, the Debtor (on behalf of itself and its estate) admits, stipulates, acknowledges and agrees that (collectively, paragraphs E(i) through E(x) below are referred to herein as the "***Debtor's Stipulations***"):

(i)    *Prepetition Credit Agreement*:  Pursuant to that certain Credit Agreement dated as of November 17, 2015 (as amended, modified or otherwise supplemented from time to time, the "***SQN Prepetition Credit Agreement***") and a Security Agreement dated as of

-4-

November 17, 2015 ("*SQN Security Agreement*") (and together with the SQN Credit Servicing Prepetition Credit Agreement, all other documents executed in connection therewith, the "*Prepetition Credit Documents*"), among Borrower, as borrower (the "*Prepetition Borrower*"), SQN Gamma, LLC, an affiliate of DIP Lender (the "*SQN Prepetition Lender*"), the Prepetition Lender extended certain loans and other accommodations to the Prepetition Borrower on the terms set forth therein.

(ii)     *Prepetition Obligations*:  As of the Petition Date, the Prepetition Lender was owed approximately $49,100,000 in principal obligations (in addition, smaller facilities from affiliates of the Prepetition Lender have outstanding balances of approximately $1,825,100), plus interest, fees, costs and expenses and all other "Obligations" under and as defined in the Prepetition Credit Agreement (the "*SQN Prepetition Obligations*");

(iii)     *Collateral for the Prepetition Obligations.*  The SQN Prepetition Lender asserts that the Prepetition Obligations are secured by first priority perfected security interests in certain equipment of the Debtor and a junior priority perfected security interest in substantially all other assets of the Prepetition Borrower, subordinate only to the first priority security interest of Wanxiang America Corporation ("*Wanxiang*").

(iv)     Shunfeng International Clean Energy Ltd., majority shareholder of the Debtor, guaranteed certain of the SQN Prepetition Obligations pursuant to that certain Shareholder Guaranty dated as of November 17, 2015.

(v)     *Default by the Debtor.*  The Debtor acknowledges and stipulates that the Borrower and Debtor are in default of their debts and obligations under the Prepetition Credit Documents.

F.     *Findings Regarding the Postpetition Financing.*

(i)    *Need for Postpetition Financing and Use of Cash Collateral.*    The Debtor's need to obtain credit pursuant to the DIP Facility is immediate and critical in order to file and prosecute the Trade Case (as defined herein) and to enable the Debtor to continue operations (including disposing of remaining inventory and collecting receivables), to minimize the disruption of the Debtor as a "going concern", to administer and to preserve the value of its estate.  The ability of the Debtor to finance its operations, maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise finance its operations requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors, and the possibility for a successful reorganization.  The Debtor does not have sufficient available sources of working capital and financing to operate its business or maintain its properties in the ordinary course of business without the DIP Facility.

(ii)    *No Credit Available on More Favorable Terms.*    Given its current financial condition, financing arrangements, and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code.  The Debtor has also been unable to obtain credit:  (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien pursuant to section 364(c)(2) of the Bankruptcy Code.  Within the time frame required

by its need to avoid immediate and irreparable harm, financing on a postpetition basis is not otherwise available without granting the DIP Lender, (1) perfected security interests in and liens on (each as provided herein) all of the Debtor's existing and after-acquired assets, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

   (iii) *Use of Proceeds of the DIP Facility*.  DIP Agent and DIP Lenders are providing the DIP Facilities to fund the Debtor's filing and the administration of its Case and the prosecution of that certain Section 201 trade case seeking United States government protection for the US solar industry ("**Trade Case**") and required operations of the Debtor during the prosecution of the Trade Case and the administration of the Debtor's Case.  As a condition to the entry into the DIP Agreement and the extension of credit under the DIP Facility, the DIP Agent and DIP Lender requires, and the Debtor has agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the Financing Documents, this Interim Order and the Budget (defined below and as the same may be modified from time to time) solely for (1) working capital and other general corporate purposes, (2) permitted payment of costs of administration of the Case (subject to the limitations of the Carve Out defined below), (3) payment of fees and expenses due under the DIP Facility, and as approved by the Court.

   (iv) *Sections 506(c) and 552(b)*.  Upon entry of the Final Order, in light of the DIP Facility and the DIP Agent's and DIP Lender's agreement to subordinate its rights of payment, liens and superpriority/priority claims to the Carve Out DIP Lender is entitled to and shall receive (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

   G. *Good Faith of the DIP Agent and the DIP Lender*.

(i)      *Willingness to Provide Financing.*   The DIP Lender has indicated a willingness to provide financing to the Debtor subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the Financing Documents; and (c) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Agent and DIP Lender are extending credit to the Debtor pursuant to the Financing Documents in good faith, and that the DIP Agent's and DIP Lender's claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the Financing Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e).*   The terms and conditions of the DIP Facility and the Financing Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arm's length among the Debtor, DIP Agent, and DIP Lender.  Credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code.  Accordingly, the DIP Agent and DIP Lender are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

-8-

H.    *Final Hearing*.  At the Final Hearing, the Debtor will seek final approval of the proposed postpetition financing arrangements pursuant to a proposed Final Order, which shall be in form and substance acceptable to the DIP Agent, DIP Lender, Prepetition Agent and Prepetition Lender, approving such postpetition financing arrangements, notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order.

I.    *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the Office of the U.S. Trustee; (ii) the Internal Revenue Service; (iii) Debtor's thirty (30) largest unsecured creditors; (iv) counsel to Wanxiang; (v) counsel to the DIP Agent for itself and for the DIP Lender; (vi) the Georgia Department of Revenue; (vii) counsel to Wells Fargo Bank, N.A.; (viii) all parties who have filed a notice of appearance and requested service of pleadings in the Case; (ix) the Internal Revenue Service; (x) applicable state and local taxing authorities; and (xi) Shunfeng International Clean Energy Ltd.  The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

J.    The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, effective immediately, that:

1.    <u>Interim Financing Approved</u>.  The Motion is granted as set forth herein, the Interim Financing (as defined herein) is authorized and approved, subject to the terms and

conditions set forth in this Interim Order, and the Debtor is authorized to obtain borrowings under the DIP Facility on an interim basis in an amount up to $1,417,102 pending entry of a Final Order.

2.    <u>Objections Overruled</u>.  All objections to the Interim Financing to the extent not withdrawn or resolved are hereby overruled.

<b>DIP Facility Authorization</b>

3.    <u>Authorization of the DIP Financing and Financing Documents</u>.  The Financing Documents are hereby approved for the Interim Financing.  The Debtor is expressly and immediately authorized, empowered and directed to execute and deliver the Financing Documents and subject to, the terms of this Interim Order and the Financing Documents, to deliver all instruments and documents which may be required or necessary for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the Financing Documents.  The Debtor is hereby authorized and directed to pay the principal, interest, fees, expenses and other amounts described in the Financing Documents as such become due and without need to obtain further Court approval, all to the extent provided in the Financing Documents.  Upon payment, such amounts shall be deemed fully earned, indefeasibly paid, and non-refundable.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the Financing Documents.

4.    <u>Authorization to Borrow</u>.  Until the earlier of (a) the Maturity Date (as defined in the DIP Agreement), (b) an unfavorable decision in the Trade Case (as determined in the sole and reasonable discretion of DIP Agent), and (c) the termination of obligations under the Financing Documents by the DIP Agent upon the occurrence and during the continuation of an

-10-

Event of Default (as defined herein) (such earlier date, the "**_Termination Date_**"), and subject to the terms, conditions, limitations on availability and reserves set forth in the Financing Documents, DIP Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized to request extensions of credit under the DIP Facility (in the form of loans) of up to an aggregate principal amount not to exceed $4.0 million at any one time outstanding (the "**_Interim Financing_**").

5.    <u>DIP Loan Outstandings</u>.  The Financing Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Loan Outstandings, which DIP Loan Outstandings shall be enforceable against the Debtor, its estate and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Case, or in any other proceedings superseding or related to any of the foregoing (collectively, "**_Successor Case_**").  Upon entry of this Interim Order, the DIP Loan Outstandings will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to the DIP Agent or DIP Lender under the Financing Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owed pursuant to the Financing Documents.  The DIP Loan Outstandings shall be due and payable, without notice or demand, on the Termination Date (as defined herein), except as provided in paragraph 3(b) herein.

6.    <u>DIP Liens and DIP Collateral</u>.  Effective immediately upon the execution of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent is hereby granted, for the benefit of itself and the DIP Lender, continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected security

IMPAC 5089868v.1

interests in and liens on (the "*DIP Liens*") any and all presently owned and hereafter acquired personal property, real property and other assets of the Debtor, whether owned or consigned by or to, or leased from or to the Debtor, including, without limitation, the following (collectively, the "*DIP Collateral*"): all (i) property of the Debtor; (ii) all proceeds and products of the foregoing; (iii) commercial tort claims, including, without limitation, the Trade Claim, and (iv) upon entry of a Final Order, liens on avoidance actions and claims arising under chapter 5 of the Bankruptcy Code, and all of the proceeds of (i) through (iv).

7.     DIP Lien Priority.  The DIP Liens securing the DIP Loan Outstandings shall be junior in payment and priority to the (a) Carve Out, and (b) Permitted Prior Liens (including without limitation those of SQN Secured Lender and Wanxiang), and shall otherwise be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral.  Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Case, upon the conversion of the Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Case or Successor Case.  Upon entry of the Final Order the DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

8.     DIP Superpriority Claims.  Upon entry of this Interim Order, the DIP Agent and DIP Lender are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Case and any Successor Case

-12-

(collectively, the *"DIP Superpriority Claims"*) for all DIP Loan Outstandings. The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtor or its estate in the Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and the Bankruptcy Code, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtor and its estate, and any successor trustee or other estate representative to the extent permitted by law. In addition, upon entry of a Final Order, the DIP Superpriority Claims shall extend to (i) commercial tort claims and (ii) any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code, or any of the proceeds of (i) and (ii).

9.    Warrants and Trade Case Success Fee. In consideration for the funds advanced under the DIP Facility to file and prosecute the Trade Claim, DIP Agent and DIP Lender are hereby granted: Upon entry of the Final Order (a) warrants representing no less than forty percent (40%) of the outstanding shares of the Borrower and Debtor (or the reorganized Debtor pursuant to a confirmed plan of reorganization under the Bankruptcy Code) on a fully diluted basis in form and substance acceptable to DIP Agent and (b) if a successful determination in the Trade Case is made in favor of the Borrower and Debtor , then a fee in the amount equal to fifty percent (50%) of the increase in the value of the stock and other equity interests of the Borrower and Debtor resulting from such successful determination of the Trade Case will be payable (in cash or equity) upon the later of (x) the effective date of a Plan and (y) ten (10) days after the

final determination of the calculation of such fees by DIP Agent. For avoidance of doubt, the Trade Case Success Fee shall be measured by the difference between (to the extent a positive number) (a) the value of the stock and other equity interests of the Borrower and Debtor on the Petition Date and (b) the value of the stock and other equity interests of the Borrower and Debtor on the date of demand for payment by the DIP Agent.

10.    No Obligation to Extend Credit. None of the DIP Agent or DIP Lender shall have any obligation to make any loan or advance under the Financing Documents, unless all of the conditions precedent to the making of such extension of credit under the applicable Financing Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and the DIP Lender, each in its sole discretion.

11.    Use of DIP Facility Proceeds; Payment of Prepetition Obligations. From and after the Petition Date, the Debtor shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the Financing Documents and in compliance with the Budget, a copy of which is attached to this Interim Order as **Exhibit A**. Notwithstanding any first-day orders entered authorizing the Debtor to pay any prepetition or other expenses, all such payments shall be made in accordance with the Budget.

12.    Amendment of the Financing Documents. The Financing Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if:    (i) the amendment, modification, or supplement is (a) in accordance with the Financing Documents, (b) beneficial to the Debtor, and (c) not prejudicial in any material respect to the rights of third parties; (ii) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to counsel for the Statutory Committee (if any) and the U.S. Trustee upon five (5) business days' notice; and (iii) the

amendment, modification or supplement is filed with the Court. The consent of the Statutory Committee or the U.S. Trustee, and approval of the Court is not necessary to effectuate any such amendment, modification or supplement; provided, however, that in the event the Statutory Committee or the U.S. Trustee file a written objection to such amendment, modification or supplement with this Court within such five (5) business day period, the proposed amendment, modification or supplement shall be subject to the approval of this Court, and further provided that the Statutory Committee and U.S. Trustee may waive in writing their right to object to any proposed amendment, modification or supplement otherwise satisfying (i)-(iii) above, thereby resulting in that proposed amendment, modification or supplement being deemed effective without the passing of such five (5) business day period. Except as otherwise provided in this paragraph 12, no waiver, modification, or amendment of any of the provisions of any DIP Document shall be effective unless set forth in writing, signed on behalf of the Debtor and with the necessary consents required under and executed in accordance with the Financing Documents, and approved by the Court on notice.

13.    Budget. Attached hereto as Exhibit A is a thirteen (13) week Budget (the "**Budget**") for the period from April 17, 2017 through and including July 16, 2017, which has been consented to by the DIP Agent. The Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Debtor expects to incur during each month of the Budget. The Debtor shall be authorized to use the proceeds of the DIP Facility only for payment of such items as are set forth in the Budget and subject to the terms and conditions set forth in the DIP Agreements and this Order. The Budget shall be revised by the end of each month during the period of this Order, and which shall remain subject to the consent of the DIP Agent each month. Not later than the

second (2nd) business day of each week commencing with the second week of the period covered by the Budget, the Debtor shall provide the DIP Agent with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance (the "*Variance Percent*") of such actual disbursements and revenues from those reflected in the Budget for that period.  Any disbursement by the Debtor other than for budgeted amounts as set forth in the Budget shall constitute an Event of Default in accordance with the provisions of this Order unless the DIP Agent consents to those changes in writing; provided, however, that the Debtor may make payments in excess of the total budgeted disbursements so long as (i) the Variance Percent of the aggregate of all actual disbursements for each week shall not exceed ten percent (10.0%) of the budgeted disbursements for that week; and (ii) the Variance Percent of the aggregate of all actual disbursements for (a) the first two-week period of the Budget, (b) the first three-week period of the Budget, and (c) any consecutive four-week period shall not exceed ten percent (10.0%) of the aggregate of all budgeted disbursements for such four-week period (subsections (i) and (ii) above are collectively, the "*Allowed Disbursement Variance*").  For the avoidance of doubt, any amount included in the Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks of the Budget.

14.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtor to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims; (b) permit the Debtor to incur all liabilities and obligations under the Financing Documents, the DIP Facility and this Interim Order; (c) permit the Debtor to perform such other acts as are necessary to effectuate the

terms of this Interim Order; and (d) authorize the Debtor to pay the DIP Agent and DIP Lender, payments made in accordance with the terms of this Interim Order.

15.    Perfection of DIP Liens.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Agent and DIP Lender, to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent is authorized to file, as it deems necessary in its sole discretion, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtor is authorized and directed to execute and deliver promptly upon demand to the DIP Agent, all such financing statements, mortgages, notices and other documents as any of the DIP Agent and DIP Lender, may reasonably request. The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

16.    Proceeds of Subsequent Financing.  If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently

-17-

appointed in this Case or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the Financing Documents at any time prior to the repayment in full of all DIP Loan Outstandings and the termination of the DIP Agent's and DIP Lender's obligation to extend credit under the DIP Facility, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in the Financing Documents.

17.     Maintenance of DIP Collateral.  Until the payment in full in cash of all DIP Loan Outstandings, and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, the Debtor shall insure the DIP Collateral as required under the DIP Facility.

18.     Disposition of DIP Collateral; Rights of DIP Agent and DIP Lender.  The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (with the exception of prepetition inventory which shall be subject to prior Bankruptcy Court approval if not sold in the ordinary course) without the prior written consents as required under the Financing Documents.

19.     DIP Termination.  On the Termination Date all DIP Loan Outstandings shall be immediately due and payable and all commitments to extend credit under the DIP Facility will terminate.

20.     Events of Default.  The occurrence of an "Event of Default" under the DIP Agreement (subject to any extensions or waivers as permitted under the Financing Documents), or a default under the terms and conditions of this Interim Order shall constitute an event of default under this Interim Order, unless expressly waived in writing by the DIP Agent in accordance with the consents required in the Financing Documents (collectively, the "*Events of Default*").

IMPAC 5089868v.1

21.    <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, (a) the DIP Agent, as directed by the DIP Lender as provided in the Financing Documents, may declare all DIP Loan Outstandings owing under the Financing Documents to be immediately due and payable, (ii)  any further commitment of the DIP Lender to extend credit (to the Debtor to the extent any such commitment remains) may be terminated, restricted, or reduced, and (iii) the DIP Agreement and any other DIP Document shall be terminated as to any future liability or obligation of the DIP Agent and the DIP Lender, but without affecting any of the DIP Liens or the DIP Loan Outstandings <u>after first providing the Debtor and the Statutory Committee three days written notice of the Event(s) of Default</u> ("***Termination Date***").  On the Termination Date, the DIP Loan Outstandings shall be due and payable, without notice or demand.  Any automatic stay otherwise applicable to the DIP Agent, DIP Lender, is hereby modified so that the DIP Agent and the DIP Lender shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the Financing Documents and this Interim Order and shall be permitted to satisfy the DIP Loan Outstandings and DIP Superpriority Claims, subject to the Carve Out; <u>provided</u>, <u>however</u>, that the DIP Agent and the DIP Lender shall not be entitled to exercise any remedies with respect to the DIP Collateral until five (5) business days after the Termination Date.  Notwithstanding anything to the contrary, the Debtor and the Statutory Committee shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.  Unless the Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end without further notice or order, and the DIP Agent and the DIP Lender, shall be permitted to exercise all remedies set forth herein, in the DIP Agreement, the Financing Documents, as

IMPAC 5089868v.1

applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Agent and DIP Lender with respect thereto pursuant to the DIP Agreement, Financing Documents, or this Interim Order.  Notwithstanding anything to the contrary in this Interim DIP Order, the right of the DIP Agent or the DIP Lender to occupy and/or use any leased premises shall be limited to any rights:  (a) existing under applicable non-bankruptcy law; (b) consented to, in writing, by the applicable landlord(s); and/or (c) granted by the Court on motion and notice, and with an opportunity for the landlords to respond.

22.    <u>Right to Credit Bid</u>.  The DIP Agent shall have the right to "credit bid" the amount of the DIP Loan Outstandings as of the date of such bid during any sale of all or substantially all of the Debtor's assets to the extent it includes the sale of any collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

23.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Through the date hereof, the DIP Agent and DIP Lender each have acted in good faith in connection with negotiating the Financing Documents, extending credit under the DIP Facility, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, amended or vacated by a subsequent order

of this Court or any other court, the DIP Agent and DIP Lender are each entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such reversal, modification, amendment or vacatur shall not affect the validity, perfection, priority, allowability, enforceability or non-avoidability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Agent or DIP Lender hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

24.    <u>Indemnification of DIP Agent and DIP Lender</u>. The Debtor shall indemnify and hold harmless the DIP Agent and each DIP Lender and their respective shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the Financing Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the Financing Documents and as further described therein and herein, <u>except</u> to the extent resulting from such indemnified party's gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Agent's and each DIP Lender's exercise of discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the DIP

Agent and each DIP Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly pay the reasonable fees and expenses of such counsel.

25. <u>Reporting Requirements</u>.  Debtor shall observe and comply with all of the financial reporting and performance covenants and conditions set forth in the Financing Documents and the Prepetition Credit Documents.

26. <u>Rights of Access and Information</u>.  Without limiting the rights of access and information afforded the DIP Agent and DIP Lender under the Financing Documents, the Debtor shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and DIP Lender reasonable access to the Debtor's premises and its books and records in accordance with the Financing Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the Debtor authorizes its independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the DIP Agent and DIP Lender all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any borrower.  Further, Debtor's counsel which is pursuing a 201-3 Trade Claim shall provide DIP Agent with a written status report of the litigation relating thereto bi-weekly.

27. <u>Carve Out</u>.

(a) *Carve Out*.  As used in this Interim Order, the "*Carve Out*" shall encompass the following expenses:  (a) following the occurrence of a Triggering Event, (i) allowed fees, and reimbursement for disbursements of professionals retained by the Debtor (the "*Debtor's Professional Fee Payments*") accrued in accordance with the Budget in an

-22-

aggregate amount for all the Debtor's Professional Fee Payments not to exceed $75,000 (less the aggregate amount of all unapplied retainers of such professionals as of the Petition Date); (ii) allowed fees and reimbursements for disbursements of professionals retained by the Statutory Committee (the "*Committee's Professional Fee Payments*") accrued in accordance with the Budget in an aggregate amount for all of the Committee's Professional Fee Payments not to exceed an amount to be determined upon retention of Committee counsel (collectively, (i) and (ii), the "*Carve Out Amount*"); (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $10,000 and (b) without reducing the Carve Out Amount, all Debtor's Professional Fee Payments and Committee Professional Fee Payments accrued in accordance with the Budget, and payable under sections 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event (the "*Pipeline Period*"). As used in this paragraph 27(a), the term "*Triggering Event*" shall mean the date the DIP Agent provides to the Debtor, with a copy to Debtor's counsel at the address set forth in the Financing Documents, a notice of (i) an Event of Default and (ii) termination of the Pipeline Period for purposes of the Carve Out. As used in this paragraph 27(a), the term "*Triggering Event*" shall also mean the Debtor's failure to pay all quarterly fees owed pursuant to 28 U.S.C. § 1930(a)(6) and interest due thereon pursuant to 31 U.S.C. § 3717 (collectively, the "*Chapter 11 Quarterly Fees*") until such time as a final decree is entered by the Court or the Court enters an ordering converting or dismissing the Debtor's Case. The U.S. Trustee will notify counsel for the Debtor, the DIP Agent, the DIP Lender and the Statutory Committee that Chapter 11 Quarterly Fees are owed (the "*Cure Amount*"), and the Debtor shall have 21 calendar days from the date of the notification to provide payment of the Cure Amount to the Office of the United States Trustee or

-23-

file the appropriate motion seeking a determination from the Court as to whether the Cure Amount is proper.

(b)    *No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.*  The DIP Agent and DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals retained by the Debtor and/or the Statutory Committee incurred in connection with this Case or any Successor Case. Until the occurrence of a Triggering Event, the allowed Debtor's Professional Fee Payments and Committee's Professional Fee Payments shall be paid in accordance with the Debtor's Budget. Nothing in this Interim Order or otherwise shall be construed (i) to obligate the DIP Agent or DIP Lender, in any way to pay compensation to or to reimburse expenses of any professionals retained by the Debtor and/or the Statutory Committee, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out Amount if actual Debtor's Professional Fee Payments and Committee's Professional Fee Payments incurred after a Triggering Event exceed the Carve Out Amount; or (iii) as consent to the allowance of any professional fees or expenses of any professionals retained by the Debtor and/or the Statutory Committee.

28.    <u>Limitations on the DIP Facility, DIP Collateral, and Carve Out</u>.  The DIP Facility, DIP Collateral, Cash Collateral, and Carve Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the DIP Agent, DIP Lender, SQN Prepetition Agent, or SQN Prepetition Lender, or their rights and remedies under the Financing Documents, Prepetition Credit Documents, the HUD Documents or this Interim Order, as applicable, including, without limitation, for the payment of any services rendered by the professionals

-24-

retained by the Debtor or any Statutory Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Loan Outstandings or Prepetition Obligations, (iii) for monetary, injunctive or other affirmative relief against any DIP Agent, DIP Lender, Prepetition Agent, or Prepetition Lender, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent or any DIP Lender of any rights and/or remedies under this Interim Order, the Financing Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent or DIP Lender upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in the Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consents required of DIP Lender or under the Financing Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor without the prior written consents of DIP Lender or required under the Financing Documents, (e) to object to, contest, or interfere with in any way the DIP Agent's or DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (f) to use or seek to use any insurance proceeds constituting DIP Collateral without the consents required under the Financing Documents; (g) to incur Debt (as defined in the DIP Agreement) outside the ordinary course of business without the prior consents required under the Financing Documents; (h) to object to or challenge in any way the claims, liens, or interests (including interests in the Prepetition Collateral or DIP Collateral) held by or on behalf of any

DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender; (i) to assert, commence or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender; (j) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the SQN Prepetition Obligations, SQN Prepetition Liens, DIP Loan Outstandings or DIP Liens or any other rights or interests of any of the Prepetition Agent or Prepetition Lender, DIP Agent or DIP Lender; or (k) to prevent (or attempt to prevent), hinder or otherwise delay the exercise by DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender of any rights and remedies granted under this Interim Order (provided they are consistent with the Intercreditor Agreement).

29.    <u>No Third Party Rights</u>.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

30.    <u>No Deemed Control</u>.    In making decisions to advance any extensions of credit under the DIP Facility, or in taking any other actions related to this Interim Order or the Financing Documents (including, without limitation, the exercise of its approval rights with respect to any budget), DIP Agent and DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of Debtor or to be acting as "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of Debtor (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar federal or state statute), and DIP Agent's and DIP Lender's

IMPAC 5089868v.1

relationship with Debtor shall not constitute or be deemed to constitute a joint venture or partnership of any kind.

31.    Section 506(c) Claims.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Case or any Successor Case at any time shall be charged against any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender, or any of their respective claims or the DIP Collateral or Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the applicable DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

32.    No Marshaling/Applications of Proceeds.   The DIP Agent, DIP Lender, Prepetition Agent, and Prepetition Lender, shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to the Financing Documents.

33.    Section 552(b).  Upon entry of the Final Order the DIP Agent, DIP Lender, Prepetition Agent and Prepetition Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of them with respect to proceeds, product, offspring or profits of any of their respective collateral.

34.    Discharge Waiver.  The Debtor expressly stipulates, and the Court finds and adjudicates that, the DIP Loan Outstandings shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the

-27-

Bankruptcy Code, unless the DIP Loan Outstandings have been paid in full in cash on or before the effective date of a confirmed plan of reorganization. Unless otherwise agreed to by the DIP Agent and DIP Lender, the Debtor shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Loan Outstandings and the cancellation, backing, or cash collateralization of all letters of credit issued under the Financing Documents.

35. <u>Rights Preserved</u>. Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent, DIP Lender, Prepetition Agent and Prepetition Lender are preserved.

36. <u>No Waiver by Failure to Seek Relief</u>. The failure of any DIP Agent, DIP Lender, Prepetition Agent or Prepetition Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the Financing Documents, the Prepetition Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

37. <u>Binding Effect of Interim Order</u>. Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, DIP Agent, DIP Lender, Prepetition Agent and Prepetition Lender, all other creditors of the Debtor, the Statutory Committee or any other court appointed committee appointed in the Case, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Case, any Successor Case, or upon dismissal of the Case or Successor Case.

-28-

38.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Loan Outstandings and Prepetition Obligations (to the extent any Prepetition Obligations remain outstanding) have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtor irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly:   (a) without the prior written consents required in the Financing Documents, (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Case or any Successor Case, equal or superior to the DIP Superpriority Claims, other than the Carve Out; and (b) without the prior written consents required under the Financing Documents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens.  The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the applicable DIP Agent, DIP Lender, Prepetition Agent, Prepetition Lender, Prepetition Term Agent, or Prepetition Term Lender.

39.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Financing Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

40.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:   (a) confirming any plan of reorganization in the Case; (b) converting the Case to a case under chapter 7 of the Bankruptcy

IMPAC 5089868v.1

Code; (c) dismissing the Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing of the Case or Successor Case. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agent and DIP Lender, pursuant to this Interim Order and/or the Financing Documents, notwithstanding the entry of any such order, shall continue in the Case, in any Successor Case, or following dismissal of the Case or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Loan Outstandings have been indefeasibly paid in full. The terms and provisions concerning the indemnification of the DIP Agent and/or DIP Lender shall continue in this Case, in any Successor Cases, following dismissal of this Case or any Successor Case, following termination of the Financing Documents and/or the repayment of the DIP Loan Outstandings.

41. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [_____] (Eastern Time) before the Honorable Kevin Gross, 6th Floor Courtroom, Room 3, at the United States Bankruptcy Court for the District of Delaware. On or before April [_____], 2017, the Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "***Final Hearing Notice***"), together with a copy of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; and (c) counsel for any Statutory Committee, if any. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on [_____], 2017 at

-30-

[_____] (Eastern Time), which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtor.

42.    Effect of this Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

43.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

44.    Notwithstanding Bankruptcy Rules 6003 and 6004 or any other Bankruptcy Rule, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.


Dated: _____, 2017
        Wilmington, Delaware

                                    _____
                                    KEVIN GROSS
                                    UNITED STATES BANKRUPTCY JUDGE

IMPAC 5089868v.1

# EXHIBIT A

Thirteen Week Budget

(To be Attached)

## Cash Flow Weekly Details - Suniva, Inc.

| CASH RECEIPTS | 4/17/2017 | 4/24/2017 | 5/1/2017 | 5/8/2017 | 5/15/2017 | 5/22/2017 | 5/29/2017 | 6/5/2017 | 6/12/2017 | 6/19/2017 | 6/26/2017 | 7/3/2017 | 7/10/2017 | 13 Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Receipts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **EXPENDITURES** | | | | | | | | | | | | | | |
| Rent | (173,336) | | (102,526) | | | | | | | | | (102,526) | | (107,578) |
| Utilities | | | (6,200) | | (3,752) | | | (6,200) | | (3,752) | | (6,200) | | (160,841) |
| Insurance / Healthcare | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (18,600) |
| Other Misc | (14,000) | | | | (14,000) | | | | (14,000) | | | | | (42,000) |
| Oracle cost | (200,000) | | | (200,000) | | | | (200,000) | | | | (200,000) | | (600,000) |
| Legal - 201 Case | | | | | | | | | | | | | | (588,000) |
| Legal - Bankruptcy | (65,000) | (65,000) | (65,000) | (65,000) | (55,000) | (55,000) | (55,000) | (55,000) | | (27,000) | (27,000) | (27,000) | (27,000) | (85,000) |
| local counsel fee | | | (45,000) | | | | (20,000) | | | | | | (9,750) | (9,750) |
| UST fee | (10,000) | | | | (12,000) | | | | (15,000) | | | (15,000) | (10,000) | (47,000) |
| claim agent fee | (16,360) | (15,160) | (15,160) | (16,360) | (15,160) | (15,160) | (13,970) | (11,370) | | (16,505) | (8,880) | (15,505) | (8,880) | (157,470) |
| CRO | (20,000) | | | | | | | | | | | | | (20,000) |
| Noncross Shutdown Costs  (chemical/shipment) | | | (100,000) | | (43,000) | | (43,000) | (43,000) | (43,000) | | (43,000) | | (43,000) | (534,000) |
| Payroll | (215,000) | | | | | | | | | | | | | |
| DOE Cost Reimbursement | | | | | | | | | | | | | | |
| **Total Weekly Expenditures** | (715,696) | (82,160) | (335,886) | (283,360) | (144,912) | (72,160) | (133,970) | (377,096) | (74,000) | (49,257) | (80,880) | (368,231) | (100,630) | (2,612,239) |
| **Total Cash Receipts & Disbursements** | (715,696) | (82,160) | (335,886) | (283,360) | (144,912) | (72,160) | (133,970) | (377,096) | (74,000) | (49,257) | (80,880) | (368,231) | (100,630) | (2,612,239) |

restructure budget 0416 13 weeks (002)FINAL.XLSX- Cash Flow by Week - Wells

## EXHIBIT B

Debtor in Possession Credit Facility Term Sheet

(To be Attached)

DIP Credit Facility
Summary of Indicative Terms and Conditions

TERM SHEET

*SUNIVA, INC.*

April 17, 2017

*Below is a summary of certain basic terms under which the DIP Lender (as defined below) would be willing to provide to the Borrower (as defined below), as debtor and debtor-in-possession under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code"), a secured revolving credit facility totaling up to $4,000,000. This term sheet represents a commitment subject to the terms and conditions described below:*

| | |
|---|---|
| **Borrower:** | Suniva, Inc., as debtor and debtor-in-possession under the Bankruptcy Code. |
| **DIP Agent:** | SQN Asset Servicing, LLC or an affiliate thereof ("SQN Asset Servicing" and, in such capacity, the "DIP Agent"). |
| **DIP Lender:** | SQN Asset Servicing, LLC (or an affiliate thereof) (the "DIP Lender"). |
| **DIP Credit Facility:** | Secured debtor-in-possession revolving credit facility in the maximum amount of $4,000,000 (the "DIP Credit Facility") (terms and conditions to be determined). |
| **Warrants:** | DIP Agent shall have received, on the DIP Close Date, warrants representing no less than 40% of the outstanding shares of the Borrower (or the reorganized Borrower pursuant to a confirmed plan of reorganization under the Bankruptcy Code) on a fully diluted basis in form and substance reasonably acceptable to DIP Agent and its counsel (the "Warrants"). |
| **Close Date:** | The date on which the initial funding of the DIP Credit Facility occurs (the "DIP Close Date"), which shall be no later than April 18, 2017. |
| **Maturity:** | The earliest of: (a) January 30, 2018, provided, however, that the Borrower will have the right to extend such date to no later than April 30, 2018 by exercising one (1) three-month extension period (the "Extension Period"); or (b) confirmation of the Plan (as defined below) (the "Maturity Date"). For purposes hereof, the "Plan" shall mean a plan of reorganization of the Borrower, the terms and conditions of which are acceptable to the DIP Agent and its counsel. |
| **Availability:** | Amounts under the DIP Credit Facility may be borrowed, repaid and reborrowed from the DIP Close Date until the Maturity Date. The initial borrowing made on the DIP Close Date shall be limited to an amount set forth in the interim DIP order, subject to the limitations set |

2

forth in the Approved Budget.

**Interest Rate:** The DIP Credit Facility will bear interest at a rate per annum equal to twelve percent (12%); provided that, upon exercise by the Borrower of the Extension Period, such rate per annum shall increase to thirteen percent (13%). The default rate will be the rate otherwise in effect plus two percent (2%), payable on demand.

**Use of Proceeds:** The proceeds of the DIP Credit Facility will be used exclusively for working capital of the Borrower and their respective subsidiaries in accordance with the Approved Budget (defined below), in form and substance acceptable to DIP Agent, to be prepared by the Borrower and their financial advisors and furnished to the DIP Agent setting forth the expenditures (which, for the avoidance of doubt, shall include (i) Chapter 11 administration expenses (and related reasonable fees and expenses of Borrower's counsel) and (ii) costs and expenses incurred in connection with the Trade Case (including reasonable fees and expenses of Borrower's counsel)) and revenues of the Borrower during the Chapter 11 Cases of the Borrower as set forth on the budget attached hereto as Exhibit A (the "Approved Budget").

**Fees:** *Closing Fee:* $100,000, payable to SQN Asset Servicing at closing, which fee shall be deemed earned on the DIP Close Date, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility on the DIP Close Date (in-lieu of being paid in cash on such date).

*Arrangement Fee:* 3% of the maximum principal amount of the DIP Credit Facility, payable to SQN Asset Servicing at closing, which fee shall be deemed earned on the DIP Close Date, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility on the DIP Close Date (in-lieu of being paid in cash on such date).

*Unused Line Fee:* 2.0% payable in kind monthly in arrears on the average daily unused portion of the DIP Credit Facility, which fee shall be deemed earned in accordance with the terms of the DIP Loan Documentation, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility from time to time in accordance with the terms of the DIP Loan Documentation.

*Plan of Reorganization Success Fees:* If a plan of reorganization is confirmed in respect of the Chapter 11 Cases and SQN Asset Servicing does not provide exit financing to the emerging entities, then a fee in the amount of $100,000 will be payable upon the date of confirmation of such plan. If a plan of reorganization is confirmed in respect of the Chapter 11 Cases and SQN Asset Servicing provides exit financing to the emerging entities, then a fee in the amount of $75,000 will be payable upon the date of confirmation of such plan.

CHICAGO/#2975904.3D

3

*Section 363 Sale Success Fees:*  If all or substantially all of the assets of the Borrower are sold pursuant to Section 363 of the Bankruptcy Code and SQN Asset Servicing does not provide financing to the purchaser to finance such sale, then a fee in the amount of $100,000 will be payable upon the closing date of such sale.  If all or substantially all of the assets of the Borrower are sold pursuant to Section 363 of the Bankruptcy Code and SQN Asset Servicing provides financing to the purchaser to finance such sale, then a fee in the amount of $75,000 will be payable upon the closing date of such sale.

*Trade Case Success Fees:*  If a successful determination in the Trade Case is made in favor of the Borrower, then a fee in an amount equal to 50% of the increase in the value of the stock and other equity interests of the Borrower resulting from such successful determination of the Trade Case will be payable (in cash or equity) upon the later of (x) the effective date of a Plan and (y) ten (10) days after the final determination of the calculation of such fees by DIP Agent (such later date the "Subject Payment Date").  For the avoidance of doubt, the Trade Case Success Fees shall be (a) measured by the difference between (to the extent a positive number) (i) the value of the stock and other equity interests of the Borrower on the Petition Date (as defined below) and (ii) the value of the stock and other equity interests of the Borrower on the Subject Payment Date and (b) subject to the terms of the final DIP order.

*Exit Fees:*  If the obligations in respect of the DIP Credit Facility are paid in full at any time, including, without limitation, on the Maturity Date, then a fee equal to 3% of the maximum principal amount of the DIP Credit Facility will be payable (in cash) contemporaneously with such payoff.  For the avoidance of doubt, the Exit Fees shall be subject to the terms of the final DIP order.

**Scheduled Interest and Principal Repayments:**  Interest on the DIP Credit Facility shall be paid in kind by capitalizing such interest on the last day of each month.  The DIP Credit Facility balances will be due and payable in cash on the Maturity Date.

CHICAGO/#2975904.3D

4

| | |
|---|---|
| **Mandatory Prepayments:** | The DIP Credit Facility will be permanently reduced by proceeds of asset sales, insurance proceeds, extraordinary receipts and new debt and equity issuances in amounts to be determined, and by a percentage to be agreed of annual excess cash flow, subject in each case to customary exceptions to be agreed upon.  For the avoidance of doubt, "extraordinary receipts" shall include any and all cash awards and/or proceeds received from the Trade Case.  All such cash awards and/or such proceeds received from the Trade Case shall be applied first, to the DIP Credit Facility until paid in full, second to other obligations owing to secured creditors in accordance with priority of law and third, to the Exit Fees due hereunder. |
| **Collateral:** | The DIP Credit Facility will be secured (subject only to (x) the Carve Out described below and (y) certain "Permitted Liens" to be determined by the parties prior to final documentation) pursuant to Section 364(c)(2) and 364(c)(3) of the Bankruptcy Code by a valid perfected security interest in all assets of the Borrower and all proceeds and products of the foregoing.  In addition, and for the avoidance of doubt, the DIP Credit Facility will be (i) secured pursuant to Section 364(c)(2) and 364(c)(3) of the Bankruptcy Code by a first priority perfected security interest in any and all claims, defenses, causes of action or rights of the Borrower arising under Sections 542 to 553 of the Bankruptcy Code (other than Section 549 of the Bankruptcy Code) or any proceeds thereof (the "Avoidance Actions") and (ii) such Avoidance Actions shall be accorded super-priority administrative claim priority status under Section 364(c)(1) of the Bankruptcy Code. |
| **Conditions Precedent:** | Customary conditions for financings of this type, including but not limited to (unless otherwise waived by DIP Agent): |

- Execution of all usual and customary credit documentation, including, without limitation, a credit agreement incorporating the terms and conditions set forth in this Term Sheet (the "Credit Agreement"), in each case in form and substance satisfactory to the DIP Agent (collectively, the "DIP Loan Documentation").

- Perfection of all security interests in the collateral (subject to Permitted Liens) as set forth in the interim DIP order.

- The absence of any action, suit, investigation, litigation or proceeding (other than the Chapter 11 Cases) pending or threatened in any court or before any arbitrator or governmental instrumentality that in DIP Agent's judgment (a) could reasonably be expected to have a material adverse effect on the Guarantors', the Borrower's or their subsidiaries' business, results of operations, condition (financial or otherwise), assets or liabilities, or could materially impair the Borrower's ability to perform satisfactorily under the DIP Credit Facility, or (b) could reasonably be expected

5

to materially and adversely affect the DIP Credit Facility.

- Payment of all fees and reasonable expenses imposed hereunder and/or incurred by DIP Agent and the DIP Lender.

- The Borrower shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to DIP Agent and its counsel, and interim financing orders (the "Financing Orders") shall have been entered by the Bankruptcy Court authorizing the secured financing under the DIP Credit Facility on the terms and conditions contemplated by this Term Sheet and, inter alia, (i) modifying the automatic stay, (ii) authorizing and granting the security interests and liens described above, (iii) granting a super-priority administrative expense claim to DIP Agent with respect to all obligations to DIP Agent and DIP Lender, subject to no priority claim or administrative expenses of the Chapter 11 Cases of the Borrower or any other entity, that any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, and (iv) containing a "good faith" finding under Section 364(e) of the Bankruptcy Code. The Financing Orders shall contain such other terms and provisions as DIP Agent and its counsel shall reasonably require.

**Documentation:**     The DIP Credit Facility will be subject to the terms and conditions set forth in the DIP Loan Documentation. Such documentation will contain usual and customary provisions for financings of this kind, including, without limitation, conditions (including those described herein), representations and warranties, affirmative and negative covenants (including those described herein), financial reporting covenants, assignment and participation provisions, indemnification, events of default (including, without limitation, those described herein, an event of default if the Trade Case is no longer deemed a viable cause of action (as determined in the reasonable discretion of the DIP Agent) and an event of default if there is a final determination of the Trade Case not in favor of the Borrower) and remedies (including, without limitation, the right to credit bid in a sale under Section 363 of the Bankruptcy Code).

**Certain Affirmative**     Usual and customary affirmative covenants for financings of this kind,
**Covenants:**     including, without limitation, the following:

- The Borrower shall file an application, in form and substance reasonably acceptable to the DIP Agent, seeking entry of an order of the bankruptcy court approving the retention of a Chief Restructuring Officer during the Chapter 11 case, on terms and conditions acceptable to the DIP Agent.

- A Plan in form and substance acceptable to the DIP Agent must be confirmed by order of the Bankruptcy court on or before November

CHICAGO/#2975904.3D

6

1, 2017.

- Other usual and customary milestones to be agreed.

- Commencing on the second day after the DIP Close Date and the same day of each week thereafter, the Borrower shall deliver to DIP Agent an update on the status of the Trade Case. For purposes hereof, the "Trade Case" shall mean that certain Section 201 trade case seeking government protection for the US solar industry.

- Subject to a joint defense/common interest agreement (to be mutually agreed) as may be necessary or appropriate, the Borrower and its counsel representing it in respect of the Trade Case, shall (a) provide DIP Agent, DIP Lender and its agents, employees and/or officers direct and immediate daily involvement in respect of the Trade Case, including, without limitation, direct access (including by phone) to the Borrower's legal counsel and other third parties engaged in the handling such Trade Case on a daily basis and (b) consult with DIP Agent and its counsel in respect of (ii) any and all strategies related to the Trade Case and (ii) approval of any settlement of any kind related to the Trade Case.

- The DIP Agent shall be named as lender's loss payee (subject to the first priority perfected position of Wanxiang on any Collateral) (property/casualty) and additional insured (liability), and non-renewal/cancellation endorsements shall provide 30 days advance notice to DIP Agent, in each case within thirty (30) days following the DIP Close Date.

- Borrower shall deliver to DIP Agent (to the satisfaction of DIP Agent) environmental reports within sixty (60) days following the DIP Close Date.

**Certain Negative Covenants:**

Usual and customary negative covenants for financings of this kind and subject to customary exceptions for facilities of this type, including, without limitation, the following:

- Limitation on liens

- Limitation on consolidation, merger and/or sale of assets

- Limitation on restricted payments

- Limitation on debt and investments

- Limitation on transactions with affiliates

- Limitation on modifications of certain agreements

For Discussion Purposes Only.

7

- Limitation on certain voluntary payments

- Limitation on superiority claims

- Limitation on change in nature of business

- Limitation on compliance with certain laws

- Limitation on Chapter 11 orders

- Limitation on executory contracts

**Budget:**    The Borrower shall not pay any expenses other than those set forth in the Approved Budget. The Approved Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Borrower expects to incur during each month of the Approved Budget. The Borrower shall be authorized to use the proceeds of the DIP Credit Facility only for payment of such items as are set forth in the Approved Budget and subject to the terms and conditions set forth in the DIP Loan Documentation and the interim DIP order. The Approved Budget shall be revised by the end of each month during the term of this DIP Credit Facility, and which shall remain subject to the consent of the DIP Agent each month. Not later than the second (2nd) business day of each week commencing with the second week of the period covered by the Approved Budget, the Borrower shall provide the DIP Agent with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance (the "Variance Percent") of such actual disbursements and revenues from those reflected in the Approved Budget for that period. Any disbursement by the Borrower other than for budgeted amounts as set forth in the Approved Budget shall constitute an Event of Default under the DIP Loan Documentation and the interim DIP order unless the DIP Agent consents to those changes in writing; provided, however, that the Borrower may make payments in excess of the total budgeted disbursements so long as (i) the Variance Percent of the aggregate of all actual disbursements for each week shall not exceed ten percent (10.0%) of the budgeted disbursements for that week; and (ii) the Variance Percent of the aggregate of all actual disbursements for (a) the first two-week period of the Approved Budget, (b) the first three-week period of the Approved Budget, and (c) any consecutive four-week period shall not exceed ten percent (10.0%) of the aggregate of all budgeted disbursements for such four-week period (subsections (i) and (ii) above are collectively, the "Allowed Disbursement Variance"). For the avoidance of doubt, any amount included in the Approved Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks of the Approved Budget. The

For Discussion Purposes Only.

CHICAGO/#2975904.3D

8

foregoing shall be tested each applicable week pursuant to a variance report delivered by the Borrower to the DIP Agent on Wednesday of each week for the immediately preceding initial two (2) week period, the immediately preceding initial three (3) week period and subsequent four (4) week periods. Such variance report shall reflect on a line-item basis the Borrower's actual performance compared to the Approved Budget for the applicable periods after the DIP Close Date and the percentage variance of the Borrower's actual results from those reflected in the then extant Approved Budget, along with management's explanation of such variance.

**Cash Management:**   Within forty-five (45) days following the DIP Close Date, the Borrower shall (a) establish a new operating deposit account that will receive (x) the proceeds of all borrowings made hereunder and (y) all accounts receivable and other remittances of the Borrower (to the extent not subject to the prior perfected lien of Wanxiang) following the DIP Closing Date and (b) with respect to such new operating deposit account, execute and deliver a deposit account control agreement and/or blocked account agreement (as determined by DIP Agent) that will provide for, at the DIP Agent's option, (i) springing cash dominion following the occurrence of an event of default, and/or (ii) full dominion and automatic daily sweeps into a collection account controlled by the DIP Agent. Collections of cash by DIP Agent and DIP Lender shall be credited to the Borrower's obligations under the DIP Credit Facility as determined by DIP Agent.

**Carve Out:**   The Financing Orders shall contain a "Carve Out" defined as follows: (a) following the occurrence of a Triggering Event (as defined below), (i) allowed fees, and reimbursement for disbursements of professionals retained by the Borrower (the "Borrower's Professional Fee Payments") accrued in accordance with the Approved Budget in an aggregate amount for all the Borrower's Professional Fee Payments not to exceed $75,000 (less the aggregate amount of all unapplied retainers of such professionals as of the petition date); (ii) allowed fees and reimbursements for disbursements of professionals retained by the Statutory Committee (the "Committee's Professional Fee Payments") accrued in accordance with the Approved Budget in an aggregate amount for all of the Committee's Professional Fee Payments not to exceed an amount to be determined upon retention of Committee counsel (collectively, (i) and (ii), the "Carve Out Amount"); (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $10,000 and (b) without reducing the Carve Out Amount, all Borrower's Professional Fee Payments and Committee Professional Fee Payments accrued in accordance with the Approved Budget, and payable under sections 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event (the "Pipeline Period"). For purposes

For Discussion Purposes Only.

9

hereof, the term "Triggering Event" shall mean the date the DIP Agent provides to the Borrower, with a copy to Borrower's counsel at the address set forth in the DIP Loan Documentation, a notice of (i) an Event of Default and (ii) termination of the Pipeline Period for purposes of the Carve Out. For purposes hereof, the term "Triggering Event" shall also mean the Borrower's failure to pay all quarterly fees owed pursuant to 28 U.S.C. § 1930(a)(6) and interest due thereon pursuant to 31 U.S.C. § 3717 (collectively, the "Chapter 11 Quarterly Fees") until such time as a final decree is entered by the Bankruptcy Court or the Bankruptcy Court enters an ordering converting or dismissing the Borrower's cases. The Carve Out shall not be used for any actions adverse in any manner to the DIP Agent or the DIP Lender.

**Expenses and Indemnification:**   The DIP Loan Documentation will provide that Borrower will be responsible for all reasonable costs, fees and expenses of the DIP Agent and the DIP Lender, and will indemnify, the DIP Agent and the DIP Lender and their respective affiliates against any liabilities arising out of the transaction, in each case whether or not any of the transactions close or are consummated. The Borrower's obligations under this paragraph shall survive termination of this Term Sheet.

**Governing Law & Forum:**   State of New York.

The parties acknowledge that this Term Sheet is intended as an outline only, has not been fully negotiated, and does not purport to summarize or contain all the conditions, covenants, representations, warranties and other provisions which would be contained in the definitive legal documentation.

Borrower's obligations described in this Term Sheet in respect of governing law, indemnification and expense reimbursement shall survive the expiration, revocation or termination of this Term Sheet and, in the case of indemnification and expense reimbursement obligations.

THIS TERM SHEET SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PROVISIONS OF SUCH STATE. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS TERM SHEET OR THE PERFORMANCE OF SERVICES HEREUNDER. THIS PARAGRAPH SHALL SURVIVE TERMINATION OF THIS TERM SHEET.

If you wish to accept this Term Sheet, please return executed counterparts of this proposal letter to SQN Asset Servicing on or before 3:00 p.m., Chicago time, on April 17, 2017; otherwise, this Term Sheet shall automatically terminate on such date and time and be of no further force or effect. SQN Asset Servicing's commitment hereunder will expire at such time in the event that we have not received such executed counterparts in accordance with the immediately preceding

CHICAGO/#2975904.3D

10

sentence. In addition, in the event that this Term Sheet is not approved by the Bankruptcy Court on or before April 20, 2017, then this Term Sheet shall automatically terminate.

If you do so execute and deliver to us this Term Sheet, we agree to hold our commitment available for you until the earlier of (i) the date of the final hearing and approval of the Credit Agreement by the Bankruptcy Court and (ii) twenty-fifth (25th) day following the Petition Date (such earlier time, the "*Expiration Date*"). Upon the occurrence of any of the events referred to in the preceding sentence, this Term Sheet and our commitment hereunder shall automatically terminate unless we, in our discretion, agree to an extension in writing. For purposes hereof, the "Petition Date" shall mean the date the Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

SQN Asset Servicing is working to present a financing package that meets your request. We greatly appreciate the opportunity to propose credit facilities that meet your requirements and look forward to discussing this Term Sheet with you.

This Term Sheet may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same agreement.  Delivery of an executed counterpart of a signature page of this Term Sheet by facsimile or electronic transmission shall be effective as a delivery of a manually executed counterpart of this Term Sheet.

Very truly yours,

SQN ASSET SERVICING, LLC

By: _____
Name: _Jeremiah Silkowski_
Title: _President_


Accepted and Agreed to in all respects:

SUNIVA, INC.

By: _____
Name: _CHENG ZHU_
Title: _President_

For Discussion Purposes Only.

## EXHIBIT A

### Approved Budget

(See attached.)

For Discussion Purposes Only.

CHICAGO/#2975904.3D

**Cash Flow Weekly Details - Suniva, Inc.**

| CASH RECEIPTS | 4/17/2017 | 4/24/2017 | 5/1/2017 | 5/8/2017 | 5/15/2017 | 5/22/2017 | 5/29/2017 | 6/5/2017 | 6/12/2017 | 6/19/2017 | 6/26/2017 | 7/3/2017 | 7/10/2017 | 13 Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Receipts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **EXPENDITURES** | | | | | | | | | | | | | | |
| Rent | (173,336) | | (102,326) | | (3,752) | | | (102,326) | | (3,752) | | (102,326) | | (307,578) |
| Utilities | | | (6,200) | | | | | (6,200) | | | | (6,200) | | (180,841) |
| Insurance / Healthcare | (2,000) | (2,000) | (2,000) | (2,000) | | | | | | | | | | (18,600) |
| Other Misc | (14,000) | | (14,000) | | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (26,000) |
| Oracle cost | (200,000) | | | (200,000) | (14,000) | | | (200,000) | (14,000) | | | (200,000) | | (42,000) |
| Legal - 201 Care | (65,000) | (65,000) | (65,000) | (65,000) | | (55,000) | (55,000) | (55,000) | | (27,000) | (27,000) | (27,000) | (27,000) | (800,000) |
| Legal - Bankruptcy | | | (65,000) | (65,000) | (55,000) | | (20,000) | | | | | (20,000) | | (588,000) |
| local counsel fee | | | (45,000) | | | | | | | | | | | (85,000) |
| UST fee | (10,000) | | | | (12,000) | | | | (15,000) | | | | (9,750) | (9,750) |
| claim agent fee | (16,360) | (15,160) | (15,160) | (16,360) | (15,160) | (15,160) | (13,370) | (11,370) | | (10,505) | (8,880) | (10,505) | (8,880) | (47,000) |
| CRO | (20,000) | | | | | | | | | | | | | (157,470) |
| Norcross Shutdown Costs (chemical/shipment) | (215,000) | | | | | | | | | | | | | (20,000) |
| Payroll | | | (100,000) | | (43,000) | | (43,000) | | (43,000) | (43,000) | (43,000) | | (43,000) | (530,000) |
| DOS Cost Reimbursement | | | | | | | | | | | | | | |
| **Total Weekly Expenditures** | (715,696) | (82,160) | (355,686) | (283,360) | (144,912) | (72,160) | (133,370) | (377,096) | (74,000) | (43,257) | (80,880) | (368,231) | (100,630) | (2,812,239) |
| **Total Cash Receipts & Disbursements** | (715,696) | (82,160) | (355,686) | (283,360) | (144,912) | (72,160) | (133,370) | (377,096) | (74,000) | (43,257) | (80,880) | (368,231) | (100,630) | (2,812,239) |

restructure budget 0416 13 weeks 0021FINAL(2).xlsx- Cash Flow by Week - Wells

## Exhibit B

**Debtor in Possession Credit Facility Term Sheet**

DIP Credit Facility
Summary of Indicative Terms and Conditions

TERM SHEET

*SUNIVA, INC.*

April 17, 2017

*Below is a summary of certain basic terms under which the DIP Lender (as defined below)
would be willing to provide to the Borrower (as defined below), as debtor and debtor-in-
possession under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code"), a secured
revolving credit facility totaling up to $4,000,000. This term sheet represents a commitment
subject to the terms and conditions described below:*

| | |
|---|---|
| **Borrower:** | Suniva, Inc., as debtor and debtor-in-possession under the Bankruptcy Code. |
| **DIP Agent:** | SQN Asset Servicing, LLC or an affiliate thereof ("SQN Asset Servicing" and, in such capacity, the "DIP Agent"). |
| **DIP Lender:** | SQN Asset Servicing, LLC (or an affiliate thereof) (the "DIP Lender"). |
| **DIP Credit Facility:** | Secured debtor-in-possession revolving credit facility in the maximum amount of $4,000,000 (the "DIP Credit Facility") (terms and conditions to be determined). |
| **Warrants:** | DIP Agent shall have received, on the DIP Close Date, warrants representing no less than 40% of the outstanding shares of the Borrower (or the reorganized Borrower pursuant to a confirmed plan of reorganization under the Bankruptcy Code) on a fully diluted basis in form and substance reasonably acceptable to DIP Agent and its counsel (the "Warrants"). |
| **Close Date:** | The date on which the initial funding of the DIP Credit Facility occurs (the "DIP Close Date"), which shall be no later than April 18, 2017. |
| **Maturity:** | The earliest of: (a) January 30, 2018, provided, however, that the Borrower will have the right to extend such date to no later than April 30, 2018 by exercising one (1) three-month extension period (the "Extension Period"); or (b) confirmation of the Plan (as defined below) (the "Maturity Date"). For purposes hereof, the "Plan" shall mean a plan of reorganization of the Borrower, the terms and conditions of which are acceptable to the DIP Agent and its counsel. |
| **Availability:** | Amounts under the DIP Credit Facility may be borrowed, repaid and reborrowed from the DIP Close Date until the Maturity Date. The initial borrowing made on the DIP Close Date shall be limited to an amount set forth in the interim DIP order, subject to the limitations set |

For Discussion Purposes Only.

2

forth in the Approved Budget.

**Interest Rate:**    The DIP Credit Facility will bear interest at a rate per annum equal to twelve percent (12%); provided that, upon exercise by the Borrower of the Extension Period, such rate per annum shall increase to thirteen percent (13%). The default rate will be the rate otherwise in effect plus two percent (2%), payable on demand.

**Use of Proceeds:**    The proceeds of the DIP Credit Facility will be used exclusively for working capital of the Borrower and their respective subsidiaries in accordance with the Approved Budget (defined below), in form and substance acceptable to DIP Agent, to be prepared by the Borrower and their financial advisors and furnished to the DIP Agent setting forth the expenditures (which, for the avoidance of doubt, shall include (i) Chapter 11 administration expenses (and related reasonable fees and expenses of Borrower's counsel) and (ii) costs and expenses incurred in connection with the Trade Case (including reasonable fees and expenses of Borrower's counsel)) and revenues of the Borrower during the Chapter 11 Cases of the Borrower as set forth on the budget attached hereto as Exhibit A (the "Approved Budget").

**Fees:**    *Closing Fee*: $100,000, payable to SQN Asset Servicing at closing, which fee shall be deemed earned on the DIP Close Date, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility on the DIP Close Date (in-lieu of being paid in cash on such date).

*Arrangement Fee:* 3% of the maximum principal amount of the DIP Credit Facility, payable to SQN Asset Servicing at closing, which fee shall be deemed earned on the DIP Close Date, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility on the DIP Close Date (in-lieu of being paid in cash on such date).

*Unused Line Fee*: 2.0% payable in kind monthly in arrears on the average daily unused portion of the DIP Credit Facility, which fee shall be deemed earned in accordance with the terms of the DIP Loan Documentation, and accrued and added to the outstanding principal indebtedness under the DIP Credit Facility from time to time in accordance with the terms of the DIP Loan Documentation.

*Plan of Reorganization Success Fees:* If a plan of reorganization is confirmed in respect of the Chapter 11 Cases and SQN Asset Servicing does not provide exit financing to the emerging entities, then a fee in the amount of $100,000 will be payable upon the date of confirmation of such plan. If a plan of reorganization is confirmed in respect of the Chapter 11 Cases and SQN Asset Servicing provides exit financing to the emerging entities, then a fee in the amount of $75,000 will be payable upon the date of confirmation of such plan.

For Discussion Purposes Only.

3

*Section 363 Sale Success Fees:* If all or substantially all of the assets of the Borrower are sold pursuant to Section 363 of the Bankruptcy Code and SQN Asset Servicing does not provide financing to the purchaser to finance such sale, then a fee in the amount of $100,000 will be payable upon the closing date of such sale. If all or substantially all of the assets of the Borrower are sold pursuant to Section 363 of the Bankruptcy Code and SQN Asset Servicing provides financing to the purchaser to finance such sale, then a fee in the amount of $75,000 will be payable upon the closing date of such sale.

*Trade Case Success Fees:* If a successful determination in the Trade Case is made in favor of the Borrower, then a fee in an amount equal to 50% of the increase in the value of the stock and other equity interests of the Borrower resulting from such successful determination of the Trade Case will be payable (in cash or equity) upon the later of (x) the effective date of a Plan and (y) ten (10) days after the final determination of the calculation of such fees by DIP Agent (such later date the "Subject Payment Date"). For the avoidance of doubt, the Trade Case Success Fees shall be (a) measured by the difference between (to the extent a positive number) (i) the value of the stock and other equity interests of the Borrower on the Petition Date (as defined below) and (ii) the value of the stock and other equity interests of the Borrower on the Subject Payment Date and (b) subject to the terms of the final DIP order.

*Exit Fees:* If the obligations in respect of the DIP Credit Facility are paid in full at any time, including, without limitation, on the Maturity Date, then a fee equal to 3% of the maximum principal amount of the DIP Credit Facility will be payable (in cash) contemporaneously with such payoff. For the avoidance of doubt, the Exit Fees shall be subject to the terms of the final DIP order.

**Scheduled Interest and Principal Repayments:** Interest on the DIP Credit Facility shall be paid in kind by capitalizing such interest on the last day of each month. The DIP Credit Facility balances will be due and payable in cash on the Maturity Date.

CHICAGO/#2975904.3D

4

| | |
|---|---|
| **Mandatory Prepayments:** | The DIP Credit Facility will be permanently reduced by proceeds of asset sales, insurance proceeds, extraordinary receipts and new debt and equity issuances in amounts to be determined, and by a percentage to be agreed of annual excess cash flow, subject in each case to customary exceptions to be agreed upon. For the avoidance of doubt, "extraordinary receipts" shall include any and all cash awards and/or proceeds received from the Trade Case. All such cash awards and/or such proceeds received from the Trade Case shall be applied first, to the DIP Credit Facility until paid in full, second to other obligations owing to secured creditors in accordance with priority of law and third, to the Exit Fees due hereunder. |
| **Collateral:** | The DIP Credit Facility will be secured (subject only to (x) the Carve Out described below and (y) certain "Permitted Liens" to be determined by the parties prior to final documentation) pursuant to Section 364(c)(2) and 364(c)(3) of the Bankruptcy Code by a valid perfected security interest in all assets of the Borrower and all proceeds and products of the foregoing. In addition, and for the avoidance of doubt, the DIP Credit Facility will be (i) secured pursuant to Section 364(c)(2) and 364(c)(3) of the Bankruptcy Code by a first priority perfected security interest in any and all claims, defenses, causes of action or rights of the Borrower arising under Sections 542 to 553 of the Bankruptcy Code (other than Section 549 of the Bankruptcy Code) or any proceeds thereof (the "Avoidance Actions") and (ii) such Avoidance Actions shall be accorded super-priority administrative claim priority status under Section 364(c)(1) of the Bankruptcy Code. |
| **Conditions Precedent:** | Customary conditions for financings of this type, including but not limited to (unless otherwise waived by DIP Agent): |

- Execution of all usual and customary credit documentation, including, without limitation, a credit agreement incorporating the terms and conditions set forth in this Term Sheet (the "Credit Agreement"), in each case in form and substance satisfactory to the DIP Agent (collectively, the "DIP Loan Documentation").

- Perfection of all security interests in the collateral (subject to Permitted Liens) as set forth in the interim DIP order.

- The absence of any action, suit, investigation, litigation or proceeding (other than the Chapter 11 Cases) pending or threatened in any court or before any arbitrator or governmental instrumentality that in DIP Agent's judgment (a) could reasonably be expected to have a material adverse effect on the Guarantors', the Borrower's or their subsidiaries' business, results of operations, condition (financial or otherwise), assets or liabilities, or could materially impair the Borrower's ability to perform satisfactorily under the DIP Credit Facility, or (b) could reasonably be expected

CHICAGO/#2975904.3D

5

to materially and adversely affect the DIP Credit Facility.

- Payment of all fees and reasonable expenses imposed hereunder and/or incurred by DIP Agent and the DIP Lender.

- The Borrower shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to DIP Agent and its counsel, and interim financing orders (the "Financing Orders") shall have been entered by the Bankruptcy Court authorizing the secured financing under the DIP Credit Facility on the terms and conditions contemplated by this Term Sheet and, inter alia, (i) modifying the automatic stay, (ii) authorizing and granting the security interests and liens described above, (iii) granting a super-priority administrative expense claim to DIP Agent with respect to all obligations to DIP Agent and DIP Lender, subject to no priority claim or administrative expenses of the Chapter 11 Cases of the Borrower or any other entity, that any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, and (iv) containing a "good faith" finding under Section 364(e) of the Bankruptcy Code. The Financing Orders shall contain such other terms and provisions as DIP Agent and its counsel shall reasonably require.

**Documentation:** The DIP Credit Facility will be subject to the terms and conditions set forth in the DIP Loan Documentation. Such documentation will contain usual and customary provisions for financings of this kind, including, without limitation, conditions (including those described herein), representations and warranties, affirmative and negative covenants (including those described herein), financial reporting covenants, assignment and participation provisions, indemnification, events of default (including, without limitation, those described herein, an event of default if the Trade Case is no longer deemed a viable cause of action (as determined in the reasonable discretion of the DIP Agent) and an event of default if there is a final determination of the Trade Case not in favor of the Borrower) and remedies (including, without limitation, the right to credit bid in a sale under Section 363 of the Bankruptcy Code).

**Certain Affirmative Covenants:** Usual and customary affirmative covenants for financings of this kind, including, without limitation, the following:

- The Borrower shall file an application, in form and substance reasonably acceptable to the DIP Agent, seeking entry of an order of the bankruptcy court approving the retention of a Chief Restructuring Officer during the Chapter 11 case, on terms and conditions acceptable to the DIP Agent.

- A Plan in form and substance acceptable to the DIP Agent must be confirmed by order of the Bankruptcy court on or before November

6

1, 2017.

- Other usual and customary milestones to be agreed.

- Commencing on the second day after the DIP Close Date and the same day of each week thereafter, the Borrower shall deliver to DIP Agent an update on the status of the Trade Case. For purposes hereof, the "Trade Case" shall mean that certain Section 201 trade case seeking government protection for the US solar industry.

- Subject to a joint defense/common interest agreement (to be mutually agreed) as may be necessary or appropriate, the Borrower and its counsel representing it in respect of the Trade Case, shall (a) provide DIP Agent, DIP Lender and its agents, employees and/or officers direct and immediate daily involvement in respect of the Trade Case, including, without limitation, direct access (including by phone) to the Borrower's legal counsel and other third parties engaged in the handling such Trade Case on a daily basis and (b) consult with DIP Agent and its counsel in respect of (ii) any and all strategies related to the Trade Case and (ii) approval of any settlement of any kind related to the Trade Case.

- The DIP Agent shall be named as lender's loss payee (subject to the first priority perfected position of Wanxiang on any Collateral) (property/casualty) and additional insured (liability), and non-renewal/cancellation endorsements shall provide 30 days advance notice to DIP Agent, in each case within thirty (30) days following the DIP Close Date.

- Borrower shall deliver to DIP Agent (to the satisfaction of DIP Agent) environmental reports within sixty (60) days following the DIP Close Date.

| | |
|---|---|
| **Certain Negative Covenants:** | Usual and customary negative covenants for financings of this kind and subject to customary exceptions for facilities of this type, including, without limitation, the following: |

- Limitation on liens

- Limitation on consolidation, merger and/or sale of assets

- Limitation on restricted payments

- Limitation on debt and investments

- Limitation on transactions with affiliates

- Limitation on modifications of certain agreements

For Discussion Purposes Only.

- Limitation on certain voluntary payments

- Limitation on superiority claims

- Limitation on change in nature of business

- Limitation on compliance with certain laws

- Limitation on Chapter 11 orders

- Limitation on executory contracts

**Budget:**   The Borrower shall not pay any expenses other than those set forth in the Approved Budget. The Approved Budget reflects, on a line-item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary and required expenses that the Borrower expects to incur during each month of the Approved Budget. The Borrower shall be authorized to use the proceeds of the DIP Credit Facility only for payment of such items as are set forth in the Approved Budget and subject to the terms and conditions set forth in the DIP Loan Documentation and the interim DIP order. The Approved Budget shall be revised by the end of each month during the term of this DIP Credit Facility, and which shall remain subject to the consent of the DIP Agent each month. Not later than the second (2nd) business day of each week commencing with the second week of the period covered by the Approved Budget, the Borrower shall provide the DIP Agent with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance (the "Variance Percent") of such actual disbursements and revenues from those reflected in the Approved Budget for that period. Any disbursement by the Borrower other than for budgeted amounts as set forth in the Approved Budget shall constitute an Event of Default under the DIP Loan Documentation and the interim DIP order unless the DIP Agent consents to those changes in writing; provided, however, that the Borrower may make payments in excess of the total budgeted disbursements so long as (i) the Variance Percent of the aggregate of all actual disbursements for each week shall not exceed ten percent (10.0%) of the budgeted disbursements for that week; and (ii) the Variance Percent of the aggregate of all actual disbursements for (a) the first two-week period of the Approved Budget, (b) the first three-week period of the Approved Budget, and (c) any consecutive four-week period shall not exceed ten percent (10.0%) of the aggregate of all budgeted disbursements for such four-week period (subsections (i) and (ii) above are collectively, the "Allowed Disbursement Variance"). For the avoidance of doubt, any amount included in the Approved Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks of the Approved Budget. The

CHICAGO/#2975904.3D

8

foregoing shall be tested each applicable week pursuant to a variance report delivered by the Borrower to the DIP Agent on Wednesday of each week for the immediately preceding initial two (2) week period, the immediately preceding initial three (3) week period and subsequent four (4) week periods. Such variance report shall reflect on a line-item basis the Borrower's actual performance compared to the Approved Budget for the applicable periods after the DIP Close Date and the percentage variance of the Borrower's actual results from those reflected in the then extant Approved Budget, along with management's explanation of such variance.

**Cash Management:** Within forty-five (45) days following the DIP Close Date, the Borrower shall (a) establish a new operating deposit account that will receive (x) the proceeds of all borrowings made hereunder and (y) all accounts receivable and other remittances of the Borrower (to the extent not subject to the prior perfected lien of Wanxiang) following the DIP Closing Date and (b) with respect to such new operating deposit account, execute and deliver a deposit account control agreement and/or blocked account agreement (as determined by DIP Agent) that will provide for, at the DIP Agent's option, (i) springing cash dominion following the occurrence of an event of default, and/or (ii) full dominion and automatic daily sweeps into a collection account controlled by the DIP Agent. Collections of cash by DIP Agent and DIP Lender shall be credited to the Borrower's obligations under the DIP Credit Facility as determined by DIP Agent.

**Carve Out:** The Financing Orders shall contain a "Carve Out" defined as follows: (a) following the occurrence of a Triggering Event (as defined below), (i) allowed fees, and reimbursement for disbursements of professionals retained by the Borrower (the "Borrower's Professional Fee Payments") accrued in accordance with the Approved Budget in an aggregate amount for all the Borrower's Professional Fee Payments not to exceed $75,000 (less the aggregate amount of all unapplied retainers of such professionals as of the petition date); (ii) allowed fees and reimbursements for disbursements of professionals retained by the Statutory Committee (the "Committee's Professional Fee Payments") accrued in accordance with the Approved Budget in an aggregate amount for all of the Committee's Professional Fee Payments not to exceed an amount to be determined upon retention of Committee counsel (collectively, (i) and (ii), the "Carve Out Amount"); (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $10,000 and (b) without reducing the Carve Out Amount, all Borrower's Professional Fee Payments and Committee Professional Fee Payments accrued in accordance with the Approved Budget, and payable under sections 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event (the "Pipeline Period"). For purposes

For Discussion Purposes Only.

9

hereof, the term "Triggering Event" shall mean the date the DIP Agent provides to the Borrower, with a copy to Borrower's counsel at the address set forth in the DIP Loan Documentation, a notice of (i) an Event of Default and (ii) termination of the Pipeline Period for purposes of the Carve Out. For purposes hereof, the term "Triggering Event" shall also mean the Borrower's failure to pay all quarterly fees owed pursuant to 28 U.S.C. § 1930(a)(6) and interest due thereon pursuant to 31 U.S.C. § 3717 (collectively, the "Chapter 11 Quarterly Fees") until such time as a final decree is entered by the Bankruptcy Court or the Bankruptcy Court enters an ordering converting or dismissing the Borrower's cases. The Carve Out shall not be used for any actions adverse in any manner to the DIP Agent or the DIP Lender.

**Expenses and Indemnification:** The DIP Loan Documentation will provide that Borrower will be responsible for all reasonable costs, fees and expenses of the DIP Agent and the DIP Lender, and will indemnify, the DIP Agent and the DIP Lender and their respective affiliates against any liabilities arising out of the transaction, in each case whether or not any of the transactions close or are consummated. The Borrower's obligations under this paragraph shall survive termination of this Term Sheet.

**Governing Law & Forum:** State of New York.

The parties acknowledge that this Term Sheet is intended as an outline only, has not been fully negotiated, and does not purport to summarize or contain all the conditions, covenants, representations, warranties and other provisions which would be contained in the definitive legal documentation.

Borrower's obligations described in this Term Sheet in respect of governing law, indemnification and expense reimbursement shall survive the expiration, revocation or termination of this Term Sheet and, in the case of indemnification and expense reimbursement obligations.

THIS TERM SHEET SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PROVISIONS OF SUCH STATE. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS TERM SHEET OR THE PERFORMANCE OF SERVICES HEREUNDER. THIS PARAGRAPH SHALL SURVIVE TERMINATION OF THIS TERM SHEET.

If you wish to accept this Term Sheet, please return executed counterparts of this proposal letter to SQN Asset Servicing on or before 3:00 p.m., Chicago time, on April 17, 2017; otherwise, this Term Sheet shall automatically terminate on such date and time and be of no further force or effect. SQN Asset Servicing's commitment hereunder will expire at such time in the event that we have not received such executed counterparts in accordance with the immediately preceding

10

sentence. In addition, in the event that this Term Sheet is not approved by the Bankruptcy Court on or before April 20, 2017, then this Term Sheet shall automatically terminate.

If you do so execute and deliver to us this Term Sheet, we agree to hold our commitment available for you until the earlier of (i) the date of the final hearing and approval of the Credit Agreement by the Bankruptcy Court and (ii) twenty-fifth (25th) day following the Petition Date (such earlier time, the "**_Expiration Date_**"). Upon the occurrence of any of the events referred to in the preceding sentence, this Term Sheet and our commitment hereunder shall automatically terminate unless we, in our discretion, agree to an extension in writing. For purposes hereof, the "Petition Date" shall mean the date the Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

SQN Asset Servicing is working to present a financing package that meets your request. We greatly appreciate the opportunity to propose credit facilities that meet your requirements and look forward to discussing this Term Sheet with you.

For Discussion Purposes Only.

This Term Sheet may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same agreement.  Delivery of an executed counterpart of a signature page of this Term Sheet by facsimile or electronic transmission shall be effective as a delivery of a manually executed counterpart of this Term Sheet.

Very truly yours,

SQN ASSET SERVICING, LLC

By: _____
Name: _Jeremiah Silkowski_
Title: _President_


Accepted and Agreed to in all respects:

SUNIVA, INC.

By: _____
Name: _CHENG ZHU_
Title: _President_

**EXHIBIT A**

**Approved Budget**

(See attached.)

CHICAGO//#2975904.3D

## Cash Flow Weekly Details - Suniva, Inc.

| | 4/17/2017 | 4/24/2017 | 5/1/2017 | 5/8/2017 | 5/15/2017 | 5/22/2017 | 5/29/2017 | 6/5/2017 | 6/12/2017 | 6/19/2017 | 6/26/2017 | 7/3/2017 | 7/10/2017 | 13 Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | | |
| Total Cash Receipts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | | |
| **EXPENDITURES** | | | | | | | | | | | | | | |
| Rent | | | (102,526) | | | | | (102,526) | | | | (102,526) | | (307,578) |
| Utilities | (173,336) | | | | (3,752) | | | | | (3,752) | | | | (180,841) |
| Insurance / Healthcare | | | (6,200) | | | | | (6,200) | | | | (6,200) | | (18,600) |
| Other Misc | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (26,000) |
| Oracle cost | (14,000) | | | | (14,000) | | | | (14,000) | | | | | (42,000) |
| Legal - 20L Case | (200,000) | | | (200,000) | | | | (200,000) | | | | (200,000) | | (800,000) |
| Legal - Bankruptcy | (65,000) | (65,000) | (65,000) | (65,000) | (55,000) | (55,000) | (55,000) | (55,000) | | (27,000) | (27,000) | (27,000) | (27,000) | (588,000) |
| local counsel fee | | | (45,000) | | | | (20,000) | | | | | (20,000) | | (88,000) |
| UST fee | | | | | | | | | | | | | (9,750) | (9,750) |
| claim agent fee | (10,000) | | | | (12,000) | | | | (15,000) | | | | (10,000) | (47,000) |
| CRO | (16,360) | (15,160) | (15,160) | (16,360) | (15,160) | (15,160) | (13,970) | (11,370) | | (10,555) | (8,880) | (10,555) | (8,880) | (157,470) |
| Noncross Shutdown Costs (chemical/shipment) | (20,000) | | | | | | | | | | | | | (20,000) |
| Payroll | (215,000) | | (100,000) | | (43,000) | | (43,000) | | (43,000) | | (43,000) | | (43,000) | (530,000) |
| OOE Cost Reimbursement | | | | | | | | | | | | | | |
| Total Weekly Expenditures | (715,696) | (82,160) | (335,886) | (283,360) | (144,912) | (72,160) | (133,970) | (377,096) | (74,000) | (43,527) | (80,880) | (368,231) | (100,630) | (2,812,239) |
| Total Cash Receipts & Disbursements | (715,696) | (82,160) | (335,886) | (283,360) | (144,912) | (72,160) | (133,970) | (377,096) | (74,000) | (43,527) | (80,880) | (368,231) | (100,630) | (2,812,239) |

restructure budget 0416 13 weeks (XLSX)FINAL.(3).xlsx- Cash Flow by Week - Weds

## Exhibit C

**Approved Budget**

## Cash Flow Weekly Details - Suniva, Inc.

| | 4/17/2017 | 4/24/2017 | 5/1/2017 | 5/8/2017 | 5/15/2017 | 5/22/2017 | 5/29/2017 | 6/5/2017 | 6/12/2017 | 6/19/2017 | 6/26/2017 | 7/3/2017 | 7/10/2017 | 13 Week Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | | |
| Total Cash Receipts | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | | |
| **EXPENDITURES** | | | | | | | | | | | | | | |
| Rent | | | (102,526) | | | | | (102,526) | | | | (102,526) | | (307,578) |
| Utilities | (173,336) | | | | (3,752) | | | | | (3,752) | | | | (180,841) |
| Insurance / Healthcare | | | (6,200) | | | | | (6,200) | | | | (6,200) | | (18,600) |
| Other Misc | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (26,000) |
| Oracle cost | (14,000) | | | | (14,000) | | | | (14,000) | | | | | (42,000) |
| Legal - 201 Cost | (200,000) | | | (200,000) | | | | (200,000) | | | | (200,000) | | (800,000) |
| Legal - Bankruptcy | (65,000) | (65,000) | (65,000) | (65,000) | (55,000) | (55,000) | (55,000) | (55,000) | | (27,000) | (27,000) | (27,000) | (27,000) | (588,000) |
| local counsel fee | | | (45,000) | | | | (20,000) | | | | | (20,000) | | (85,000) |
| UST fee | | | | | | | | | | | | | (9,750) | (9,750) |
| claim agent fee | (10,000) | | | | (12,000) | | | | (15,000) | | | | (10,000) | (47,000) |
| CRO | (16,360) | (15,160) | (15,160) | (16,360) | (15,160) | (15,160) | (13,970) | (11,370) | | (10,505) | (8,880) | (10,505) | (8,880) | (157,470) |
| Norcross Shutdown Costs  (chemical/shipment) | (20,000) | | | | | | | | | | | | | (20,000) |
| Payroll | (215,000) | | (100,000) | | (43,000) | | (43,000) | | (43,000) | | (43,000) | | (43,000) | (530,000) |
| DOE Cost Reimbursement | | | | | | | | | | | | | | - |
| **Total Weekly Expenditures** | (715,696) | (82,160) | (335,886) | (283,360) | (144,912) | (72,160) | (133,970) | (377,096) | (74,000) | (43,257) | (80,880) | (368,231) | (100,630) | (2,812,239) |
| | | | | | | | | | | | | | | |
| **Total Cash Receipts & Disbursements** | (715,696) | (82,160) | (335,886) | (283,360) | (144,912) | (72,160) | (133,970) | (377,096) | (74,000) | (43,257) | (80,880) | (368,231) | (100,630) | (2,812,239) |