**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNIVA, INC., [1] | ) | Case No. 17-10837 (KG) |
| Debtor. | ) |  |
|  | ) |  |

**DECLARATION OF DAVID M. BAKER IN SUPPORT OF FIRST DAY MOTIONS**

I, David M. Baker, being duly sworn, state the following under penalty of perjury:

1.      I am Managing Partner of Aurora Management Partners, Inc. ("Aurora").  I have more than 20 years of experience advising boards of directors and senior management of troubled companies and creditor constituencies in both operational and financing restructurings. I have also assisted in managing and administering companies during the chapter 11 process, including in this Court.  See In re Malibu Lighting Corporation, et al., No. 15-12080 (KG) (Bankr. D. Del. 2015) (a case in which I serve as the debtors' Chief Restructuring Officer).

2.      I serve as the Chief Restructuring Officer ("CRO") of Suniva, Inc. ("Suniva"), the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (this "Chapter 11 Case").[2]  Suniva retained me as CRO on April 13, 2017.  In my capacity as CRO, I am generally familiar with Suniva's day-to-day operations, business affairs and books and records.

3.      On April 17, 2017 (the "Petition Date"), the Debtor filed a voluntary petition with this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]      The last four digits of the Debtor's federal tax identification number is 2418.  The Debtor's corporate headquarters is located at 5765 Peachtree Industrial Blvd, Norcross, Georgia 30092.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

IMPAC 5089874v.1

4.      To enable the Debtor to minimize the adverse effects of the commencement of the Chapter 11 Case on its business operations, the Debtor has requested various types of relief in certain first day motions (each a "First Day Motion" and, collectively, the "First Day Motions"). The First Day Motions seek relief aimed to, among other goals, (a) ensure the continuation of Suniva's cash management procedures and other business operations; (b) honor certain prepetition employee wage and benefit obligations; (c) authorize the Debtor to incur postpetition debt on an emergency basis; and (d) authorize the retention of a claims and noticing agent as required by this Court's local rules.  The achievement of these goals will be critical to the success of this Chapter 11 Case and the Debtor's reorganization efforts.

5.      I submit this declaration (the "Declaration") in support of the First Day Motions. I am familiar with the contents of each First Day Motion (including the exhibits attached thereto) and believe that the relief sought (i) is necessary to preserve the present value of the Debtor's assets and to allow the Debtor to pursue a petition under section 201 of the Trade Act of 1974, 19 U.S.C. § 2251, with the United States International Trade Commission (the "USITC"), which, if successful, will greatly increase the value of the Debtor's assets and business, (ii) is integral to the successful reorganization of the Debtor, and (iii) serves the best interests of the Debtor's estate, its creditors and other parties in interest.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, materials provided by members of the Debtor's management team, information provided by Aurora personnel and professionals retained by the Debtor, or information obtained from my review of relevant documents.  Additionally, the opinions asserted in this Declaration are based upon my experience and knowledge of the Debtor's operations,

2

financial condition and liquidity.  If called upon to testify, I would competently testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtor.

7.      Part I of this Declaration provides a brief overview of Suniva's operations and the circumstances leading to the commencement of this Chapter 11 Case.  Part II sets forth the relevant facts in support of each of the First Day Motions.

## PART I

### A.      Overview of Suniva's Business Operations

8.      Suniva was founded in 2007 by Dr. Ajeet Rohatgi, one of the world's leading research scientists in photovoltaic ("PV") technology and founding director of the Georgia Institute of Technology's University Center of Excellence for Photovoltaic Research and Education, one of the world's leading PV research institutes.  Until recently, Dr. Rohatgi served as Suniva's Chief Technology Officer.

9.      Suniva is one of the two largest United States manufacturers (and the largest United States-based manufacturer) of PV solar cells.  Suniva has manufacturing facilities at its metro-Atlanta, Georgia headquarters as well as in Saginaw, Michigan.[3]

10.     Suniva is known worldwide for its high-quality solar panels, patented manufacturing technology, and long-term reliable performance.  Suniva has been recognized with numerous distinctions, including being named as 2016 Georgia Manufacturer of the Year by the Governor of Georgia, 2010 Renewable Energy Exporter of the Year by the Export-Import Bank of the United States, and a member of The Wall Street Journal's List of Top Venture-Backed Clean-Tech Companies in 2010.  Suniva's ground-breaking technologies for PV

---

[3] The Debtor has a wholly-owned, non-debtor subsidiary Suniva-Hong Kong Limited ("SHKL") which is organized under the laws of Hong Kong. SHKL was the sole owner of non-debtor Suniva Jinzhow Solar Limited ("SJSL") which was organized under the laws of China.  As of the Petition Date, SJSL had been dissolved, and the Debtor was in the process of having SHKL dissolved.  Neither SHKL, nor SJSL are currently operating or have any assets.

IMPAC 5089874v.1

manufacturing, such as Ion Implantation, have resulted in cell and module efficiencies reaching 21% and 18%, while lowering costs to levels that historically allowed it to compete with rival manufacturers located anywhere in the world.  Suniva's products are used in applications that serve a wide range of market segments from residential, commercial, and government, to micro-utility.

11.    On October 15, 2015, the Debtor entered into a merger agreement with Shungfeng International Clean Energy Ltd. ("SFCE"), a company organized under the laws of the Cayman Islands.  Pursuant to this transaction, SFCE provided SFCE common stock in exchange for an equity stake of approximately 64% of Suniva.  The remaining 36% stake in Suniva is owned by certain of Suniva's pre-merger investors who were issued Class A common stock in exchange for shares in the pre-merger Suniva.  Additionally, as part of the merger, shareholders contributed $20 million to Suniva, including $12 million from SFCE, between October 15, 2015 and January 2016.

12.    With funding from SFCE and additional credit described below, Suniva embarked on a significant expansion plan.  On December 15, 2016, Suniva announced the completion of a nearly $100 million expansion of its facilities at its Georgia headquarters that tripled its manufacturing capacity to 450 megawatts, with further plans to expand capacity to 700 megawatts by mid-2017.  However, market factors caught up with Suniva, halting further growth and forcing a cessation of substantially all of Suniva's manufacturing operations.

B.    **Circumstances Leading to Suniva's Need for Restructuring**

13.    For many years, Chinese manufacturers of solar cells have benefited from favorable, state-sponsored financing and lower labor costs, allowing them to flood the United States market for solar cells and modules with cheap imports.  This has negatively impacted manufacturers based in the United States, such as Suniva.  In 2012, the United States Department

4

of Commerce began to impose tariffs on imports of solar cells from China with many Chinese

solar manufacturing companies being subject to tariffs of approximately 30%.[4]  Notwithstanding

these protections, solar cell manufacturers in the United States continue to face steep price

competition from China, as well as non-China-based overseas manufacturers not subject to

United States tariffs, particularly from countries in southeast Asia, including from Chinese

manufacturers that have moved production from mainland China to southeast Asia and elsewhere

to avoid the United States tariffs.  As a result, these tariffs have not been effective in preventing

dumping of Chinese solar products into the United States.   These pressures have been

exacerbated by a recent drop in demand in the Chinese market resulting from the Chinese

government announcing, in 2016, that it was lowering subsidies for solar energy purchases.  This

has resulted in a production glut, further driving down global prices.   Unfortunately, this

downturn in solar cell prices coincided with Suniva's expansion and incurrence of significant

additional debt (described below).

14.     As a result of these market pressures, Suniva has continued to experience

significant losses.  In 2015, the last year for which Suniva's audited financial statements are

available, Suniva experienced an operating loss of $18,221,298 on revenues of $77,312,664.

Suniva's net loss in 2015 was $21,364,190.   In 2016, Suniva experienced a net loss of

$29,247,097 and in 2017, Suniva had experienced a net loss of $5,660,842 through February.

**C.     Suniva's Prepetition Indebtedness**

15.     Suniva is a party to a certain Credit and Security Agreement with Wells Fargo

Bank, National Association ("WF") dated May 25, 2012, and as amended, by which WF had

extended a revolving line of credit to Suniva (the "WF Credit Facility") secured by first liens on

---

[4] I understand that this was part of the motivation for SFCE acquiring a majority stake in Suniva – allowing it tariff-free access to the U.S. solar market.

IMPAC 5089874v.1

substantially all of Suniva's assets except most equipment as discussed below.  Suniva used the WF Credit Facility to meet its day-to-day working capital needs.  The WF Credit Agreement was supported by a Standby Credit Support and Security Agreement dated November 22, 2013, by which Wanxiang America Corporation ("Wanxiang") provided a $15,000,000 standby letter of credit in favor of WF (the "WX LOC").  Wanxiang was also granted a security interest in all of Suniva's assets and such lien was expressly subordinated to WF's liens pursuant to a certain Subordination Agreement, dated November 22, 2013.

16.     Primarily in connection with the expansion of Suniva's Georgia facility, Suniva incurred additional indebtedness to SQN Asset Servicing, LLC ("SAS") and certain affiliates thereof pursuant to (1) that certain Equipment Loan and Security Agreement, dated as of April 24, 2015 (the "April SQN Facility"), by and between Suniva and SQN Venture Partners, LLC ("SQN Venture") and (2) that certain Credit Agreement, dated as of November 17, 2015 (the "November SQN Facility"), by and among Suniva, SAS, and the lenders party thereto (the "November SQN Lenders" and together with SQN Venture and SAS, collectively, the "SQN Lenders" and whichever of the foregoing may be relevant as context requires "SQN").[5]  Suniva's obligations under the April SQN Facility are secured by a lien in certain equipment together with any proceeds thereof.  Suniva's obligations under the November SQN Facility are secured by a lien in substantially all of the Debtor's assets.  Pursuant to a certain Parent Guaranty dated November 17, 2015 made by SFCE in favor of SAS and the November SQN Lenders, SFCE guaranteed a portion of the November SQN Facility in an amount currently equal to 63% of the principal amount borrowed by Suniva, plus certain costs and expenses.  As of March 20, 2017,

---

[5] Jim Modak currently serves as Chief Financial Officer of SQN Capital Management, LLC ("SQN Capital"), an affiliate of SQN.  Mr. Modak served as Chief Financial Officer of Suniva from January 2008 until March 18, 2016.  After such time, Mr. Modak worked under contract with Suniva to help Suniva raise additional capital.  Suniva terminated its contract with Mr. Modak after approximately six months.  Except in his capacity as an officer of SQN Capital, Mr. Modak no longer has any relationship with Suniva.

IMPAC 5089874v.1

the principal amount outstanding under the April SQN Facility was approximately $1,825,100, and the principal amount outstanding under the November SQN Facility was approximately $49,100,000.

17.     Pursuant to the terms and conditions of that certain letter agreement, dated as of April 24, 2015, by and between SQN and WF, (i) WF expressly subordinated its liens in certain equipment and related proceeds (the "April SQN Priority Collateral") to the liens of SQN under the April SQN Facility and (ii) SQN confirmed to WF that it had no liens under the April SQN Facility in any of Suniva's assets other than the April SQN Priority Collateral.

18.     Pursuant to the terms and conditions of that certain letter agreement, dated as of April 24, 2015, by and between SQN and Wanxiang, (i) WX expressly subordinated its liens in the April SQN Priority Collateral to the liens of SQN under the April SQN Facility and (ii) SQN confirmed to WX that it had no liens under the April SQN Facility in any of Suniva's assets other than the April SQN Priority Collateral.

19.     Pursuant to the terms and conditions of that certain letter agreement, dated as of November 17, 2015, by and between SQN and WF, (i) WF expressly subordinated its liens in certain equipment, certain deposit and securities accounts and the funds on deposit thereon, and all intellectual property of Suniva and the proceeds of all of the foregoing (the "November SQN Priority Collateral") to the liens of SQN under the November SQN Facility and (ii) SQN expressly subordinated its liens under the November SQN Facility in all of the assets of Suniva other than the November SQN Priority Collateral to the liens of WF.

20.     Pursuant to the terms and conditions of that certain letter agreement, dated as of November 17, 2015, by and between SQN and Wanxiang, (i) Wanxiang expressly subordinated its liens in the November SQN Priority Collateral to the liens of SQN under the November SQN

IMPAC 5089874v.1

Facility and (ii) SQN expressly subordinated its liens under the November SQN Facility in all of the assets of Suniva other than the November SQN Priority Collateral to the liens of Wanxiang.

21.     On March 15, 2017, WF, in connection with an acceleration under the WF Credit Facility, (i) drew on the WX LOC in the full $15,000,000, (ii) terminated Suniva's right to further advances under the WF Credit Facility, (iii) declared any outstanding amounts under the WF Credit Facility due and payable, and (iv) applied the proceeds from the WX LOC to WF's then outstanding balance which WF determined to be $13,321,203.31 and outstanding letters of credit of $945,383.00.  Subsequently, Wanxiang provided notice that it was succeeding to WF's rights under the WF Credit Agreement and that Suniva's inventory and proceeds of Suniva's accounts receivable should be turned over to Wanxiang.  WF asserted that, after application of fees and reserves, its draw on the WX LOC may have only exceeded the amounts owed under the WF Credit Facility by $372,238.42.   WF has continued to collect proceeds of Suniva's accounts receivable, and as of March 30, 2017, WF had collected at least $757,603.39.  On March 23, 2017, Suniva provided notice to WF that Suniva was entitled to possession of the proceeds of Suniva's accounts receivable.  As a result, these funds have not been released by WF.

22.     In summary, Wanxiang now has a first priority security interest in substantially all of Suniva's assets, but not including the April SQN Priority Collateral and the November SQN Priority Collateral, in which Wanxiang's security interests are subordinate to those of SQN. SQN's debt under the April SQN Facility is secured solely by a first-priority security interest in the April SQN Priority Collateral.  SQN's debt under the November SQN Facility is secured by a first-priority security interest in the November SQN Priority Collateral and a second-priority security interest in Suniva's other assets.

23.     In addition to prepetition secured indebtedness, parties have asserted that Suniva owes various other prepetition amounts, including approximately $36.2 million to trade creditors, approximately $342,000 related to uncollected California sales tax, and approximately $25,000 in personal property tax in Michigan.[6]  Suniva has received various tax credits and incentives related to its manufacturing operations.  It is possible that certain governmental entities may assert claims related to these credits and incentives.  Furthermore, as described below, Suniva is a defendant in two lawsuits brought under the Worker Adjustment and Retraining Notification Act of 1988 29 U.S.C. §§ 2101-2109 et seq. ("WARN Act").

**D.      Cessation of Production and Workforce Reduction**

24.     As a result of its ongoing liquidity issues, Suniva was unable to continue manufacturing operations.  Similarly, sales operations were significantly curtailed.  On March 29, 2017, Suniva terminated 191 out of 265 employees, including substantially all of Suniva's Michigan-based employees.  Subsequently, Suniva has reduced its staff further, so that as of the Petition Date, it had 35 employees.

25.     Suniva's Georgia facility contains numerous hazardous chemicals and gasses that are used in the solar cell production process as well as research and development.  These chemicals must be removed from the facility before operation of the facility can be shut down.  Some of these chemicals, such as silane and trimethylaluminium (which are pyrophorics), present particular hazards that require special training.  Suniva is providing around the clock staffing of the Georgia facility by trained employees until these hazardous chemicals are removed.  It is anticipated that the removal of the hazardous chemicals will be substantially complete by the end of this week, and Suniva's workforce then will be reduced to approximately

---

[6] The California sales taxes were never collected by Suniva because, at the times of the sales, it was believed that the purchasers were exempt from sales tax.

IMPAC 5089874v.1

11 employees.  Suniva intends to maintain a sufficient number of employees during this Chapter 11 Case to ensure that Suniva's equipment is maintained and to ensure that Suniva can properly prosecute this Chapter 11 case and the Section 201 petition (as described herein).

26.    On March 31, 2017, one of Suniva's former employees filed a complaint against Suniva in the United States District Court for the Northern District of Georgia on behalf of himself and similarly situated former employees, alleging that Suniva had violated the WARN Act, by failing to provide 60 days' advance written notice of the employees' termination on March 29, 2017.  On April 6, 2017, a different former Suniva employee filed a complaint against Suniva in the United States District Court for the Eastern District of Michigan on behalf of herself and similarly situated former employees, alleging a violation of the WARN Act arising out of the same March 29, 2017, termination of employees.

**E.    Section 201 Petition and Reorganization Efforts**

27.    Suniva has been unable to raise new equity or find a new source of working capital.  Additionally, Wanxiang directed Suniva to stop selling inventory, turn over any remaining inventory, and directed WF to freeze the account in which Suniva's collections were deposited.  As a result, Suniva currently has no access to cash.  Therefore, Suniva cannot meet its payroll obligations, even at its significantly reduced staff levels, and, absent funding from one of its current lenders or SFCE, would have to file for chapter 7 bankruptcy protection.  After considerable discussions over the past few weeks, Wanxiang and SFCE each notified Suniva that they were unwilling to provide additional financing or capital to Suniva.  Furthermore, Suniva's management determined that it could not obtain additional financing from other lenders.  However, after significant negotiations, SQN agreed to provide postpetition financing to be used in this Chapter 11 Case on certain conditions described below.  To assist Suniva with the chapter

IMPAC 5089874v.1

11 bankruptcy process, on April 14, 2017, Suniva retained Aurora and Suniva's board of directors appointed me as CRO.

28.     One of the conditions to SQN's post-petition financing is that Suniva prosecute a petition under section 201 of the Trade Act of 1974, 19 U.S.C. § 2251 ("Section 201").[7] Whereas Chinese and Taiwanese manufactured solar cells are subject to U.S. tariffs, solar cells manufactured elsewhere are not.  It is solar cells manufactured in southeast Asia and included in solar modules or panels that are flooding the United States market, driving down prices. Domestic industries seriously injured or threatened with serious injury by increased imports may petition the USITC under Section 201 for import relief.  After being petitioned, the USITC determines whether an article is being imported in such increased quantities that it is a substantial cause of serious injury, or threat thereof, to the U.S. industry producing an article like or directly competitive with the imported article.  If the Commission makes an affirmative determination, it recommends to the President of the United States relief that would prevent or remedy injury and facilitate industry adjustment to import competition.  The President makes the final decision whether to provide relief and the amount of relief.  The USITC must generally make its finding within 120 days of receipt of a Section 201 petition and must transmit its report to the President, together with any relief recommendations, within 180 days after receipt of the petition.  If the USITC finding is affirmative, it must recommend a remedy to the President, who determines what relief, if any, will be imposed.  Such relief may be in the form of a tariff increase, quantitative restrictions, or orderly marketing agreements.  Importantly, such relief, if found applicable to U.S. solar cell manufacturers, could protect U.S.-based manufacturers against imports of solar cells manufactured in southeast Asia as well as Japan, Germany, South

---

[7] Suniva will be filing an application to retain Mayer Brown LLP as special counsel under section 327(e) of the Bankruptcy Code.  The firm has been representing Suniva prepetition on Section 201 issues.

Korea, and Canada.   Therefore, if a Section 201 petition is successful, it could resuscitate Suniva's business, allow Suniva to compete with the lower cost imports currently flooding the U.S. market, and dramatically increase the value of Suniva's substantial equipment and enterprise.

## PART II

29.     Concurrently with the filing of this Chapter 11 Case, Suniva has filed several First Day Motions, consisting of an administrative motion and motions relating to Suniva's business operations.  Suniva believes that approval of each First Day Motion is an important element of its reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to its remaining operations and reorganization strategy.  I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to Suniva's ability to achieve a successful reorganization.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.

A.      *Debtor's Motion For Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Operate Its Cash Management System, (B) Honor Certain Prepetition Obligation Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief* (**the "Cash Management Motion"**)

30.     By the Cash Management Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to (a) continue to operate its cash management system (the "Cash Management System") and maintain its bank accounts identified in Exhibit 1 of the proposed interim order approving the Cash Management Motion (the "Bank Accounts") (ii) honor certain prepetition obligations related thereto, (iii) maintain existing business forms (the "Business Forms"), and (iv) granting related relief.  The Debtor intends to open new compliant bank accounts within the next three weeks but needs the Bank Accounts until then.

31.     The continued use of the Cash Management System and the Bank Accounts until new bank accounts are opened is essential to the Debtor's remaining business operations. The Debtor believes that, for now, the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtor's current needs. To require the Debtor to close immediately the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtor's estate. Moreover, permitting the Debtor to continue using its existing Bank Accounts for the time being is essential to a smooth and orderly transition of the Debtor into chapter 11 and to avoid disruption of its remaining operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

32.     The Cash Management System is a practical mechanism that allows the Debtor to transfer its revenues to the payment of its obligations that decreases the burdens on the Debtor, and that provides several important benefits, including the ability to: (i) control and monitor corporate funds; (ii) ensure cash availability; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Moreover, the current continued operation of the Cash Management System is crucial to the Debtor's ability to pay its employees.

**B.**     ***Debtor's Motion for Interim and Final Orders (I) Authorizing, but not Directing the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*** (the "<u>Wages Motion</u>")

33.     By the Wages Motion and as described in greater detail therein, the Debtor seeks, among other things, authority (i) to pay, remit, or reimburse as applicable, in its sole discretion not more than:  (a) $203,000 on account of prepetition Employee Compensation; (b) $20,000 on account of prepetition Withholding Obligations; (c) $2,500 on account of prepetition

13

Reimbursable Expenses; and (d) $5,000 on account of the prepetition Employee Benefits Programs, and (ii) to continue employee benefit programs.[8]

34.     The Debtor will need to fund payroll on Thursday, April 20, 2017 for the period covering April 1, 2017 through April 14, 2017.  During this period, in addition to attempting to seek funding to save the Debtor's business, among other things, the Debtor's employees continued to sell inventory (with Wanxiang's consent) as well as remove hazardous chemicals from the Debtor's Georgia facility.  As of April 1, 2017, the Debtor had approximately 60 employees.[9]  As noted above, as of the Petition Date, the Debtor employs 35 employees (the "Employees").  The Employees include personnel who are intimately familiar with the Debtor's businesses, processes, and systems, and who cannot be easily replaced.  Many of the Employees are integral to the safety and security of the Debtor's plants and the valuable equipment therein, including the disposal of hazardous waste.  Additionally, certain of the Employees are and will be critical to the prosecution of the Section 201 petition.  Without the uninterrupted services of the Employees, the ability of the Debtor to maximize creditor recoveries and the general administration of the Debtor's estate will be materially impaired.

35.     The Debtor is not seeking to pay, pursuant to the Wages Motion, any Employee or Former Employee more than the $12,850 priority cap imposed by section 507(a)(4) or 507(a)(5). The DIP Lender (as defined below) has indicated its willingness to fund the amounts for which approval is sought in the Wages Motion.  As a result, I believe the Court should grant the relief sought in the Wages Motion.

---

[8] The defined terms used in this sentence and not otherwise defined in this Declaration shall have the meanings set forth in the Wage Motion.

[9] The approximately 25 employees that had been employed as of April 1, 2017, and that were terminated prior to the Petition Date are referred to herein as the "Former Employees."

**C.**     ***Debtor's Motion for Interim and Final Orders Authorizing the Debtor to (A) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (B) Provide Security and Other Related Relief* (the "<u>DIP Financing Motion</u>")**

36.     Pursuant to the DIP Financing Motion, the Debtor requests approval of and authority to enter into a secured, superpriority postpetition revolving loan facility of up to $4 million (the "<u>DIP Facility</u>") with SQN Asset Finance Income Fund Limited (the "<u>DIP Lender</u>"). The DIP Facility represents an interim solution to the Debtor's liquidity needs, including meeting its payroll, rent, and other obligations associated with the Chapter 11 Case.  Additionally, it allows the Debtor to preserve its assets while prosecuting a Section 201 petition which, if successful, could resuscitate the Debtor's business and dramatically increase the value of the Debtor's substantial equipment.  The Debtor and its advisors have determined that the DIP Facility is the Debtor's best postpetition financing option available.  The Debtor requests access to interim funding in the amount of $1,417,102 upon entry of the interim order and $4 million upon entry of the final order approving the DIP Facility (together the "<u>DIP Orders</u>").  Based on my experience, I believe the DIP Facility should be approved.

37.     The Debtor and its advisors determined that, in light of the Debtor's prepetition capital structure and existing liens on substantially all of the Debtor's assets, in order to obtain the necessary liquidity to administer the Chapter 11 Case and prosecute the Section 201 petition, the Debtor would either have to (a) find a postpetition lender willing to extend credit that would be junior to the liens of SQN and Wanxiang or be unsecured or (b) obtain postpetition financing secured by liens that would prime the liens of SQN and Wanxiang.  It was clear to the Debtor that no lenders would be willing to extend junior or unsecured credit.  Similarly, it was clear to the Debtor that adequate protection could not be provided to SQN and Wanxiang so that a priming lien was not an option.  Furthermore, after several weeks of negotiations with SQN, Wanxiang, and SFCE, SFCE and Wanxiang each informed the Debtor that each was unwilling to

15

fund the Chapter 11 Case.  Only SQN was willing to lend on a postpetition basis to the Debtor. The Debtor and its advisors then engaged in further, rigorous negotiations with SQN and its advisors to obtain the best financing terms available.  The negotiations were conducted at arm's length and may be characterized as "hard bargaining" by all interested parties.  Late into the evening before the Petition Date, key terms of the DIP Facility were still being negotiated.

38.     Based upon my experience, third-parties would be unwilling to provide unsecured or junior secured credit and would be unwilling to enter into a priming fight with the Debtor's existing secured lenders who would not consent to priming.  Therefore, I believe the DIP Facility is, overall, the only realistic financing available to the Debtor under the circumstances.  Absent this financing being made available, the Debtor would be forced to immediately file for relief under Chapter 7 of the Bankruptcy Code.  I believe the terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estate and that entry into the DIP Credit Agreement represents a sound exercise of the Debtor's business judgment.  I believe the DIP Facility is absolutely critical to the Debtor's ability to administer its Chapter 11 Case and prosecute the Section 201 petition, and that the Court should approve the relief requested in the DIP Motion.

> **D.** *Application for an Order Appointing Garden City Group, LLC as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 2002-1(f) Nunc Pro Tunc to the Petition Date* (**the "Claims and Noticing Agent Application"**)

39.     In the Claims and Noticing Agent Application, the Debtor seeks to retain Garden City Group, LLC ("GCG") as its claims and noticing agent in this Chapter 11 Case.  I believe that by retaining GCG in this Chapter 11 Case, the Debtor's estate and its creditors will benefit from GCG's service.  I understand that for more than three decades GCG has provided claims and noticing services in numerous chapter 11 cases in this District.  Consequently, I understand

16

that GCG has developed efficient and cost-effective methods in its area of expertise.  I also understand that GCG is equipped to handle the necessary mailings involved in properly sending the required notices to creditors and other interested parties in this Chapter 11 Case and, therefore, I believe that the Claims and Noticing Agent Application should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Dated:  April 17, 2017                                    SUNIVA, INC.


                                                          */s/ David M. Baker*
                                                          Name:  David M. Baker
                                                          Title:  Chief Restructuring Officer

17

IMPAC 5089874v.1