# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**SUNIVA, INC.,**<br><br>                Debtor. | Chapter 11<br><br>Case No. 17-10837 (KG)<br><br>**Hearing Date: June 12, 2018 at 2:00 p.m.**<br>**Objection Deadline: June 5, 2018 at 4:00 p.m.** |

## MOTION OF VERITIV CORPORATION TO COMPEL DEBTOR TO REJECT ITS EXECUTORY CONTRACTS WITH VERITIV CORPORATION

Veritiv Corporation ("Veritiv"), by and through its undersigned counsel, hereby moves the Court for entry of an order compelling the Debtor, Suniva, Inc. ("Suniva," or the "Debtor"), to reject its executory contracts with Veritiv (the "Motion"). In support of its Motion, Veritiv respectfully represents as follows:

### PRELIMINARY STATEMENT

1. Prior to the commencement of this chapter 11 case, the Debtor and Veritiv entered into eight (8) separate warehousing agreements, pursuant to which Veritiv agreed to store certain of Suniva's inventory in eight (8) of Veritiv's warehousing facilities across the United States (the "Warehousing Agreements"). In exchange for the use of Veritiv's warehousing facilities, Suniva agreed to make periodic payments of fees and expenses incurred in the handling, storage, and delivery of the warehoused inventory. An example of these Warehousing Agreements is attached hereto as **Exhibit A**.

2. Since the Petition Date, Veritiv has performed, and is continuing to perform, all of its obligations under the Warehousing Agreements. The Debtor's inventory is still being stored at Veritiv's warehousing facilities, and Veritiv continues to provide the Debtor with invoices documenting such storage and providing the amount of fees owed therefor. Despite all this,

however, the Debtor has failed to make even a single payment for any of the postpetition warehousing services Veritiv has provided to it, notwithstanding numerous requests for payment that have been communicated to the Debtor and its counsel.  Further, the Debtor has not retrieved its inventory from Veritiv's warehousing facilities and there is no indication the Debtor has attempted to make alternative warehousing arrangements, despite repeated requests by Veritiv to do so.

3. The Debtor's actions, or rather inaction, have placed a strain on Veritiv.  Not only has Veritiv remained entirely uncompensated for its warehousing of the Debtor's inventory since the Petition Date, Veritiv has had to undertake additional expenses to transport and temporarily store such inventory in order to maintain Veritiv's ordinary business operations.

4. Over a year has passed since the Debtor commenced this chapter 11 case.  The Debtor has had more than a reasonable amount of time to determine whether to assume or reject the Warehousing Agreements, and is not currently making any postpettion payments under the Warehousing Agreements.  Accordingly, Veritiv respectfully requests the Court to compel the Debtor to reject the Warehousing Agreements with Veritiv.  In addition, Veritiv requests that this Court enter an order requiring the Debtor to immediately remove all of the Debtor's inventory from Veritiv's warehousing facilities upon resolution of any possessory liens with respect to the inventory and payment of past due amounts due to Veritiv.[1]

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28

---

[1] Veritiv understands that prior to the Petition Date, the Debtor granted certain lenders security interests in and liens upon the inventory that is stored in Veritiv's warehousing facilities.

U.S.C. § 157(b)(2), and Veritiv confirms its consent, pursuant Local Rule 9013-1(f), to the entry of a final order or judgment by the Court solely in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested in this Motion are sections 365(d)(2) and 503(b)(1)(A) of the Bankruptcy Code.

## BACKGROUND

8.      Veritiv owns and operates a number of warehousing facilities across the United States.

9.      In the ordinary course of its business, between December 7, 2009 and January 6, 2017, Veritiv and/or its predecessors in interest entered into eight (8) separate Warehousing Agreements with Suniva to store certain of Suniva's solar panels in Veritiv's warehousing facilities.  As consideration for Veritiv's promise to store the specified inventory, Suniva agreed to pay certain storage, handling, and labor fees to Veritiv.

10.     Currently, Veritiv is storing approximately 1,252 pallets of Suniva's solar panels across eight of its warehousing facilities.

11.     On April 17, 2017 (the "Petition Date"), Suniva filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued to operate its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     Since the Petition Date, Veritiv has continued to store the Debtor's inventory and send invoices to the Debtor in the ordinary course and as required under the Warehousing Agreements.

13.   The Debtor has failed to pay for any of the postpetition services provided by Veritiv.

14.   Since the Petition Date, Veritiv has requested on numerous occasions that the Debtor promptly pay Veritiv for its postpetition costs and look for alternative warehousing arrangements.  To date, the Debtor has neither paid Veritiv for its outstanding balance nor given any indication that it has even attempted to secure such alternative warehousing arrangements.

15.   In the nearly thirteen (13) months since the Petition Date, the Debtor has not moved to assume or reject the Warehousing Agreements pursuant to section 365(d)(2) of the Bankruptcy Code.

16.   While this bankruptcy case has been pending, Veritiv has continued to incur the costs of storing the Debtor's inventory, and has incurred additional expenses in order to transport and secure temporary storage trailers for such inventory as Veritiv continues to manage its warehousing facilities in the ordinary course of its business.  In addition, the Debtor's inventory continues to take up a substantial amount of much needed space in Veritiv's warehousing facilities.

17.   As of May 14, 2018, Veritiv is owed an outstanding postpetition balance of $157,251.10 in various fees under the Warehousing Agreements that have been billed through the Debtor's ordinary invoicing system and have thus far gone unpaid.[2]

18.   On May 21, 2018, the Debtor filed its *Motion for an Order Authorizing the Debtor to (A) Incur Postpetition Debt; and (B) Provide Security and other Related Relief* (the "New DIP Motion") [Dkt. No. 689].  If approved, the financing facility proposed by the New

---

[2] In addition to the postpetition amounts due, as of September 13, 2017, Veritiv was owed $753,777.18 on account of the Prepetition Period.

DIP Motion should provide the Debtor with ample liquidity to pay the postpetition amounts due to Veritiv.[3]

## RELIEF REQUESTED

19. Pursuant to 11 U.S.C. §§ 365(d)(2) and 503(b)(1)(A), Veritiv respectfully requests the entry of an order, substantially in the form attached hereto as **Exhibit B**, compelling the Debtor to (i) reject each of the Warehousing Agreements, and (ii) retrieve all of its inventory from Veritiv's warehousing facilities, subject to resolution of any possessory lien rights of Veritiv and payment of Veritiv's claims.

## BASIS FOR THE RELIEF REQUESTED

20. The Debtor's consistent failure to pay for Veritiv's postpetition services for over a year requires that it be compelled to reject each of the Warehousing Agreements. Section 365(d)(2) of the Bankruptcy Code provides:

> In a case under chapter 9, 11, 12, or 13, the [debtor-in-possession] may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan, but the court, on the request of any party to such contract or lease, may order the [debtor-in-possession] to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. §365(d)(2).[4] Section 365(d)(2) therefore recognizes that, while debtors ought to have sufficient time to make informed decisions about which contracts to assume or reject, such "breathing space . . . is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002). Indeed, courts have long recognized that the purpose of section 365(d)(2) is to

---

[3] Veritiv reserves all of its rights to object to the New DIP Motion and nothing herein should be construed as Veritiv's consent to the terms of the new financing facility.

[4] There is no question that the Warehousing Agreements constitute "executory contracts" within the meaning of section 365(d)(2). Both on the Petition Date and since, Veritiv and the Debtor have had ongoing material obligations under each of the Warehousing Agreements: Veritiv has had to continue to store the Debtor's inventory in its warehousing facilities and the Debtor has had to make periodic payments for Veritiv's storage services within a set number of days of receiving invoices.

5

"prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-à-vis the estate." *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1078–79 (3d Cir. 1992) (quoting S. Rep. No. 95-989, at 59 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5845).

21.  This Court has broad discretion to determine whether, in light of the particular facts and circumstances of the case, the Debtor has been afforded reasonable time to assume or reject the Warehousing Agreements. *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003). In determining whether to require the Debtor to assume or reject the Warehousing Agreements within a specified time, the Court "must balance the interests of the contracting party against the interests of the debtor and its estate." *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001). Courts, in turn, have articulated various factors to be considered when balancing the interests of the debtor and non-debtor party to an executory contract, including: (1) the nature of the interests at stake; (2) the balance of hurt to the litigants; (3) the good to be achieved; (4) the safeguards afforded to the litigants; (5) whether the action to be taken is so in derogation of Congress's scheme that the court may be said to be arbitrary; (6) the debtor's failure or ability to satisfy postpetition obligations; (7) the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code; (8) the importance of the contract to the debtor's business and reorganization; (9) whether the debtor has sufficient time to appraise its financial situation and the potential value of the assets in formulating a plan; (10) whether there is a need for judicial determination as to whether an executory contract exists; (11) whether exclusivity has been terminated; and (12) the purpose of chapter 11, to permit the successful rehabilitation of debtors. *In re Adelphia*, 291 B.R. at 293; *see also In re Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J. 1986).

22. Here, consideration of the relevant factors overwhelmingly supports a finding that the Debtor has had a reasonable amount of time to determine whether to assume or reject the Warehousing Agreements. In particular, courts have routinely accelerated the decision to assume or reject an executory contract where, as here, the debtor has defaulted on their postpetition obligations. *See, e.g.*, *Zions Credit Corp. v. Rebel Rents, Inc. (In re Rebel Rents, Inc.)*, 291 B.R. 520, 531 (Bankr. C.D. Cal. 2003) ("Debtor cannot continue to maintain its freedom to assume or reject leases with [non-debtor party] without paying for its use of the vehicles."); *In re EnCap Golf Holdings*, Nos. 08-18581 (NLW), 08-18590 (NLW), 2008 WL 5955350, at *5 (D.N.J. Dec. 24, 2008) (granting motion to assume or reject executory contract where non-defaulting party was in the "unenviable position of having to continue to meet its obligations [under the contract] while [debtor] ha[d] defaulted on its [postpetition] payment obligation."); *In re Travelot Co.*, 286 B.R. 462, 469 (ordering debtor to assume or reject executory contract within fifteen days where debtor had "minimal funds in the bank," was in default on the contract, and had not "visibly undertaken to raise the necessary capital" to cure the default); *In re Taber Farm Assocs.*, 115 B.R. at 455. Indeed, it is well settled law that "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984). To permit a debtor to continue to receive such benefits while continually putting off any decision to assume or reject the executory contract at issue would only allow the debtor "to have its cake and eat it too." *Theatre Holding Corp. v. Mauro (In re Theatre Holding)*, 681 F.2d 102, 105 (2d Cir. 1982); *see also In re Rebel Rents*, 291 B.R. at 531.

23. Here, as noted, the Debtor has failed to pay Veritiv for any of its postpetition services. While Veritiv has incurred continuing costs to store the Debtor's inventory, the Debtor has stored its inventory at Veritiv's warehousing facilities without giving any firm indication or commitment as to when, if ever, it expects to pay Veritiv for its services and/or seek to establish alternative warehousing arrangements despite Veritiv's repeated inquiries. Any further delay in rejecting the Warehousing Agreements simply adds to Veritiv's expenses. Accordingly, this factor significantly supports compelling the Debtor to reject the Warehousing Agreements.

24. The Debtor's failure to pay for Veritiv's postpetition services is even more troubling in light of the fact that this bankruptcy case is now over one year old and the Debtor is seeking approval of a second postpetition financing facility. The Debtor has had nearly thirteen (13) months to evaluate its financial position and the relative value of the Warehousing Agreements. This is more than sufficient time for the Debtor to make a prudent, informed decision, particularly when Veritiv continues to incur additional costs in connection with its performance under the Warehousing Agreements. *See, e.g.*, *In re Rebel Rents*, 291 B.R. at 530 (finding six months sufficient for debtor to "appraise its financial situation and the value of the . . . leases" where debtor had defaulted on its postpetition obligations); *In re Travelot*, 286 B.R. at 469 (same); *In re EnCap Golf Holdings*, 2008 WL 5955350, at *5 (finding nine months to be a reasonable amount of time). Therefore, this factor also supports compelling the Debtor to reject the Warehouse Agreements.

25. Each of the remaining relevant factors also supports a finding that the Debtor has had a reasonable amount of time to assume or reject the Warehousing Agreements. Granting the requested relief would eliminate the strain on Veritiv's resources imposed by the Debtor's failure to honor its postpetition obligations under the Warehousing Agreements without significantly

8

prejudicing the Debtor. For over a year now, Veritiv has used a substantial amount of needed warehouse space and has incurred increasing costs and expenses, including, as of May 14, 2018, an outstanding postpetition balance of $157,251.10 representing over a year's worth of unpaid invoices, in order to store the Debtor's inventory. Compelling the Debtor to reject the Warehousing Agreements, pay Veritiv, and retrieve its inventory would allow Veritiv to escape the additional burdens Veritiv has incurred in the ordinary course of its business operations as a result of having to transport and secure temporary storage trailers for the Debtor's inventory. Moreover, any further delay in rejecting the Warehousing Agreements would cause Veritiv to incur additional expenses as it seeks to close an additional two warehouses which would require the movement of even more of the Debtor's inventory. *In re Taber Farm Assocs.*, 115 B.R. 455, 457 (Bankr. S.D.N.Y. 1990) (granting motion to compel assumption or rejection of contract where debtor had defaulted on postpetition payments and non-debtor party to the contract was "shoulder[ing] the financial expenses of the property."); *cf. In re Physician Health*, 262 B.R. at 296 (considering prejudice to non-debtor party caused by further delay in assuming or rejecting executory contract).

26.     In contrast to Veritiv's significant interests at stake and potential for harm, the Debtor's interests here are minimal: the Warehousing Agreements are apparently not essential for the Debtor's successful reorganization, nor has the Debtor suggested that it would be unable to secure alternative warehousing arrangements. Even if such storage services were somehow particularly important to the Debtor's business, the Debtor has not indicated to Veritiv, despite Veritiv's repeated requests to do so, that it has even attempted to secure alternative warehousing arrangements or make appropriate arrangements to pay Veritiv. Instead, the Debtor has simply chosen to do nothing: to not pay its postpetition obligations, to not retrieve its inventory from

Veritiv's warehousing facilities, and to not make any sort of decision whether to assume or reject the Warehousing Agreements.  Accordingly, consideration of the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, the damage Veritiv will suffer beyond the compensation afforded by the Bankruptcy Code, and the importance of the Warehousing Agreements to the Debtor's successful reorganization each weigh heavily in Veritv's favor and support compelling the Debtor to reject the Warehousing Agreements and remove its inventory.

27.     Finally, the relief requested herein is neither inconsistent with the purposes of chapter 11 nor in derogation of the scheme created by Congress.  Indeed, rather than derogate from Congress's scheme, compelling the debtor to reject the Warehouse Agreements in this case is required by it.  As noted, the purpose of Section 365(d)(2) is to prevent doubt about the status of a contractual relationship between the debtor and non-debtor contracting parties.  *See In re Univ. Med. Ctr.*, 973 F.2d at 1078–79 (3d Cir. 1992); S. Rep. No. 95-989, at 59 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5845.  Here, the Debtor has gone more than a year without paying its postpetition obligations to Veritiv, has failed to collect its inventory from Veritiv's warehousing facilities, and has thus far refused to assume or reject any of the Warehousing Agreements.  Veritiv has been left in the dark about the status of its contractual relationships with the Debtor for more than a year, has been forced to incur additional storage costs for the Debtor's inventory, and has been unable to use the substantial amount of its storage space that has been taken up by the Debtor's inventory.  This is precisely the situation that section 365(d)(2) seeks to prevent.  Accordingly, these factors also support compelling the Debtor to reject the Warehousing Agreements.

## **CONCLUSION**

28.     Therefore, Veritiv respectfully requests that this Court, pursuant to 11 U.S.C. § 365(d)(2), compel the Debtor to reject each of its eight Warehousing Agreements with Veritiv and to retrieve all of its property from Veritiv's warehousing facilities.

Dated: May 22, 2018
      Wilmington, Delaware      COLE SCHOTZ P.C.

      /s/ *Katherine M. Devanney*
      Norman L. Pernick (No. 2290)
      Katherine M. Devanney (No. 6356)
      500 Delaware Avenue, Suite 1410
      Wilmington, DE 19801
      Telephone: (302) 652-3131
      Facsimile:  (302) 652-3117
      npernick@coleschotz.com
      kdevanney@coleschotz.com

      - and -

      SIDLEY AUSTIN LLP
      Jessica C. Knowles Boelter
      One South Dearborn Street
      Chicago, Illinois 60603
      Telephone: (312) 853-7000
      Facsimile: (312) 853-7036
      jboelter@sidley.com

      *Counsel for Veritiv Corporation*