## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SUNIVA, INC., [1] | ) Case No. 17-10837 (KG) |
| | ) |
| Debtor. | ) **Hearing Date: June 27, 2018 at 10:00 a.m.** |
| | ) **Objection Deadline: June 26, 2018 at 12:00 p.m.** |

## DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 506(c) AND 554(a) OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE DEBTOR TO (I) ABANDON CERTAIN ASSETS AND (II) SURCHARGE WANXIANG AMERICA CORPORATION'S COLLATERAL

Suniva, Inc. (the "Debtor") hereby submits this motion (the "Motion"), pursuant to sections 105(a), 506(c) and 554(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order substantially in the form annexed hereto as **Exhibit A**, authorizing the Debtor to (i) abandon certain assets that are burdensome to the estate; and (ii) surcharge certain collateral of Wanxiang America Corporation ("Wanxiang"). In support of this Motion, the Debtor respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    As set forth more fully in the *Declaration of David M. Baker in Support of First Day Motions* [D.I. 10] (the "Baker Declaration"), which is incorporated by reference herein, and as reported to the Court during the course of this Chapter 11 Case, the Debtor's reorganization hopes have been tied to obtaining sufficient government trade relief from imports of solar cells. See, e.g., Baker Decl. ¶¶ 13-14, 27-28.

---

[1]    The last four digits of the Debtor's federal tax identification number is 2418. The Debtor's corporate headquarters is located at 5765 Peachtree Industrial Blvd, Norcross, Georgia 30092.

2.      On April 26, 2017, the Debtor filed a petition under section 201 of the Trade Act of 1974, 19 U.S.C. § 2251 ("Section 201"), seeking relief from imports of crystalline silicon photovoltaic cells on behalf of solar cell manufacturers based in the United States.  On May 23, 2017, the United States International Trade Commission ("USITC") formally initiated proceedings under Section 201 (the "Trade Case").  On September 22, 2017, the USITC issued a unanimous decision determining that increased imports of crystalline silicon photovoltaic cells into the United States had caused serious injury to the domestic solar cell manufacturing industry.  On October 31, 2017, the USITC issued its remedy recommendation to the President.  On January 22, 2018, the United States Trade Representative reported the President's decision in the Trade Case: the application of safeguard tariffs on imports for four years; 30% in the first year, 25% in the second year, 20% in the third year, and 15% in the fourth year.[2]

3.      In addition to the Trade Case, the Debtor asserts that it has certain interests in the anti-dumping/countervailing duties imposed on solar cells manufactured in China and Taiwan and collected by the U.S. government in other trade actions pre-dating the Trade Case.  On May 29, 2018, the Court approved additional lending to enable the Debtor to work towards possibly recovering these funds and to pay the Debtor's administrative expenses associated therewith.  See Final Order Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364 [D.I. 702].

4.      Wanxiang has a first-priority lien on the Debtor's inventory, accounts receivable, certain equipment, spare parts, and proceeds of the same.  See Baker Decl. ¶ 22.  For more than a year, the Debtor has engaged Wanxiang in off and on discussions regarding the disposition of the Debtor's inventory, but the discussions failed to lead to any agreement.  Throughout this time, the Debtor continued to incur expenses associated with the preservation of Wanxiang's inventory and

---

[2]      The first 2.5 gigawatts of imported solar cells are exempt from tariff in each of the four years.

IMPAC 5847616V.1

other Wanxiang collateral such as Wanxiang's first-lien equipment collateral. On May 24, 2018, the Debtor's prepetition lenders, including Wanxiang, conducted an auction of certain the Debtor's assets under Article 9 of the Uniform Commercial Code. At the auction, Wanxiang made credit bids totaling $3,050,000 for its first-lien equipment, spare parts, and certain general intangibles (the "Wanxiang Foreclosure Sale Assets"). See *Transcript of Auction Proceeding, May 24,* 2018 (the "Auction Transcript," a true and correct copy of which is attached hereto as **Exhibit B**) at 32-33. Wanxiang's credit bids were the winning bids for the Wanxiang Foreclosure Sale Assets. The Debtor is informed that the sale of the Wanxiang Foreclosure Sale Assets closed on May 29, 2018.

5.    On May 22, 2018, Veritiv Corporation ("Veritiv"), a provider of third-party warehouses in which certain of the Debtor's inventory is stored (the "Veritiv Solar Panel Inventory"), filed a motion seeking to compel rejection of Veritiv's storage contracts with the Debtor and requesting that the Debtor remove the Debtor's inventory after satisfaction of any possessory liens. See *Motion of Veritiv Corporation to Compel Debtor to Reject its Executory Contracts with Veritiv Corporation* [D.I. 692] (the "Veritiv Motion).

6.    Given the recent foreclosure sale,[3] the Vertiv Motion seeking removal of the Veritiv Solar Panel Inventory, the lack of an agreement with Wanxiang regarding the disposal of the Veritiv Solar Panel Inventory and other inventory subject to Wanxiang's liens (collectively, the "Inventory"), the competing lien claims of Veritiv and Wanxiang to the Veritiv Solar Panel Inventory, and the Debtor's lack of equity in the Inventory, the Debtor has determined that it should abandon all of the Inventory so that the Debtor is no longer burdened by costs not central to the Debtor's reorganization. Furthermore, the Debtor seeks a determination that it is entitled to

---

[3]    None of the Debtor's inventory was foreclosed upon.

3

surcharge Wanxiang for the estate's costs associated with the preservation and disposal of the Inventory and the Wanxiang Foreclosure Sale Assets (together with the Inventory, the "Assets").

7.       Through the Motion, the Debtor seeks to surcharge the Wanxiang Foreclosure Sale Assets for the estate's costs beginning on March 8, 2018, the date that the SQN DIP Lenders (as defined below) gave notice of default under the SQN DIP Facility Agreement (as defined below). Upon receipt of the notice of default, it became clear that the Debtor would no longer be working towards a reorganization that involved quickly restarting operations and the Debtor would have to explore alternative reorganization strategies that did not require preserving the Wanxiang Foreclosure Sale Assets.  From that point forward, the Debtor's preservation of the Wanxiang Foreclosure Sale Assets solely benefited Wanxiang.  In contrast, the Debtor seeks to surcharge the Inventory beginning on the Petition Date (as defined below).  Beginning shortly after the Petition Date, the Debtor and Wanxiang began negotiations regarding the disposition of the Inventory.  The Debtor made numerous and varied offers to Wanxiang.  The Debtor even went so far as to prepare a stipulation providing Wanxiang with stay relief in May 2017 so that Wanxiang could foreclose on the Inventory.  However, Wanxiang did not accept that offer.  As a result, since the Petition Date, the Debtor's preservation of the Inventory has been solely for Wanxiang's benefit.

## II.    JURISDICTION

8.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b).[4]

---

[4]      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

IMPAC 5847616V.1

## III.    BACKGROUND

9.    On April 17, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.    On April 27, 2017, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed.

11.    As noted in the Baker Declaration, prior to the Petition Date, the Debtor was a party to a certain Credit and Security Agreement with Wells Fargo Bank, N.A. ("WF") dated May 25, 2012, and as amended, by which WF had extended a revolving line of credit to the Debtor (the "WF Credit Facility") secured by first liens on substantially all of the Debtor's assets.  The WF Credit Agreement was supported by the Wanxiang Agreement, by which Wanxiang provided a $15,000,000 standby letter of credit in favor of WF.  Wanxiang was also granted a security interest in all of the Debtor's assets and such lien was expressly subordinated to WF's liens pursuant to that certain Subordination Agreement, dated November 22, 2013.  As of the Petition Date, the amount due and owing to Wanxiang, the successor to WF (as discussed below), was approximately $15,000,000.[5]

12.    On the Petition Date, the Debtor's assets included, among other things, certain manufacturing equipment as well as finished solar cells and modules.  The Debtor maintained its

---

[5]    On February 14, 2018, the Court entered its *Order Approving Stipulation* [D.I. 516] which provided, among other things, that funds in the amount of $2,223,579.57 held by WF were to be turned over to Wanxiang, thereby reducing Wanxiang's claim against the Debtor, and that WF released its claims against the Debtor except with respect to certain letters of credit it had issued in support of the Debtor.  On May 15, 2018, the Court entered its *Agreed Order Authorizing Release of Escrowed Amount* [D.I. 681] providing that an additional $337,192 was to be paid to Wanxiang, thereby further reducing Wanxiang's claim against the Debtor.

manufacturing equipment at its Norcross, Georgia and Saginaw, Michigan facilities.  As noted above, the Debtor's manufacturing equipment and spare parts were sold at a foreclosure auction which closed on May 29, 2018.  The equipment and spare parts remain in Suniva's facilities, and the Debtor continues to pay rent and utilities at those facilities.

13.    Prior to the Petition Date, the Debtor had stored its modules at various third-party warehouses and at the Debtor's Saginaw, Michigan facility.[6]  Shortly before the Petition Date and on the Petition Date itself, Wanxiang took possession of several truckloads of modules from the Debtor's Saginaw, Michigan facility.  Upon information and belief, Wanxiang has continued to hold these modules at Wanxiang's own storage facilities.  Additionally, inventory consisting of cells not yet assembled into modules have been stored primarily at the Debtor's Saginaw, Michigan facility.

14.    Since the Petition Date, the Debtor has collected prepetition accounts receivable, yielding approximately $595,000 (the "Wanxiang Cash").  The Debtor holds the Wanxiang Cash in a segregated bank account.  As noted above, Wanxiang has a first-priority lien in the Wanxiang Cash.

15.    On May 19, 2017, the Court entered its the *Final Order Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364* [Docket No. 171] (as amended, the "SQN DIP Order"), by which, among other things, the Court authorized the Debtor to enter into a post-petition financing agreement (the "SQN DIP Facility Agreement") with certain lenders (the "SQN DIP

---

[6]    Civic Solar, a pre-petition customer of the Debtor, asserts that prior to the Petition Date, Civic Solar received title to certain of modules stored at a third-party warehouse owned by Fulsource Fulfillment & Logistics ("Fulsource"). See D.I. 593.  The Debtor agrees that title to 84 pallets of modules was transferred to Civic Solar prior to the Petition Date and has confirmed that the modules are located at a Fulsource warehouse, but, to date, Wanxiang continues to dispute that Civic Solar is entitled to take possession of the modules.  To the extent the Debtor has an interest in the modules claimed by Civic Solar, the Debtor seeks to abandon such interest through this Motion.

Lenders"). On March 8, 2018, the SQN DIP Lenders provided notice of certain events of default under the SQN DIP Facility Agreement.

16.     On March 23, 2018, SQN Asset Servicing, LLC (the "SQN Prepetition Lender") filed its *Motion of SQN Asset Servicing, LLC for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362* [D.I. 596]. On April 17, 2018, the Court entered its *Order Granting Motion of SQN Asset Servicing, LLC for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362* [D.I. 635] and authorizing SQN to repossess and dispose of certain equipment and other collateral under the Debtor's prepetition loan agreements with the SQN Prepetition Lender and its related lenders. At the auction held on May 24, 2018, the SQN Prepetition Lender was the highest bidder for certain of the Debtor's equipment and the Debtor's intellectual property, having made credit bids totaling $25,050,000 for these assets. See Auction Trans. at 32-36. On May 29, 2018, the SQN Prepetition Lender closed upon the foreclosure sale of this collateral.

17.     On April 26, 2018, Wanxiang filed the *Motion of Wanxiang America Corporation for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362* [D.I. 651]. On May 3, 2018, the Court entered its *Agreed Order Granting Wanxiang America Corporation Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 Relating to Certain Equipment and Spare Pa*rts [D.I. 665] (the "Wanxiang Order"), that, among other things, authorizes Wanxiang to obtain possession and dispose of the Wanxiang Equipment (as defined therein). Additionally, the Wanxiang Order provided:

> The Debtor and Committee expressly reserve and do not waive their respective rights, if any, under 11 U.S.C. § 506(c) to recover from the proceeds of the Wanxiang Equipment, or from the Wanxiang Cash, the reasonable, necessary costs and expenses of preserving, or disposing of, the Wanxiang Equipment or other Wanxiang collateral to the extent of any benefit to Wanxiang. The lifting of the automatic stay as to the Wanxiang Equipment, the Wanxiang Sale, or the other disposition of the Wanxiang Equipment shall not be a defense to any attempt to surcharge the Wanxiang Equipment. The Debtor may satisfy any costs and

7

expenses of preserving or disposing of the Wanxiang Equipment, upon entry of an Order after notice and a hearing, from the Wanxiang Cash. Except as noted above, Wanxiang reserves and does not waive its right to defend and object to any assertion of recoveries under 11 U.S.C. § 506(c) or otherwise. However, nothing herein shall require the Debtor to turn over the Wanxiang Cash.

Wanxiang Order ¶ 8. As noted above, on May 29, 2018, Wanxiang closed upon its credit bid for the Wanxiang Foreclosure Assets. However, since May 29, 2018, the Wanxiang Equipment remains in the Debtor's facilities.

18.    Since the Petition Date, the Debtor has incurred and continues to incur costs (the "Surchargeable Expenses") related to the preservation of Wanxiang's collateral, including the Wanxiang Equipment and the Inventory, for the benefit of Wanxiang. The Surchargeable Expenses total $689,085.98, including the following:[7]

- $169,316.10 incurred to store approximately 1,252 pallets of finished modules at warehouses maintained by Veritiv;[8]

- $49,977.60 to store approximately 229 pallets of finished modules at warehouses maintained by Fulsource;[9]

- $40,200 for a post-petition premium paid on the Debtor's cargo insurance policy;[10]

---

[7]    The Debtor is continuing to reconcile its unpaid expenses related to the preservation and disposition of the Assets and reserves its right to supplement the Surchargeable Expenses at or prior to the hearing on its request to surcharge the Assets. The Debtor has not included the fees of its bankruptcy counsel, trade counsel, or its Chief Restructuring Officer and his staff. Additionally, the Debtor is not including in the Surchargeable Expenses, the rent, utilities, and related costs incurred prior to the SQN DIP Lenders issuing the notice of default on March 8, 2018. The Debtor believes including such charges in the Surchargeable Expenses would have been appropriate.

[8]    This is the sum of the unpaid, post-petition storage costs that Veritiv asserts are due through May 14, 2018, see Veritiv Mot. ¶ 25 ($157,251.10), and the Debtor's estimate of additional Veritiv storage costs through June 30, 2018 ($12,065.30). The Debtor has not yet reconciled the amounts asserted by Veritiv and reserves the right to do so. To the extent additional costs are incurred by the Debtor as a result of continued storage or abandonment, the Debtor reserves all rights to surcharge Wanxiang for such amounts.

[9]    This is sum of the unpaid, post-petition storage costs Fulsource asserts is due through May 31, 2018 ($46,361.30), and the Debtor's estimate of additional Fulsource storage costs through June 30, 2018 ($3,616.30). The Debtor has not yet reconciled the amounts asserted by Fulsource and reserves the right to do so. To the extent additional costs are incurred as a result of continued storage or abandonment, the Debtor reserves all rights to surcharge Wanxiang for such amounts.

[10]    The Debtor's cargo insurance policy covers modules stored at the Veritiv and Fulsource warehouses. The Debtor paid this amount in November 2017.

- $11,889.52 for post-petition property insurance premiums;[11]

- $5,358.56 in payroll expenses for employees that assisted in the collection of accounts receivable;[12]

- $185,772.18 in Saginaw, Michigan rent, utilities, and payroll expenses;[13] and

- $226,571.72 in Norcross, Georgia rent, utilities, payroll expenses, and certain equipment costs.[14]

## V.    DISCUSSION

19.    By this Motion, the Debtor respectfully requests that the Court enter an order, pursuant to sections 105(a), 506(c) and 554(a) of the Bankruptcy Code, authorizing the Debtor to (i) abandon all rights, title and interest of the Debtor with respect to the Inventory; and (ii) surcharge the Assets and the Wanxiang Cash to the extent of the Surchargeable Expenses.

### A.    Abandonment

20.    Section 554(a) of the Bankruptcy Code provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).  The right to abandon property

---

[11]    This amount represents the Debtor's calculation of the premium attributable to insuring the Wanxiang Equipment from March 8, 2018 through May 29, 2018 and its inventory stored at the Saginaw, Michigan facility from March 8, 2018 through June 30, 2018.

[12]    The Debtor estimates that its accounting employee has devoted 5% of his post-petition time to collecting accounts receivable.  This amount is equal to 5% of the employee's post-petition salary and benefits through June 30, 2018.

[13]    The Wanxiang Equipment uses 40.04% of the space at the Debtor's Saginaw, Michigan facility.  Wanxiang's inventory collateral uses an additional 30.17% of the space at the Debtor's Saginaw, Michigan facility.  Therefore, 40.04% of the Debtor's Saginaw, Michigan rent, utilities, and related employee costs from March 8, 2018 through June 30, 2018 ($50,636.43) can be attributed to the preservation of the Wanxiang Equipment and 30.17% of the Debtor's Saginaw, Michigan rent, utilities, and related employee costs from April 17, 2017 through June 30, 2018 (135,135.75) can be attributed to the preservation of Wanxiang's inventory collateral.  If any of the Assets remain at the Debtor's Saginaw, Michigan facility after June 30, 2018, then the costs of preserving such Assets continue to accrue, and the Debtor reserves the right to surcharge Wanxiang for such costs.

[14]    The Wanxiang Equipment uses 38.53% of the space at the Debtor's Norcross, Georgia facility.  This amount represents 38.53% of the Debtor's rent, utilities, related employee costs, and water treatment equipment expenses from March 8, 2018 through June 30, 2018, all of which preserved the Wanxiang Equipment.  If any of the Wanxiang Equipment remains at the Debtor's Norcross, Georgia facility after June 30, 2018, then the costs of preserving such Wanxiang Equipment will continue to accrue, and the Debtor reserves the right to surcharge Wanxiang for such costs.

IMPAC 5847616V.1

is, except for certain exceptions inapplicable in the present case, unfettered.  Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot., 474 U.S. 494, 507 (1986); In re Unidigital, Inc., 262 B.R. 283, 287 (Bankr. D. Del. 2001) (explaining that, "in order to fit into the Midlantic exception, the debtor must be attempting to abandon property in contravention of state or local laws or regulations designed to protect the public") (citation omitted).

21.     Prior to the Petition Date, the Debtor routinely and in the ordinary course of business sold, or when necessary disposed of, non-core assets that had little value to its operations. Indeed, even during the pendency of this Chapter 11 Case, the Debtor has abandoned assets of *de minimis* value so as to rid the estate of burdensome assets (and attendant costs) that were not needed in connection with the Debtor's reorganization efforts.  See *Order Authorizing Debtor to Abandon De Minimis Assets* [D.I. 489] (order approving abandonment of certain solar module assets).

22.     By this Motion, the Debtor seeks, among other things, to abandon the Inventory which is no longer necessary for the reorganization of the Debtor's estate and thereby avoid the burdensome costs associated with storing, liquidating, or disposing of the Inventory.  Furthermore, the proposed abandonment will permit Wanxiang[15] to take possession of and liquidate the Inventory so as to satisfy, at least in part, its claim.[16]  Given that the Debtor and Wanxiang are unable to come to terms on an orderly liquidation process for the Inventory (despite numerous proposals by the Debtor to do so), the Debtor has no equity in the Inventory, and because the Inventory is no longer needed for the Debtor's reorganization prospects, the Debtor respectfully

---

[15]     Veritiv asserts that it may have a possessory lien in the inventory stored at its facilities.  See Veritiv Mot. ¶ 4.

[16]     Upon information and belief, the Inventory may be worth more than $3 million if properly marketed. However, the Debtor does not believe that the value of the Inventory exceeds the remaining amount of Wanxiang's secured claim.

submits that the proposed abandonment of the Inventory is appropriate, represents the Debtor's exercise of sound business judgment, and is in the best interest of the estate.

23.     Courts in this district have approved similar relief in other chapter 11 cases. <u>See</u>, <u>e.g.</u>, <u>In re Venoco, LLC</u>, No. 17-10828 (KG) (Bankr. D. Del. Nov. 2, 2017) (authorizing the abandonment of property which the debtor described as being "burdensome because it cannot be moved without the cost outweighing the benefit to the Debtors' estates"); <u>In re Washington Mutual, Inc., et al.</u>, Case No. 08-12229 (MFW) (Bankr. D. Del. Jan. 19, 2012) (authorizing debtors to abandon assets); <u>In re Continental Airlines</u>, 1993 U.S. Dist. LEXIS 2290, *3-4 (D. Del. 1993) (authorizing debtor to abandon stock it owned that was worthless). For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of its estate and creditors.

24.     There are certain notice requirements attendant to the abandonment process. <u>See</u>, <u>e.g.</u>, Fed. R. Bankr. P. 6007. Bankruptcy Rule 6007 requires that, unless otherwise ordered, 14-days' notice of a proposed abandonment of property must be given to the U.S. Trustee, all creditors, any indenture trustee, and committees elected or appointed pursuant to sections 705 and 1102 of the Bankruptcy Code. The Debtor submits that providing notice of the proposed abandonment to all creditors would defeat the goal of minimizing the costs to the Debtor's estate, and given the nature and limited value of the Inventory, notice should be limited to the parties receiving notice of this Motion as described below.

**B.      The Surchargeable Expenses**

25.     Section 506(c) of the Bankruptcy Code provides, in relevant part:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim . . .

11

11 U.S.C. § 506(c).

26.    Accordingly, section 506(c) of the Bankruptcy Code provides an express statutory exception to the general rule that a secured creditor is not responsible for paying the costs of administration of a bankruptcy case.  "If expenses for the preservation or disposition of property are incurred primarily for the benefit of a creditor holding a security interest in the property, such expenses, properly identified, may be charged against the secured creditor." Gen. Elec. Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.), 739 F.2d 73, 76 (2d Cir. 1984). To allow a claimant that has expended funds to preserve or dispose of secured collateral to recover such funds from the secured creditor who benefitted from the payment of such costs "prevents a windfall to the secured creditor at the expense of the claimant." Precision Steel Shearing, Inc. v. Fremont Financial Corp. (In re Visual Indus., Inc.), 57 F.3d 321, 325 (3d Cir. 1995) (citing IRS v. Boatmen's First Nat'l Bank of Kan. City, 5 F.3d 1157, 1159 (8th Cir. 1993)).

27.    To surcharge expenses under section 506(c) of the Bankruptcy Code, the claimant must demonstrate that the expenditures (1) are reasonable and necessary to the preservation or disposal of the property and (2) provide a direct benefit to the secured creditors. In re C.S. Assocs., 29 F.3d 903, 906 (3d Cir. 1994).  The Debtor submits that the Surchargeable Expenses clearly meet the foregoing standard.

    ***i.***   ***The Surchargeable Expenses are Reasonable and Necessary to Preserve and Dispose of the Assets***

28.    Since the inception of this Chapter 11 Case, the Debtor, with the services provided by the contracted warehousing and insurance companies, the assistance of estate professionals and employees of the Debtor, and the use of the Debtor's post-petition financing, preserved and maximized the value of the Assets.  Indeed, as early as May 28, 2017, the Debtor even presented a stipulation to Wanxiang that provided Wanxiang with stay relief as to the Inventory, but

Wanxiang told the Debtor to explore other alternatives.  Despite numerous proposals from the Debtor, the Debtor and the Wanxiang could not reach an agreement regarding the disposition of the Inventory.  Given the Debtor's lack of equity in the Inventory, Wanxiang could have sought stay relief early in this Chapter 11 Case.  Instead, Wanxiang sought to keep the burden of maintaining the Inventory with the Debtor.  Fairness dictates that Wanxiang should bear the expenses resulting from its decision.  Furthermore, without the expenditure of the Surchargeable Expenses, the value of the Assets would have materially declined to the detriment of Wanxiang and, therefore, were necessary.  As the Surchargeable Expenses total approximately $689,000, and the value of the Assets may exceed $6 million, the Debtor submits that the Surchargeable Expenses are undoubtedly reasonable.

> ### ii.  The Surchargeable Expenses Have Provided and Will Provide a Direct Benefit to Wanxiang

29.    "[A]n expense incurred primarily to preserve or dispose of encumbered property" is incurred primarily for the benefit of the secured creditor.  Southwest Secs., FSB v. Segner (In re Domistyle Inc.), 811 F.3d 691, 698 (5th Cir. 2015).  Here, the Surchargeable Expenses have provided and will provide a direct benefit to Wanxiang because such expenses have permitted and will permit the Assets to be turned over to Wanxiang which will provide Wanxiang with an opportunity to liquidate the Assets for its sole benefit.  As a result of abandoning the Inventory and the foreclosure sale of the Wanxiang Equipment, the Debtor can continue its renewed efforts to reorganize, which efforts, if successful, will also directly benefit Wanxiang.  Furthermore, the Surchargeable Expenses represent costs that were incurred by the Debtor while housing, insuring, and maintaining the Assets, costs directly associated with the preservation of the Assets for Wanxiang.  If the Debtor had not incurred the Surchargeable Expenses, the Assets would have declined in value or Wanxiang would have incurred these same expenses directly.

       *iii.*       ***The Surchargeable Expenses Should be Charged Against the Wanxiang Cash and then Paid by Wanxiang***

30.      As noted above, the Debtor holds the Wanxiang Cash in a segregated account.  The Wanxiang Cash, as proceeds of the Debtor's accounts receivable, is Wanxiang's collateral.  The Debtor should be entitled to satisfy the Surchargeable Expenses out of Wanxiang Cash.  Indeed, this was contemplated by the Wanxiang Order which provided, in part:  "The Debtor may satisfy any costs and expenses of preserving or disposing of the Wanxiang Equipment, upon entry of an Order after notice and a hearing, from the Wanxiang Cash."  Wanxiang Order ¶ 8.  To the extent the Surchargeable Expenses exceed the Wanxiang Cash, Wanxiang should be required to pay the balance to the Debtor within ten (10) business days of entry of an order approving the Debtor's surcharge of the Assets.  If Wanxiang does not satisfy the Surchargeable Expenses, the Debtor reserves the right to sell or otherwise dispose of any Assets that remain in its possession.[17]

**C.**      **Reservation of Rights**

31.      Nothing contained herein is intended or should be construed as an admission of the validity of any claim or lien against the Debtor, a waiver of the Debtor's right to dispute any claim or lien, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  The Debtor expressly reserves its right to contest any claim or lien with respect to the Inventory in accordance with applicable non-bankruptcy law.

32.      The Debtor is continuing to reconcile its unpaid expenses related to the preservation and disposition of the Assets and reserves its right to supplement the Surchargeable Expenses at or prior to the hearing on this Motion.

---

[17]      As noted above, the Wanxiang Foreclosure Sale Assets remain in the Debtor's facilities.  The Debtor reserves its rights to seek any remedies it may have under applicable law to remove such assets from the Debtor's facilities.

14

**D.    Notice**

33.    Notice of this motion will be provided to the following parties, or their counsel, if known (a) the Office of the U.S. Trustee; (b) counsel to the Committee; (c) counsel to Wanxiang; (d) counsel to the SQN Prepetition Lender; (e) counsel to the Debtor's post-petition lenders; (f) counsel to Veritiv; (g) Fulsource; (h) counsel to Civic Solar; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

**E.    No Prior Request**

34.    No prior request for the relief sought in this Motion has been made to this or any other court.

IMPAC 5847616V.1

## V.     CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially

in the form annexed hereto as **Exhibit A**, granting the relief set forth herein and such other and

further relief as it deems just and proper.

Dated:  June 19, 2018                **POTTER ANDERSON & CORROON LLP**
        Wilmington, Delaware

*/s/ D. Ryan Slaugh*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Co-Counsel to the Debtor and Debtor in Possession*

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers, Esq.
Colin M. Bernardino, Esq.
1100 Peachtree Street NE
Suite 2800
Atlanta, GA  30309
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

*Counsel to the Debtor and Debtor in Possession*

IMPAC 5847616V.1