## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNIVA, INC.,[1] | ) | Case No. 17-10837 (KG) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**[PROPOSED] SECOND AMENDED DISCLOSURE STATEMENT FOR CHAPTER 11
PLAN OF REORGANIZATION FOR SUNIVA, INC. PROPOSED BY THE DEBTOR**

**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan (DE Bar No. 4057)
1313 North Market Street, Sixth Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Co-Counsel for the Debtor and Debtor in Possession*

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers (admitted *pro hac vice*)
Colin M. Bernardino (admitted *pro hac vice*)
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

*Counsel for the Debtor and Debtor in Possession*

---

[1]     The last four digits of the Debtor's federal tax identification number is 2418.  The Debtor's corporate headquarters is located at 5765 Peachtree Industrial Blvd., Norcross, Georgia 30092.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................1

    **A.**  Disclosure Statement Enclosures ........................................................2

    **B.**  Summary of Claims, Treatment, and Estimated Recovery ....................3

II.  DEBTOR BACKGROUND ........................................................................7

    **A.**  Description of Debtor and Debtor's Business ......................................7

    **B.**  Debtor's Prepetition Indebtedness ......................................................8

    **C.**  Debtor's Cessation of Production and Workforce Reduction..............11

III.  OVERVIEW OF THE CHAPTER 11 CASE ............................................11

    **A.**  Voluntary Petition .............................................................................11

    **B.**  Debtor's "First Day" and Other Relief ..............................................12

    **C.**  Appointment of Creditors' Committee ..............................................13

    **D.**  Debtor-in-Possession Financing and Post-Petition Litigations............13

    **E.**  Claims Process and Bar Dates ...........................................................19

    **F.**  Exclusivity ........................................................................................21

    **G.**  Debtor's Section 201 Petition and Other Trade Relief .......................21

IV.  THE PLAN ..............................................................................................22

    **A.**  Summary of Classification of Claims and Interests............................22

    **B.**  Treatment of Classified Claims and Interests ....................................23

    **C.**  Treatment of Unclassified Claims .....................................................29

    **D.**  Treatment of Executory Contracts and Unexpired Leases .................32

    **E.**  Cancellation of Securities and Instruments........................................34

    **F.**  Management Incentive Plan................................................................34

    **G.**  Establishment of a Plan Administrator ..............................................34

i

**H.**    Estate Causes of Action .................................................................................35

**I.**    Releases and Exculpations .............................................................................35

**J.**    Indemnification Provisions .............................................................................35

**K.**    Miscellaneous Provisions................................................................................35

**L.**    Conditions Precedent to Confirmation of the Plan .................................36

**M.**    Conditions Precedent to Effective Date of the Plan................................36

**N.**    Non-Occurrence of Effective Date .............................................................37

**V.**    IMPLEMENTATION AND EXECUTION OF THE PLAN ...........................................37

**A.**    Effects of Confirmation of the Plan ...........................................................37

**B.**    Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements ............................38

**C.**    Preservation of Causes of Action; Compromise and Settlement of Disputes...........................................................................................................39

**D.**    Discharge of Claims and Interests ..............................................................40

**E.**    Release of Liens ..............................................................................................40

**F.**    Injunctions.......................................................................................................40

**G.**    Exculpations.....................................................................................................41

**H.**    Releases.............................................................................................................41

**I.**    Dissolution of Committee ............................................................................42

**J.**    Provisions Governing Distributions.............................................................42

**K.**    Term of Injunctions or Stays.......................................................................44

**L.**    Final Fee Hearing and Final Decree ...........................................................44

**VI.**    CONFIRMATION OF THE PLAN................................................................................45

**VII.**    FEASIBILITY ...................................................................................................................49

**VIII.**    BEST INTERESTS OF CREDITORS AND ALTERNATIVES TO PLAN ...................49

**A.**    Chapter 7 Liquidation ...................................................................................49

ii

**B.**    Alternative Plan(s) ....................................................................................50

IX.    RISK FACTORS ....................................................................................................51

    **A.**    Classifications of Claims and Interests ..................................................51

    **B.**    Non-Occurrence of the Effective Date ...................................................51

    **C.**    Failure to Receive Requisite Accepting Votes .......................................51

    **D.**    Nonconsensual Confirmation...................................................................51

    **E.**    Failure to Confirm the Plan....................................................................52

    **F.**    Risk of Additional or Larger Claims .....................................................52

    **G.**    Alternative Chapter 11 Plan...................................................................53

    **H.**    Variances from Projections.....................................................................53

    **I.**    Certain Tax Considerations....................................................................53

    **J.**    The Debtor's Emergence from Chapter 11 is Not Assured ...................53

X.    TAX CONSEQUENCES OF THE PLAN ...........................................................54

XI.    CONCLUSION......................................................................................................54

6104222V.1

## **EXHIBITS**

EXHIBIT A          Plan of Reorganization

EXHIBIT B          Disclosure Statement Order

EXHIBIT C          Liquidation Analysis

6104222V.1

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO BANKRUPTCY COURT APPROVAL OF THE DISCLOSURE STATEMENT.

# I.

## INTRODUCTION

This is the disclosure statement (as amended, modified, or supplemented, the "Disclosure Statement") for Suniva, Inc. ("Suniva" or the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), filed pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") and in connection with the *Chapter 11 Plan of Reorganization for Suniva, Inc. Proposed by the Debtor* dated February 19, 2019 (the "Plan"),[2] a copy of which is annexed to this Disclosure Statement as **Exhibit A.**

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan, (ii) advises holders of Claims and Interests of their rights under the Plan, (iii) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed.

**IT IS THE OPINION OF THE DEBTOR THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND ITS STAKEHOLDERS. FOR ALL THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTOR RECOMMENDS THAT YOU RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE.**

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY APRIL 2, 2019 AT 4:00 P.M. (EASTERN TIME) (THE "VOTING DEADLINE"). THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MARCH 7, 2019 (THE "RECORD DATE").**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "CONFIRMATION HEARING") WILL BE HELD BEFORE THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, COURTROOM 3, 6TH FLOOR, WILMINGTON, DELAWARE 19801 ON APRIL 9, 2019 AT 2:00 P.M. (EASTERN TIME), OR AS SOON THEREAFTER AS**

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

**COUNSEL MAY BE HEARD. THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE APRIL 2, 2019 AT 4:00 P.M. (EASTERN TIME).**

PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTOR'S BOOKS AND RECORDS AND PLEADINGS FILED BY THE DEBTOR. STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, ALTHOUGH THE DEBTOR HAS ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.   THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11.   THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON ITS ACCURACY.

YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL, AND TAX ADVISORS TO UNDERSTAND FULLY THE PLAN AND DISCLOSURE STATEMENT.  THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GIVEN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE SUCH DATE.  THIS DISCLOSURE STATEMENT IS INTENDED, AMONG OTHER THINGS, TO SUMMARIZE THE PLAN AND MUST BE READ IN CONJUNCTION WITH THE PLAN AND ITS EXHIBITS, IF ANY.  IF ANY CONFLICTS EXIST BETWEEN THE PLAN AND DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

A.    **Disclosure Statement Enclosures**

The following four enclosures accompany this Disclosure Statement:

- **Disclosure Statement Approval Order**.  A copy of the order approving the Disclosure Statement, without exhibits which, among other things, approves this Disclosure Statement, establishes procedures for voting on the Plan (the "Voting Procedures"), and

schedules the Confirmation Hearing and the deadline for objecting to confirmation of the Plan.

- **Confirmation Hearing Notice**. A copy of the notice of the Voting Deadline and, among other things, notice of the date, time, and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice").

- **Ballots**. One or more ballots (and return envelopes) for voting to accept or reject the Plan unless you are not entitled to vote because you are (a) not impaired under the Plan and are presumed to accept the Plan, (b) deemed to reject the Plan, or (c) a holder of a Claim subject to an objection filed by the Debtor, which Claim is temporarily disallowed for voting purposes. See Article IV of this Disclosure Statement for an explanation of which parties are entitled to vote and a description of the Voting Procedures.

- **Letter From the Official Committee of Unsecured Creditors (the "Committee").** A letter from the Committee addressed to all general unsecured creditors recommending that they vote to accept the Plan.

### B.    Summary of Claims, Treatment, and Estimated Recovery

The Plan reflects, among other things, the outcome of a settlement approved by the Court on November 20, 2018 [D.I. 941], and described in Article III.D. of this Disclosure Statement. New equity will be issued by the reorganized Debtor (the "Reorganized Debtor") under the Plan to Granite Holdings I, LLC (the "Equity Purchaser"), a special purpose entity owned entirely by Lion Point, in satisfaction of the LP DIP Claims (which exceed $14.7 million and continue to accrue interest and fees) and payment by the Equity Purchaser to the Debtor of the Cash Purchase Price (defined in the Plan as $1,150,000.00 less any amounts advanced under the LP Unsecured DIP Credit Agreement in excess of $2,400,000.00) on the Effective Date.[3] The new equity to be issued under the Plan is described in Article V.A.3 of this Disclosure Statement.[4]

The Debtor believes that absent the consideration being provided by Lion Point through the Equity Purchaser, the Debtor cannot emerge from Chapter 11. The Debtor presently has no operations and no significant assets except for (i) approximately $1 million in cash which is subject to liens, (ii) a chance to receive funds from the United States government through an AD/CVD Settlement (defined herein in section III.G and also referred to as a Specified Distribution), and (iii) its leasehold interest in approximately 400MW capacity of manufacturing equipment which is important for when the company will restart operations (the timing of such restart cannot be estimated with certainty and could only occur if the Debtor exits from Chapter 11). The Debtor is not aware of any source of funding for a Chapter 11 plan other than Lion Point. No other parties have stepped forward to propose an alternative plan or funding, despite the Debtor being involved

---

[3]    "LP DIP Claims" means, collectively, the First DIP Facility Claims, the LP Secured DIP Facility Claims and the LP Unsecured DIP Facility Claims.

[4]    The Debtor believes that the amount of the LP DIP Claims and the Cash Purchase Price greatly exceed the Debtor's value today, which, given the lack of significant assets, liquidity other than from Lion Point, and operations is speculative.

in a well-publicized bankruptcy case for the last two years where its needs for funding and the possibility of an AD/CVD Settlement were well known. The potential recovery to unsecured creditors is the product of lengthy, arm's-length negotiations between Lion Point and the Committee (acting as a fiduciary to all unsecured creditors). Therefore, the Debtor believes that the consideration being provided for the Reorganized Debtor's equity, which could yield a complete loss on Lion Point's investment or could produce funds substantially in excess of Lion Point's investment (which may be used, among other things, to fund tax obligations and costs to restart Debtor's operations), is fair as is the Plan's mechanism for a potential distribution to unsecured creditors.

As set forth in section IV.B.4.iii herein, the Debtor believes that it is impossible to estimate the Debtor's chances of receiving a Specified Distribution. Similarly, the Debtor does not know when any such Specified Distribution would be received or what obligations may be imposed as conditions to receipt of the Specified Distribution (a portion of which would be netted against the Specified Distribution). Furthermore, as set forth in section VIII.A.2 herein, the Debtor also believes that in a Chapter 7 liquidation, the Debtor's Chapter 7 estate would have virtually no chance of recovering a Specified Distribution. The Debtor believes that the Plan represents the best chance of a recovery for creditors.

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan. This summary is qualified in its entirety by reference to the Plan and the exhibits attached thereto and to the Plan Supplement.

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|-------|------|-------------------|-----------|------------------------------------------|----------------------------------|
| 1 | Other Priority Claims | Unimpaired, Not Entitled to Vote | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, on the first Distribution Date after such Claim becomes an Allowed Other Priority Claim, in full satisfaction, settlement, and release of, and in exchange for such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment of such Allowed Claim in full in Cash. | $2,467,000 | 100%[5] |

---

[5]       The Plan contemplates settlement of the WARN Act Class Claim (as defined herein). Pursuant to the settlement described herein and as more fully set forth in Section 5.21 of the Plan, in full satisfaction of their claim, holders of the WARN Act Class Claim have agreed to receive an initial payment of $600,000 (the "WARN Act Class Claim Initial Consideration") with the potential for an additional payment of $1,867,000 (the "WARN Act Class Claim Contingent Consideration") on certain conditions.

6104222V.1

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|-------|------|-------------------|-----------|------------------------------------------|----------------------------------|
| 2 | Other Secured Claims | Unimpaired, Not Entitled to Vote | Unless otherwise agreed to by the holder of an allowed Secured Claim, on the Effective Date,[6] each holder of an allowed Secured Claim shall receive, at the option of the Debtor, with the consent of the Equity Purchaser and the Committee, (i) payment in full in cash, (ii) reinstatement of the legal, equitable and contractual rights of the holder relating to such Secured Claim, (iii) delivery of the collateral securing such Secured Claim or (iv) treatment in any other manner so that such Secured Claim shall otherwise be rendered unimpaired. | $0 | 100% |
| 3 | Secured Tax Claims | Impaired, Entitled to Vote | The liens securing the Secured Tax Claims shall unaffected by the Plan and shall be retained by the holder of the Secured Tax Claims.  In full satisfaction and discharge of the Secured Tax Claims, the holder of the Secured Tax Claims shall have recourse to its collateral through the enforcement of its liens pursuant to Georgia law after the Effective Date, and the Debtor shall not restrict the holder's access to its collateral.  To the extent, if any, any stay of enforcement of these liens is in effect as of the Effective Date as a consequence of the pendency of the Chapter 11 Case, such stay shall be lifted on the Effective Date in accordance with the terms of the Confirmation Order. | $783,911.03 | 0-100% |
| 4 | General Unsecured Claims | Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or | $80,000,000 | 0 – 100%[7] |

---

[6]        "Effective Date" means the date specified by the Debtor in a notice, the form and substance of which shall be reasonably acceptable to the Debtor, the Equity Purchaser and the Committee, filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in the Plan are satisfied or waived in accordance with the Plan, and no stay of the Confirmation Order is in effect.

[7]        Details related to the calculation of a potential recovery for holders of General Unsecured Claims are set

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|---|---|---|---|---|---|
| | | | elects to be treated as a holder of a Convenience Claim, in full satisfaction, settlement, and release of, and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro-Rata share of the Unsecured Creditor Distribution. | | |
| 5 | Convenience Claims | Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, as soon as reasonably practicable after such Claim is Allowed, each holder of an Allowed Convenience Claim shall receive from the Plan Administrator, in full satisfaction, settlement, release and discharge of, and | $962,963 | 15.6%[8] |

forth in section IV.B.4.iii herein.  The following illustrates potential recoveries for unsecured creditors at certain levels of Net Specified Proceeds:

| Gross Amount of Specified Distribution[1] | Amounts of Government Liabilities, Incentives, and Expenses[2] | Amount of Net Specified Proceeds | Unsecured Creditor Distribution | Estimated Recovery for General Unsecured Creditors[3] |
|---|---|---|---|---|
| $10,000,000 | $10,000,000 | $0 | $0 | 0% |
| $60,000,000 | $15,000,000 | $45,000,000 | $1,350,000 | 2.7% |
| $160,000,000 | $40,000,000 | $120,000,000 | $3,600,000 | 7.2% |
| $210,000,000 | $52,500,000 | $157,500,000 | $4,875,000 | 9.8% |
| $260,000,000 | $65,000,000 | $195,000,000 | $7,750,000 | 15.5% |
| $298,345,865 | $74,586,466 | $223,759,399 | $11,813,910 | 23.6% |
| $384,461,153 | $96,115,288 | $288,354,865 | $50,000,000 | 100% |

[1]These amounts are for illustrative purposes only.

[2]Purely for illustrative purposes, the Debtor used the greater of $10 million or 25% of the gross Specified Distribution.  The actual amounts of the government liabilities, incentives, and expenses may vary.

[3]This chart reflects the Debtor's belief that Allowed General Unsecured Claims of $50,000,000 will be eligible to receive the Unsecured Creditor Distribution.  The actual amount of Allowed General Unsecured Claims eligible to receive the Unsecured Creditor Distribution may vary.

[8]       The recovery percentage for each holder of a Convenience Claim may vary depending on (i) whether such holder elects to have a claim in excess of $25,000 reduced to $25,000 so that the claim is eligible to be treated as a Convenience Claim, and (ii) the number of creditors that make such election.

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|-------|------|-------------------|-----------|----------------------------------------|----------------------------------|
| | | | in exchange for such Convenience Claim, Cash in the amount of its Pro-Rata share of $150,000.00. | | |
| 6 | 510 Claims | Impaired, Not Entitled to Vote | There shall be no distribution to the holders of 510 Claims on account of such Claims. | $0 | 0% |
| 7 | Interests in Suniva | Impaired, Not Entitled to Vote | On the Effective Date, all Interests shall be deemed canceled and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to the holders of Interests on account of such Interests. | $0 | 0% |

## II.

## DEBTOR BACKGROUND

### A.    Description of Debtor and Debtor's Business

Suniva was founded in 2007 by Dr. Ajeet Rohatgi, one of the world's leading research scientists in photovoltaic ("PV") technology and founding director of the Georgia Institute of Technology's University Center of Excellence for Photovoltaic Research and Education, one of the world's leading PV research institutes.  Until shortly before the Debtor filed its bankruptcy petition on April 17, 2017 (the "Petition Date"), Dr. Rohatgi served as Suniva's Chief Technology Officer.

As of the Petition Date, Suniva was one of the two largest United States manufacturers (and the largest United States-based manufacturer) of PV solar cells and had manufacturing facilities at its metro-Atlanta, Georgia headquarters as well as in Saginaw, Michigan.[9]

Suniva is known worldwide for its high-quality solar panels, patented manufacturing technology, and long-term reliable performance.  Suniva has been recognized with numerous distinctions, including being named as 2016 Georgia Manufacturer of the Year by the Governor of Georgia, 2010 Renewable Energy Exporter of the Year by the Export-Import Bank of the United States, and a member of the Wall Street Journal's List of Top Venture-Backed Clean-Tech Companies in 2010.  Suniva's ground-breaking technologies for PV manufacturing, such as Ion Implantation, have resulted in cell and module efficiencies reaching 21% and 18%, while lowering

---

[9]    On July 13, 2018, Suniva rejected the lease for its facility in Saginaw, Michigan.  Suniva remains in possession of its facility in Norcross, Georgia (the "Norcross Facility").

6104222V.1

costs to levels that historically allowed it to compete with rival manufacturers located anywhere in the world. Suniva's products are used in applications that serve a wide range of market segments from residential, commercial, and government to micro-utility.

On October 15, 2015, the Debtor entered into a merger agreement with Shungfeng International Clean Energy Ltd. ("SFCE"), a company organized under the laws of the Cayman Islands. Pursuant to this transaction, SFCE provided SFCE common stock in exchange for an equity stake of approximately 64% of Suniva. The remaining 36% stake in Suniva is owned by certain of Suniva's pre-merger investors who were issued Class A common stock in exchange for shares in the pre-merger Suniva. Additionally, as part of the merger, shareholders contributed $20 million to Suniva, including $12 million from SFCE, between October 15, 2015 and January 2016.

With funding from SFCE and additional credit (described below), Suniva embarked on a significant expansion plan. On December 15, 2016, Suniva announced the completion of a nearly $100 million expansion of its facilities at its Georgia headquarters that tripled its manufacturing capacity to 450 megawatts, with further plans to expand capacity to 700 megawatts by mid-2017. However, market factors caught up to Suniva, halting further growth and forcing a cessation of substantially all of Suniva's manufacturing operations.

Certain circumstances led to Suniva's need for restructuring. For many years, Chinese manufacturers of solar cells have benefitted from favorable, state-sponsored financing and lower labor costs, allowing them to flood the United States market for solar cells and modules with cheap imports. This negatively impacted manufacturers based in the United States, such as Suniva. In 2012, the United States Department of Commerce began to impose tariffs on imports of solar cells from China with many Chinese solar manufacturing companies being subject to tariffs of approximately 30%. Notwithstanding these protections, solar cell manufacturers in the United States continue to face steep price competition from China, as well as non-China-based overseas manufacturers not subject to United States tariffs, particularly from countries in southeast Asia, including from Chinese manufacturers that have moved production from mainland China to southeast Asia and elsewhere to avoid the United States tariffs. As a result, these tariffs have not been effective in preventing dumping of Chinese solar products into the United States. These pressures were exacerbated by a drop in demand in the Chinese market resulting from the Chinese government announcing, in 2016, that it was lowering subsidies for solar energy plants, which reverberated negatively across the Chinese module and cell markets. This resulted in a production glut, further driving down global prices. Unfortunately, this downturn in solar cell prices coincided with Suniva's expansion and incurrence of significant additional debt (described below).

As a result of these market pressures, Suniva continued to experience significant losses. In 2015, the last year for which Suniva's audited financial statements are available, Suniva experienced an operating loss of $18,221,298 on revenues of $77,312,664. Suniva's net loss in 2015 was $21,364,190. In 2016, Suniva experienced a net loss of $29,247,097, and in 2017, Suniva continued to experience losses.

### B.    Debtor's Prepetition Indebtedness

Suniva was party to a certain Credit and Security Agreement with Wells Fargo Bank, National Association ("WF") dated May 25, 2012 (the "WF Credit Agreement"), as amended, by

which WF extended a revolving line of credit to Suniva (the "<u>WF Credit Facility</u>") secured by first liens on substantially all of Suniva's assets except most equipment, as discussed below.  Suniva used the WF Credit Facility to meet its day-to-day working capital needs.  The WF Credit Agreement was supported by a Standby Credit Support and Security Agreement dated November 22, 2013, by which Wanxiang America Corporation ("<u>Wanxiang</u>") provided a $15,000,000 standby letter of credit in favor of WF (the "<u>WX LOC</u>").  Wanxiang was granted a security interest in all of Suniva's assets, and such lien was expressly subordinated to WF's liens pursuant to a certain Subordination Agreement, dated November 22, 2013 (the "<u>Subordination Agreement</u>" and together with the WX LOC, the "<u>WX Credit Documents</u>").

Primarily in connection with the expansion of Suniva's Georgia facility, Suniva incurred additional indebtedness to SQN Asset Servicing, LLC ("<u>SAS</u>") and certain affiliates thereof pursuant to (i) that certain Equipment Loan and Security Agreement, dated as of April 24, 2015 (the "<u>April SQN Credit Agreement</u>"), by and between Suniva and SQN Venture Partners, LLC ("<u>SQN Venture</u>") and (ii) that certain Credit Agreement, dated as of November 17, 2015 (the "<u>November SQN Credit Agreement</u>"), by and among Suniva, SAS, and the lenders party thereto (the "<u>November SQN Lenders</u>" and together with SQN Venture and SAS, collectively, the "<u>SQN Lenders</u>" and whichever of the foregoing may be relevant as context requires, "<u>SQN</u>").[10]

Suniva's obligations under the April SQN Credit Agreement were secured by a lien in certain equipment together with any proceeds thereof.  Suniva's obligations under the November SQN Credit Agreement were secured by a lien in substantially all of the Debtor's assets.  Pursuant to a certain Parent Guaranty dated November 17, 2015, made by SFCE in favor of SAS and the November SQN Lenders, SFCE guaranteed a portion of the November SQN Facility in an amount, as of the Petition Date, equal to 63% of the principal amount borrowed by Suniva, plus certain costs and expenses (the "<u>SFCE Guaranty Agreement</u>" and together with the November SQN Credit Agreement and the April SQN Credit Agreement, the "<u>SQN Secured Credit Documents</u>").  As of March 20, 2017, the principal amount outstanding under the April SQN Credit Agreement was approximately $1,825,100, and the principal amount outstanding under the November SQN Credit Agreement was approximately $49,100,000.

Pursuant to the terms and conditions of that certain letter agreement, dated as of April 24, 2015, by and between SQN and WF, (i) WF expressly subordinated its liens in certain equipment and related proceeds (the "<u>April SQN Priority Collateral</u>") to the liens of SQN under the April SQN Facility, and (ii) SQN confirmed to WF that it had no liens under the April SQN Facility in any of Suniva's assets other than the April SQN Priority Collateral.

Pursuant to the terms and conditions of that certain letter agreement, dated as of April 25, 2015, by and between SQN and Wanxiang, (i) Wanxiang expressly subordinated its liens in the April SQN Priority Collateral to the liens of SQN under the April SQN Facility, and (ii) SQN

---

[10]    Upon information and belief, Jim Modak currently serves as Chief Financial Officer of SQN Capital Management, LLC ("<u>SQN Capital</u>"), an affiliate of SQN.  Mr. Modak served as Chief Financial Officer of Suniva from January 2008 until March 18, 2016.  After such time, Mr. Modak worked under contract with Suniva to help Suniva raise additional capital.  Suniva terminated its contract with Mr. Modak after approximately six months. Except in his capacity as an officer of SQN Capital, Mr. Modak no longer has any relationship with Suniva.

confirmed to Wanxiang that it had no liens under the April SQN Facility in any of Suniva's assets other than the April SQN Priority Collateral.

Pursuant to the terms and conditions of that certain letter agreement, dated as of November 17, 2015, by and between SQN and WF, (i) WF expressly subordinated its liens in certain equipment, certain deposit and securities accounts and the funds on deposits thereon, and all intellectual property of Suniva and the proceeds of all of the foregoing (the "November SQN Priority Collateral") to the liens of SQN under the November SQN Facility and (ii) SQN expressly subordinated its liens under the November SQN Facility in all of the assets of Suniva other than the November SQN Priority Collateral to the liens of WF.

Pursuant to the terms and conditions of that certain letter agreement, dated as of November 17, 2015, by and between SQN and Wanxiang, (i) Wanxiang expressly subordinated its liens in the November SQN Priority Collateral to the liens of SQN under the November SQN Facility, and (ii) SQN expressly subordinated its liens under the November SQN Facility in all of the assets of Suniva other than the November SQN Priority Collateral to the liens of Wanxiang.

On March 15, 2017, WF, in connection with an acceleration under the WF Credit Facility, (i) drew on the WX LOC in the full amount of $15,000,000, (ii) terminated Suniva's right to further advances under the WF Credit Facility, (iii) declared any outstanding amounts under the WF Credit Facility due and payable, and (iv) applied the proceeds from the WX LOC to WF's then outstanding balance, which WF determined to be $13,321,203.31, and outstanding letters of credit of $945,383.00. Subsequently, Wanxiang provided notice that it was succeeding to WF's rights under the WF Credit Agreement and that Suniva's inventory and proceeds of Suniva's accounts receivable should be turned over to Wanxiang. WF asserted that, after application of fees and reserves, its draw on the WX LOC may have only exceeded the amounts owed under the WF Credit Facility by $372,238.42. WF continued to collect proceeds of Suniva's accounts receivable, eventually collecting $2,023,786.97 (the "A/R Collections"). On March 23, 2017, Suniva provided notice to WF that Suniva was entitled to possession of the proceeds of Suniva's accounts receivable.

In summary, as of the Petition Date, Wanxiang had a first priority secured interest in substantially all of Suniva's assets, but not including the April SQN Priority Collateral and the November SQN Priority Collateral, in which Wanxiang's security interests were subordinate to those of SQN or in any proceeds from an AD/CVD Settlement (as defined herein). SQN's debt under the April SQN Facility was secured solely by a first-priority security interest in the April SQN Priority Collateral. SQN's debt under the November SQN Facility was secured by a first-priority security interest in the November SQN Priority Collateral and a second-priority security interest in Suniva's other assets.[11] As a result of certain stipulations and settlements approved by the Bankruptcy Court and described in greater detail below, all of WF, SQN and Wanxiang's

---

[11]    SQN Venture Income Fund LP filed a claim against Suniva in the amount of $1,668,574.39 (Claims Register #157, dated as of October 24, 2017), SQN Asset Servicing, LLC filed a claim against Suniva in the amount of $54,693,083.73 (Claims Register #159, dated as of October 24, 2017), and SQN AIF IV, L.P. filed a claim against Suniva in the amount of $1,064,595.99 (Claims Register #160, dated as of October 24, 2017). Wanxiang America Corp. filed a claim against Suniva in the amount of $0.00 (Unliquidated) (Claims Register #153, dated as of October 24, 2017) and a claim against Suniva in the amount of $15,000,000.00 (Unliquidated) (Claims Register #163, dated as of October 25, 2017).

10

claims were resolved, the security interests and liens granted by the Debtor to WF, SQN and Wanxiang have been released.

In addition to secured indebtedness described above, certain entities have asserted that Suniva owes various other prepetition amounts, including approximately $36.2 million to trade creditors, approximately $412,000 related to uncollected California sales tax,[12] approximately $41,476 in personal property taxes in Michigan and approximately $784,000 in personal property taxes in Georgia. In addition, Suniva has received various tax credits and incentives related to its manufacturing operations. Governmental entities have asserted claims related to those credits and incentives. Furthermore, Suniva is a defendant in two lawsuits brought under the Worker Adjustment and Retraining Notification Act of 1988 29 U.S.C. §§ 2101-2109 *et seq.*, including a class action before the Bankruptcy Court, styled as *Lam v. Suniva, Inc.*, Adversary Proceeding No. 17-50349 (KG) (the "WARN Act Class Action"). The WARN Act Class Action has been stayed since June 26, 2017. The *Lam* lead plaintiffs (the "WARN Act Class Representatives") have filed a proof of claim (the "WARN Act Class Claim") purportedly on behalf of themselves and other similarly situated former employees (the "WARN Act Class") asserting that they are entitled to, among other things, a priority claim in the amount of $3,084,000. Suniva filed an answer in the WARN Act Class Action disputing the allegations therein and denying all liability on the part of Suniva. As described below, the WARN Act Class Action and the WARN Act Class Claim are to be resolved through a settlement detailed in the Plan.

### C.    Debtor's Cessation of Production and Workforce Reduction

As a result of its ongoing liquidity issues, Suniva was unable to continue manufacturing operations. Similarly, sales operations were significantly curtailed. On March 29, 2017, Suniva terminated 191 out of 265 employees, including substantially all of Suniva's Michigan-based employees. Subsequently, Suniva reduced its staff further, so that as of the Petition Date, Suniva had 35 employees. As of the filing of this Disclosure Statement, and as a result of further staff reductions, Suniva has only three employees.

### III.

### OVERVIEW OF THE CHAPTER 11 CASE

### A.    Voluntary Petition

On the Petition Date, the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued, and will continue until the Effective Date, to manage its properties as a debtor-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code. An immediate effect of the filing of the Chapter 11 Case was the imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined the

---

[12]    The California sales taxes were never collected by Suniva because, at the time of the sales, it was believed that the purchasers were exempt from sales tax.

commencement or continuation of: (i) all collection efforts by creditors; (ii) enforcement of liens against any assets of the Debtor; and (iii) litigation against the Debtor.

A further description of the Debtor's corporate history, business, prepetition debt structure, and the challenges that led to the commencement of the Chapter 11 Case can be found in the *Declaration of David M. Baker in Support of First Day Motions* [D.I. 10], which was filed on the Petition Date.

### B.    Debtor's "First Day" and Other Relief

On the Petition Date, the Debtor filed a motion requesting authority to continue to use its cash management system (the "Cash Management Motion") [D.I. 3].  On April 19, 2017, the Bankruptcy Court granted the relief sought in the Cash Management Motion on an interim basis [D.I. 26], and on May 18, 2017, the Bankruptcy Court granted the relief sought in the Cash Management Motion on a final basis [D.I. 164].

Also on the Petition Date, the Debtor filed a motion requesting authority to pay prepetition employee obligations (the "Employee Wage Motion") [D.I. 4].  On April 19, 2017, the Bankruptcy Court granted the relief sought in the Employee Wage Motion on an interim basis [D.I. 25], and on May 18, 2017, the Bankruptcy Court granted the relief sought in the Employee Wage Motion on a final basis [D.I. 163].

Further, on the Petition Date, the Debtor filed an application seeking the appointment of Garden City Group, LLC ("GCG") as the Debtor's claims and noticing agent [D.I. 5].  The Bankruptcy Court approved the appointment on April 19, 2017 [D.I. 27].  On April 28, 2017, the Debtor filed an application seeking the approval of the retention of GCG as the Debtor's administrative agent [D.I. 60].  On May 18, 2017, the Bankruptcy Court approved the retention of GCG as the Debtor's administrative agent [D.I. 158].  Epiq Corporate Restructuring, LLC, as the successor to GCG, is presently the Debtor's claims and noticing agent.

On April 28, 2017, the Debtor filed an application seeking approval of the retention of Kilpatrick Townsend & Stockton LLP as counsel for the Debtor [D.I. 58], an application seeking approval of the retention of Potter Anderson & Corroon LLP as co-counsel for the Debtor [D.I. 62], and an application seeking approval of the retention of Mayer Brown, LLP as special counsel for the Debtor [D.I. 59].  These applications were approved on May 16 and 18, 2017 [D.I. 132, 159, & 160].  Additionally, on April 28, 2017, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to (A) Employ and Retain Aurora Management Partners Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring Related Services, (B) Designating David M. Baker as Chief Restructuring Officer for the Debtor, Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief* [D.I. 61].  The Bankruptcy Court approved the motion on May 18, 2017 [D.I. 157].

Further, on April 28, 2017, the Debtor filed a motion requesting authority to pay certain utility companies (the "Utilities Motion") [D.I. 63].  On May 11, 2017, the Bankruptcy Court granted the relief sought in the Utilities Motion on an interim basis, and on June 19, 2017 [D.I. 113], the Bankruptcy Court granted the relief sought in the Utilities Motion on a final basis [D.I. 215].

On May 5, 2017, the Debtor filed a motion requesting authority to pay prepetition insurance obligations (the "Insurance Motion") [D.I. 83].  On May 11, 2017, the Bankruptcy Court granted the relief sought in the Insurance Motion on a final basis [D.I. 112].

### C.    Appointment of Creditors' Committee

On April 27, 2017, the Committee was appointed by the Office of the United States Trustee for Region 3 (the "U.S. Trustee") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Case. The members of the Committee are Wacker Chemie AG, Woongjin Energy Co., LTD., Guangzhou Ruxing Technology Development, Co., Ltd., Veritiv Operating Company, and Heraeus Precious Metals North America Conshohocken LLC.

The Committee retained Seward & Kissel LLP as its lead counsel; Morris, Nichols, Arsht & Tunnell LLP as its Delaware co-counsel; and Emerald Capital Advisors as its financial advisor. On June 16, 2017, the Bankruptcy Court approved the Committee's retention of its professionals. [D.I. 206, 207, & 208].

### D.    Debtor-in-Possession Financing and Post-Petition Litigations

On the Petition Date, the Debtor filed the *Debtor's Motion for Interim and Final Orders Authorizing the Debtor to (A) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (B) Provide Security and Other Related Relief* [D.I. 6] (the "First DIP Motion"). The First DIP Motion requested authority for the Debtor to, among other things, obtain $4 million of postpetition financing (as amended from time to time, the "First DIP Facility") from SQN.

On April 19, 2017, the Bankruptcy Court entered its *Interim Order (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364 and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* [D.I. 25] (the "Interim DIP Order").  The Interim DIP Order authorized the Debtor to borrow $1,417,102 from SQN on an interim basis.

On May 10, 2017, Lion Point Capital, L.P. ("Lion Point") filed the *Objection of Lion Point Capital, LP to Debtor's Motion for Interim and Final Orders Authorizing the Debtor to (A) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (B) Provide Security and Other Related Relief* [D.I. 99] (the "Lion Point DIP Objection").

Prior to the final hearing on the First DIP Motion, and as a result of negotiations by and among the Debtor, Lion Point, SQN, and the Committee, the parties agreed to resolve the Lion Point DIP Objection.  The negotiated resolution provided for, among other things, (i) an increased funding commitment under the First DIP Facility from $4.0 million to $5.2 million, and (ii) an obligation for SQN to fund $3.9 million and Lion Point to fund $1.3 million for a total funding commitment of $5.2 million (SQN and Lion Point, the "First DIP Lenders").  The resolution additionally provided that Lion Point would fund $50,000 to SQN and $75,000 to the Debtor to reimburse SQN and the Debtor's estate for fees and expenses incurred in addressing the Lion Point DIP Objection.

On May 19, 2017, the Bankruptcy Court entered the *Final Order Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364* (the "Final DIP Order") [D.I. 169], which order

incorporated the terms of the aforementioned resolution and included a revised Debtor-in-Possession Credit Agreement (the "First DIP Credit Agreement").  In exchange for the financing provided under the First DIP Facility, the Final DIP Order provided the First DIP Lenders with, among other things, liens in all assets of the Debtor, except for avoidance actions, that are junior to all properly perfected prior liens, including those of Wanxiang and SQN.  In addition, the Final DIP Order provided the First DIP Lenders with (a) warrants representing no less than forty percent (40%) of the outstanding shares of the Borrower prior to a confirmed plan of reorganization under the Bankruptcy Code on a fully diluted basis, provided, however, (i) such percentage shall be increased to seventy-five percent (75%) after further notice, hearing and order of the Court, and (ii) unless the warrants are exercised prior to confirmation, the Debtor or Committee shall not propose a plan of reorganization under the Bankruptcy Code that provides for such percentage to be less than seventy-five percent (75%) of the reorganized Borrower on a fully diluted basis, in a form and substance reasonably acceptable to the DIP Agent (the "DIP Lender Warrants"); and (b) if a successful determination in the Trade Case (as defined herein) is made in favor of the Debtor, then a fee in the amount equal to sixty percent (60%) of the increase in the value of the stock and other equity interest in the Debtor resulting from such successful determination of the Trade Case (the "Trade Case Success Fee").  For the avoidance of doubt, the Trade Case Success Fee was only payable if there was a 100% recovery on account of general unsecured claims in cash or securities or a combination thereof, after taking into account the payment in cash or equity of the Trade Case Success Fee.

On July 18, 2017, the Bankruptcy Court entered the *Order Approving Debtor's Motion to Increase Warrant Percentage Pursuant to Final DIP Order* (the "SQN DIP Lender Warrant Order") [D.I. 246], which granted the First DIP Lenders Warrants representing 75% of the outstanding shares of the Debtor prior to a confirmed plan of reorganization on a fully diluted basis.  The Warrants granted under the SQN DIP Lender Warrant Order replaced the Warrants previously granted to the First DIP Lenders under the Final DIP Order.

On August 17, 2017, the Debtor filed its *Motion of Debtor for Entry of an Order (I) Approving an Incentive Program for a Key Employee; and (II) Increasing the Post-Petition Lending Commitment to Fund the Proposed Incentive Program* [D.I. 28] (the "KEIP Motion"). Pursuant to the KEIP Motion, the Debtor sought, among other things, a $100,000 increase in the First DIP Lenders' total funding commitments under the First DIP Credit Agreement to pay amounts related to the proposed key employee incentive plan (the "KEIP").  On September 5, 2017, the Bankruptcy Court entered an Order approving the KEIP Motion [D.I. 307] (the "KEIP Order"), thereby increasing the total funding commitments under the First DIP Credit Agreement to $5.3 million.

On October 5, 2017, the Debtor filed the *Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to Enter Into an Amendment to the DIP Credit Agreement* (the "DIP Amendment Motion") [D.I. 337].  Pursuant to the DIP Amendment Motion and a supplement filed in connection therewith, the Debtor and the First DIP Lenders agreed to enter into an amendment to its existing First DIP Credit Agreement (the "First Amendment").  On October 13, 2017, the Court entered an Order approving the DIP Amendment Motion.  Pursuant to the First Amendment: (i) the aggregate commitments under the First DIP Credit Agreement were increased by $3,001,398 such that the aggregate Commitments of all the First DIP Lenders totaled $8,306,398;

and (ii) a revised form of budget was agreed to that covered the period from October 1, 2017 through and including December 31, 2017.

On January 3, 2018, the Bankruptcy Court entered the Order Authorizing the Debtor to Enter into a Second Amendment to the DIP Credit Agreement [D.I. 445] (the "Second DIP Amendment Order"), pursuant to which, among other things, the Debtor was authorized to enter into a second amendment to its existing First DIP Credit Agreement (the "Second Amendment"). Pursuant to the Second Amendment: (i) the aggregate commitments under the First DIP Credit Agreement were increased by $1,240,687 such that the aggregate Commitments of all the First DIP Lenders totaled $9,547,085; (ii) a revised form of budget was agreed to that covered the period from January 1, 2018 through February 15, 2018; (iii) the Applicable Margin (as defined in the First DIP Credit Agreement) was increased to thirteen percent (13%) per annum for any day on or after January 1, 2018; (iv) the Scheduled Maturity Date (as Defined in the First DIP Credit Agreement) was extended until March 15, 2018; and (v) the Trade Case Success Fee was increased to 70%, subject to a further order of the Bankruptcy Court.

On January 18, 2018, the Debtor filed a motion seeking approval and authorization of a stipulation by and among the Debtor, the Committee, Wanxiang, and WF regarding certain cash collateral held by WF (the "WF Cash Collateral Stipulation") [D.I. 479]. Pursuant to the WF Cash Collateral Stipulation, among other things, (i) WF agreed to turn over the A/R Collections and the proceeds of the WX LOC (collectively, the "Wells Fargo Cash") to Wanxiang, less certain fees, expenses and reserves for the outstanding letters of credit, and (ii) WF waived any claims it had against the Debtor and released any liens or security interests in had in any of the Debtor's property. To resolve an objection by the Georgia Tech Research Corporation ("GTRC"), an escrow account was established to hold $362,192 (the "GTRC Escrow"). The Bankruptcy Court entered an order approving the WF Cash Collateral Stipulation on February 14, 2018 [D.I. 516].

On February 16, 2018, the Court entered its *Order Authorizing the Debtor to Enter Into a Third Amendment to the DIP Credit Agreement* [D.I. 527], that, among other things, approved a two-week budget through the week of February 26, 2018, and increased the amount the Debtor was permitted to borrow under the First DIP Facility to $9,762,796. Although this budget did not cover a period beyond the week of February 26, 2018, the First DIP Lenders continued to fund the Debtor's payroll obligations, among other expenses, under the First DIP Credit Agreement.

On March 8, 2018, SQN provided notice of certain events of default under the First DIP Facility to the Debtor.

On March 23, 2018, SQN, in its capacity as prepetition lender to the Debtor (the "SQN Prepetition Lender"), filed its *Motion of SQN Asset Servicing, LLC for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362* [D.I. 596]. On April 17, 2018, the Court entered its *Order Granting Motion of SQN Asset Servicing, LLC for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362* [D.I. 635] and authorizing SQN to repossess and dispose of certain equipment and other collateral (the "SQN Prepetition Collateral") under the November SQN Credit Agreement and to enforce any and all rights and remedies available to the SQN Prepetition Lender under the SQN prepetition credit documents.

On April 17, 2018, the Court entered its *Order Authorizing the Debtor to Enter Into a Fourth Amendment to the DIP Credit Agreement* [D.I. 636] (the "Fourth Amendment Order"), that, among other things, approved a 7-week budget through the week of May 14, 2018 (the "Fourth Updated Budget") and increased the amount the Debtor was permitted to borrow under the First DIP Facility to $10,639,543.00.

On April 26, 2018, Wanxiang filed the *Motion of Wanxiang America Corporation for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362* [D.I. 651]. On May 3, 2018, the Court entered its *Agreed Order Granting Wanxiang America Corporation Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 Relating to Certain Equipment and Spare Parts* [D.I. 665] (the "Wanxiang Order"), that, among other things, authorized Wanxiang to obtain possession and dispose of the Wanxiang Equipment (as defined therein).

On May 9, 2018, SQN provided notice of an additional event of default under the First DIP Facility. On May 11, 2018, the Debtor responded to the notice, disputing the May 9th event of default, and asserting, that as result of SQN's failure to fund certain draw requests, SQN, as a SQN DIP Lender, was a defaulting lender under the First DIP Facility, and the Carve Out provided in the SQN DIP Order was amended as provided under paragraph 3 of the Fourth Amendment Order.

On May 15, 2018, the Bankruptcy Court entered an order providing that $25,000 was distributed from the GTRC Escrow to the GTRC and the balance to Wanxiang [D.I. 681].

On May 21, 2018, following the March 8, 2018 notice of default under the First DIP Facility, and negotiations between the Debtor, SQN and Lion Point to provide further postpetition funding to assist with the Debtor's reorganization, the Debtor filed the *Debtor's Motion for an Order Authorizing the Debtor to (A) Incur Postpetition Debt; and (B) Provide Security and Other Related Relief* [D.I. 689] (the "LP Secured DIP Motion"). On May 29, 2018, the Bankruptcy Court entered its order approving the LP Secured DIP Motion which, among other things, approved a twenty-week budget (the "First Lion Point Budget") through and including October 7, 2018, and provided the Debtor with access to a $1,999,634.00 delayed-draw term loan facility (the "LP Secured DIP Facility").

On May 24, 2018, SQN and Wanxiang conducted an auction under Article 9 of the Uniform Commercial Code for the SQN Prepetition Collateral and the Wanxiang Equipment. At the auction, SQN was the only bidder for SQN's first lien equipment collateral, with a credit bid of $25 million, and Wanxiang was the only bidder for the Wanxiang Equipment, with a credit bid of $3 million. Additionally, SQN was the only bidder for the Debtor's intellectual property, with a credit bid of $50,000, and Wanxiang was the only bidder for the Debtor's general intangibles, with a credit bid of $50,000. On May 29, 2018, SQN and Wanxiang closed on their credit bids. Accordingly, following the auction, the SQN Prepetition Collateral and the Wanxiang Equipment the Debtor's general intangibles ceased to be property of the Debtor's estate.

In late July 2018, concerned that the Norcross Lease would be deemed rejected on August 1, 2018 if additional funding was not provided, and after approval of the Fifth Stipulation Extending the Date to Assume or Reject Norcross, Georgia Lease (the "Norcross Stipulation"), Lion Point provided approximately $500,000 directly to the landlord for the Norcross Facility (the

<u>Norcross Landlord</u>") so that the Debtor could extend the deadline for assuming or rejecting the Norcross Lease.[13]

On August 2, 2018, the Debtor sent letters to SQN and Wanxiang, requesting that by August 16, 2018, SQN and Wanxiang either (i) remove their respective equipment (the "<u>Equipment</u>"), or (ii) begin to remove their respective equipment and enter into agreements to remove their respective equipment, or face a dispossessory action in Georgia state court seeking to compel removal of the Equipment (such action, the "<u>State Court Action</u>").

On August 10, 2018, SQN commenced the adversary proceeding styled as *SQN Asset Servicing, LLC v. Suniva, Inc., et al.*, Adversary Proceeding No. 18-50687-KG (the "<u>Adversary Proceeding</u>") by filing a complaint seeking an injunction preventing the Debtor and Lion Point from taking any action, directly or indirectly, to remove the SQN Equipment from the Norcross Facility, and asserted that doing so would cause irreparable harm to the Debtor's chances to receive funds from an AD/CVD Settlement (as defined herein). *See* No. 18-50687-KG, D.I. 3. Additionally, SQN filed a motion seeking a temporary restraining order and preliminary injunction (the "<u>TRO/PI Motion</u>"). *See* No. 18-50687-KG, D.I. 2.

On August 14, 2018, the Debtor and Lion Point jointly filed an objection to the entry of a temporary restraining order in the Adversary Proceeding. On August 15, 2018, the Committee intervened in the Adversary Proceeding, and the Bankruptcy Court, after a hearing, entered an order denying the temporary restraining order later that day. *See* No. 18-50687-KG, D.I. 23 and 25.

On August 17, 2018, the Debtor commenced the State Court Action, in which it sought, among other things, a writ requiring SQN and Wanxiang to remove the Equipment from the Norcross Facility

From late August and continuing through October, SQN, the Debtor, the Committee, and Lion Point engaged in substantial discovery and other litigation related to the Adversary Proceeding.

On October 1, 2018, SQN dismissed Lion Point from the Adversary Proceeding and also filed an amended complaint in the Adversary Proceeding. *See* No. 18-50687-KG, D.I. 44 & 45.

On October 23, 2018, the Debtor filed the *Debtor's Motion for an Order (I) Authorizing Debtor to Obtain Unsecured Postpetition Financing and Granting Administrative Expense Status Pursuant to 11 U.S.C. §§ 105(a) and 364(c); and (II) Granting Related Relief* (the "<u>LP Unsecured DIP Motion</u>") [D.I. 896] seeking authorization to obtain unsecured postpetition financing consisting of a $3,444,943 delayed-draw term loan facility provided by Lion Point.

On October 31, 2018, SQN withdrew the TRO/PI Motion. *See* No. 18-50687-KG, D.I. 101. On November 6, 2018, SQN objected to the LP Unsecured DIP Motion. [D.I. 909].

---

[13]    Subsequently, and as provided for in the Norcross Stipulation, Lion Point provided additional funds to extend the Debtor's deadline to assume or reject the Norcross Lease from January 31, 2019 to April 30, 2019.

6104222V.1

The Debtor, SQN, Wanxiang, Lion Point, and the Committee engaged in extensive negotiations in an effort to reach a comprehensive and global settlement. The parties reached agreement and on November 14, 2018, the Debtor filed the *Motion for Approval of Global Settlement Agreement* [D.I. 925] seeking the Court's approval of a global settlement (the "<u>Global Settlement</u>") of the pending litigations among other issues. The Debtor filed a *Further Redacted Motion for Approval of Global Settlement Agreement* [D.I. 932] on November 15, 2018 setting forth certain of the terms of the global settlement agreement (the "<u>Settlement Agreement</u>"), which, among other things, resulted in the following:

- Lion Point or its affiliate acquired 100% of SQN's claims arising from the First DIP Facility, leaving Lion Point or its affiliate as the sole DIP Lender.

- SQN and Wanxiang released any and all security interests in the Debtor's property.

- SQN dismissed the Adversary Proceeding and the Debtor dismissed the State Court Action.

- The terms for the Debtor's future use of Equipment at the Norcross Facility.

- Treatment of SQN and Wanxiang's unsecured Deficiency Claims under the Plan.

- Waiver and release of certain claims among SQN, Wanxiang, the Debtor, Loin Point and the Committee; and

- SQN and Wanxiang agreeing to not object to any further financing provided by Lion Point to the Debtor.

On November 20, 2018, the Bankruptcy Court entered orders granting the LP Unsecured DIP Motion [D.I. 943] and approving the Settlement Agreement [D.I. 941].

On February 13, 2019, the Debtor filed a motion seeking to enforce the Settlement Agreement [D.I 1019] (the "<u>Motion to Enforce</u>"), in which the Debtor sought a determination from the Bankruptcy Court regarding the terms of the equipment lease and license agreement, by and among the Debtor, the Equity Purchaser, SQN, and Wanxiang that was contemplated by the Settlement Agreement (the "<u>Equipment Lease</u>"). Among other things, the Settlement Agreement required the Equipment Lease to provide that SQN will license the Debtor's former intellectual property to the Debtor and that SQN and Wanxiang will lease the Equipment to the Debtor for at least two years from the date the Plan becomes effective, with an option for the Debtor to purchase the Equipment or extend the lease under certain circumstances. Pursuant to the Motion to Enforce, the Debtor sought an order finding that the terms of that certain Definitive Equipment Lease and License Agreement (Exhibit C to the Motion to Enforce) were binding on the Debtor, the Equity Purchaser, SQN, and Wanxiang. Subsequent to the filing of the Motion to Enforce, the parties agreed on certain modifications to the Definitive Equipment Lease and License Agreement to resolve certain matters raised in the Motion to Enforce, but did not resolve others (namely, responsibility for outstanding ad valorem taxes, certain of which presently constitute liens against

18

the Equipment).[14]  On February 28, 2019, the Bankruptcy Court held a hearing on the Motion to Enforce.  On March 1, 2019, the Bankruptcy Court entered its Memorandum Order [D.I. 1067], imposing the terms of the Definitive Equipment Lease and License Agreement, as modified by agreement of the parties, except the terms governing the treatment of certain 2017 and 2018 ad valorem taxes.  The Bankruptcy Court has scheduled a hearing on March 19, 2019, to determine responsibility for the 2017 and 2018 ad valorem taxes.  If the Bankruptcy Court determines that the Debtor is responsible for such taxes (totaling $1,706,916.51), recoveries to general unsecured creditors will be reduced because the Debtor will require additional funding to satisfy such taxes and that funding will be netted against the Specified Distribution (as defined herein), thereby reducing the amount of the Unsecured Creditor Distribution (as described in section IV.B.4.).

> ### E.    <u>Claims Process and Bar Dates</u>

Pursuant to an order dated September 8, 2017 [D.I. 313], the Bankruptcy Court established the following deadlines for filing Proofs of Claim in the Chapter 11 Case:

- October 25, 2017 (the "<u>General Bar Date</u>") for all Claims, except as noted below;

- November 17, 2017 for government units holding Claims against the Debtor;

- for Claims amended or supplemented by amended schedules, the later of (a) the General Bar Date and (b) the date that is thirty (30) days after the date that notice of the applicable amendment to the Schedules is served on the claimant; and

- for any claims arising from or relating to the rejection of executory contracts or unexpired leases, in accordance with section 365 of the Bankruptcy Code and pursuant to an order of the Bankruptcy Court entered prior to the confirmation of the Plan (any such order, a "<u>Rejection Order</u>"), the later of (a) the General Bar Date and (b) the date that is thirty (30) days after the entry of the applicable Rejection Order.

On January 24, 2018, the Debtor filed a motion seeking to establish a deadline for filing a request for allowance of certain administrative expense claims arising during the period from the Petition Date through and including January 31, 2018 [D.I. 491] (the "<u>Administrative Expense Claim Bar Date Motion</u>").  On February 9, 2018, the Bankruptcy Court entered an Order [D.I. 507] establishing March 26, 2018 at 4:00 p.m. (ET) as the deadline to file claims asserting administrative expense priority under section 503(b) of the Bankruptcy Code ("<u>Administrative

---

[14]    As noted in section II.B. above, the Gwinnett County Tax Commissioner has filed two proofs of claim related to 2017 ad valorem taxes in a combined amount of $783,911.03.  In December 2017, the Gwinnett County Tax Commissioner filed tax liens for the 2017 ad valorem taxes.  These liens attach to the Equipment and form the basis for the Secured Tax Claims (the Plan's treatment of which is described in section IV.B.3.).  Subsequent to SQN and Wanxiang foreclosing on the Equipment, the Debtor received two 2018 ad valorem tax bills from the Gwinnett County Tax Commissioner in a combined amount of $775,132.96 and two 2018 ad valorem tax bills from the City of Norcross in the combined amount of $133,222.49.  The 2018 ad valorem taxes arose on January 1, 2018, and, therefore, were subject to the First Administrative Expense Claim Bar Date.  The taxing authorities did not file Administrative Expenses Claims by the First Administrative Expense Claims Bar Date, and, therefore, the Debtor asserts such taxes are barred from being asserted against the Debtor's estate.  Nonetheless, the 2018 taxes also could give rise to tax liens being filed against the Equipment.

Expense Claims"), other than section 503(b)(9) claims, which arose during the period from the Petition Date through and including January 31, 2018 (the "First Administrative Expense Claim Bar Date").

The following types of Administrative Expense Claims were excepted from and were not required to be filed by the First Administrative Expense Claim Bar Date:

- any Administrative Expense Claims that (a) have been previously paid by the Debtor in the ordinary course of business or otherwise (b) have been allowed by order of the Court;

- Administrative Expense Claims previously filed with the Claims Agent or the Court;

- Administrative Expense Claims held by a person or entity that has filed a motion requesting allowance of such Administrative Expense Claim prior to the filing of the Administrative Expense Claim Bar Date Motion;

- Administrative Expense Claims of any professional retained and employed by the Debtor or the Committee, pursuant to sections 327, 328, or 1103 of the Bankruptcy Code, including any ordinary course of business professionals retained, pursuant to an order of the Bankruptcy Court approving the employment of ordinary course business professionals, for compensation, indemnification, or reimbursement of costs and expenses relating to professional services performed and expenses incurred on and after the Petition Date;

- any claims by any member of the Committee for reimbursement of expenses incurred in connection with the member's service on the Committee;

- any claims for fees payable to the Clerk of the Bankruptcy Court;

- any fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6) or accrued interest thereon arising under 31 U.S.C. § 3717;

- any claim held by the DIP Agent, or any DIP Lender; and

- Administrative Expense Claims arising after January 31, 2018.

The Order setting the First Administrative Expense Claim Bar Date provided that "Any person or entity purportedly holding an Administrative Expense Claim that is required to file a Request for Payment, but fails to do so properly or timely in accordance with the Administrative Expense Bar Date Order, shall not, absent further order of this Court, participate in any distribution in this chapter 11 case on account of such alleged Administrative Expense Claim, or, in the event that this case is converted, in any case under Chapter 7." [D.I. 507].

The Debtor provided notice of the deadlines above as required by their respective Orders. The Debtor is in the process of reviewing the Proofs of Claims and Administrative Expense Claims filed in the Chapter 11 Case.

F.      **Exclusivity**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a Chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "Exclusive Plan Period"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the Chapter 11 case to obtain acceptances of such plan (the "Exclusive Solicitation Period," and together with the Exclusive Plan Period, the "Exclusive Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. On July 14, 2017, the Bankruptcy Court entered an order extending the Exclusive Plan Period to December 13, 2017, and the Exclusive Solicitation Period to February 11, 2018 [D.I. 240]. The Debtor filed a second motion to extend the Exclusive Periods on December 13, 2017 [D.I. 425] (the "Second Exclusivity Extension Motion"). On March 27, 2018, the Bankruptcy Court entered an order extending the Exclusive Plan Period to through and including March 13, 2018 and the Exclusive Solicitation Period to May 12, 2018 [D.I. 602]. The Exclusive Periods expired thereafter.

G.      **Debtor's Section 201 Petition and Other Trade Relief**

One of the conditions of the First DIP Facility was that Suniva prosecute a petition under section 201 of the Trade Act of 1974, 19 U.S.C. § 2251 ("Section 201"). Whereas Chinese and Taiwanese manufactured solar cells are subject to additional United States antidumping and/or countervailing duty tariffs, solar cells manufactured elsewhere were not. It was solar cells manufactured in southeast Asia, and included in solar modules or panels, that were flooding the United States market, driving down prices. Domestic industries seriously injured or threatened with serious injury by increased imports may petition the United States International Trade Commission (the "USITC") under Section 201 for import relief. After being petitioned, the USITC determines whether an article is being imported in such increased quantities that it is a substantial cause of serious injury, or threat thereof, to the United States industry producing an article like or directly competitive with the imported article.

On April 26, 2017, Suniva filed its Section 201 petition with the USITC (the "Trade Case"). As a result of filing the Section 201 petition and completing other related tasks, the USITC formally initiated the Trade Case on May 23, 2017. Thereafter, on September 22, 2017, the USITC issued a unanimous decision determining that the increased imports of crystalline silicon photovoltaic cells into the United States have caused serious injury to the domestic solar industry (the "Injury Determination").[15] As a result of the favorable Injury Determination, the USITC proceeded to the remedy phase of the Trade Case and held a public hearing on remedy on October 3, 2017. The USITC submitted its report containing its injury determination, remedy recommendations, certain additional findings, and the basis for them to the President by November 13, 2017 (the "Remedy Recommendation").[16] Following the Remedy Recommendation, the Office of the United States Trade Representative (the "USTR"), the federal agency responsible for developing and recommending United States trade policy to the President, requested that the

---

[15]     The USITC's Injury Determination resulted from a 4-0 vote.

[16]     The Remedy Recommendation was not unanimous. However, all of the USITC commissioners recommended four years of tariffs on the import of solar cells and modules.

Debtor and other parties provide briefing on the Trade Case in connection with the Remedy Recommendation. The Debtor and other parties fully complied with and provided the additional briefing as requested. As part of its recommendation process, the USTR conducted a hearing on the Trade Case on December 6, 2017. On January 22, 2018, the USTR announced the President's decision on the Trade Case, namely imposing safeguard tariffs on imported solar cells and modules as follows: Year 1 – 30%; Year 2 – 25%; Year 3 – 20%; and Year 4 – 15%. The tariffs do not apply to the first 2.5 gigawatts imported each year.

Consistently with the announcement made by the Office of the U.S. Trade representative on January 22, 2018,[17] in February of 2018, the Debtor participated in a meeting that the USTR convened with members of the domestic solar and the domestic polysilicon industries, at which several issues were discussed, including the antidumping and countervailing duty orders on Chinese and Taiwanese cells and modules, and the opportunity to settle those orders with a goal of fair and sustainable trade throughout the domestic whole solar energy value chain, which would benefit U.S. producers, workers, and consumers (the "AD/CVD Settlement").

IV.

**THE PLAN**

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE DEBTOR URGES ALL HOLDERS OF CLAIMS AND INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.

### A. Summary of Classification of Claims and Interests

All Claims and Interests, except Administrative Expense Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims, as described in Article 2 of the Plan, are not classified in the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which Classes are: (a) Impaired or Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or deemed to reject the Plan:

---

[17] https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/january/president-trump-approves-relief-us.

22

| Class | Claims | Status | Voting Rights |
|-------|--------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept |
| Class 3 | Secured Tax Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Convenience Claims | Impaired | Entitled to Vote |
| Class 6 | 510 Claims | Impaired | Not Entitled to Vote; Deemed to Reject |
| Class 7 | Interests in Suniva | Impaired | Not Entitled to Vote; Deemed to Reject |

**B.**    **Treatment of Classified Claims and Interests**

1.    **Class 1—Other Priority Claims**.

i.    Description: Any Claim against the Debtor entitled to priority in payment as specified in Bankruptcy Code section 507(a), other than an Administrative Expense Claim, the LP DIP Claims, a Fee Claim, or a Priority Tax Claim.

ii.    Class 1 consists of Other Priority Claims.

iii.    Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, on the later of the Effective Date or ten (10) Business Days after such Claim becomes an Allowed Other Priority Claim, in full satisfaction, settlement, and release of, and in exchange for such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment of such Allowed Claim in full in Cash.

iv.    Section 5.21 of the Plan provides the terms of the WARN Act Settlement.  Pursuant to the WARN Act Settlement, the WARN Act Class will receive cash in the amount of the WARN Act Class Claim Initial Consideration, plus, if the Net Specified Proceeds received by the Debtor or the Reorganized Debtor (or any successor or assigns) exceeds $150,000,000.00, cash in the amount of the WARN Act Class Claim Contingent Consideration.

No later than ten (10) Business days after the Effective Date, the Reorganized Debtor shall pay the WARN Act Class Claim Initial Consideration to counsel for the for the WARN Act Class ("WARN Act Class Counsel") via wire transfer, according to instructions to be supplied by WARN Act Class Counsel.

As of the Effective Date, members of the WARN Act Class shall be

23

vested with the indefeasible right to receive their pro-rata share of the WARN Act Class Claim Contingent Consideration. If conditions for payment of the WARN Act Class Claim Contingent Consideration are satisfied, then, no later than thirty (30) days after receipt by the Reorganized Debtor of the Specified Distribution, the Reorganized Debtor shall pay WARN Act Class Counsel the WARN Act Class Claim Contingent Consideration.

Payments to WARN Act Class Counsel of the WARN Act Class Claim Initial Consideration and the WARN Act Class Claim Contingent Consideration (if conditions for payment of the WARN Act Class Claim Contingent Consideration are met) shall satisfy any obligation the Debtor or Reorganized Debtor has on account of the WARN Act Class Claim or WARN Act Class Action, including any costs or attorneys' fees sought by the WARN Act Class and/or the WARN Act Class Counsel. WARN Act Class Counsel shall retain a settlement administrator who shall be responsible for preparing and mailing Pro-Rata distributions of the WARN Act Class Initial Consideration and the WARN Act Class Claim Contingent Consideration, along with IRS 1099 forms, as soon as reasonably possible to each member of the WARN Act Class net of: (a) the Service Payments,[18] from which no fees shall be withheld; and (b) WARN Act Class Counsel's fees, which shall be 33 1/3% of any distribution received (minus the one-time Service Payments) under the WARN Act Class Settlement, plus WARN Act Class Counsel's out-of-pocket expenses, which shall include the fees and costs of the settlement administrator, which fees and costs are projected to be no more than $15,000.

Within fifteen (15) Business Days of the Effective Date of the Plan, the WARN Act Class representatives and the Reorganized Debtor shall execute and file a dismissal with prejudice of the WARN Act Class Action.

The WARN Act Class Claim shall be Allowed as an Other Priority Claim in the amount of $2,447,000.00 pursuant to Section 507(a)(4) of the Bankruptcy Code without the need for such WARN Act Class Counsel or any member of the WARN Act Class to take any further action to seek allowance of such claim. The Allowed WARN Act Class Claim shall be entitled only to the WARN Act Class Claim Initial Consideration and the WARN Act Class Claim Contingent Consideration (if any) as set forth in Section 5.21 of the Plan. The allowance of the WARN Act Class Claim shall serve to nullify and void any and all claims previously filed by members of the WARN Act Class on account of any purported obligations of the Debtor under the WARN Act. The Debtor or Reorganized Debtor and the Claims Agent shall be authorized to take all necessary actions to expunge from the claims register any and all such nullified and voided and nullified claims.

2.     **Class 2—Other Secured Claims.**

i.     Description: Any secured claim that is not a Secured Claim.

ii.     Class 2 consists of the Other Secured Claims, if any.

iii.     Treatment: Except as noted herein, unless otherwise agreed to by the holder of an allowed Secured Claim, on the Effective Date, each holder of an allowed Secured Claim shall receive, at the option of the Debtor, with the consent of the Equity Purchaser, (i)

---

[18]     The term Service Payments means one-time payments of $3,500 each to the WARN Act Class Representatives for their service to the WARN Act Class in this Chapter 11 Case and the WARN Act Class Action.

payment by the Reorganized Debtor in full in cash, (ii) reinstatement of the legal, equitable and contractual rights of the holder relating to such Secured Claim, (iii) delivery of the Collateral securing such Secured Claim or (iv) treatment in any other manner so that such Secured Claim shall otherwise be rendered unimpaired.

iv.    The United States Department of Energy (the "DOE") filed a proof of claim [Claims Register No. 50] (the "DOE Claim") asserting an interest in certain property acquired pursuant to US Government Award # DE-EE 0006352 and US Government Award # DE-EE0006815 (the "DOE Awards"), in addition to asserting a claim for amounts allegedly overbilled by the Debtor under the DOE Awards. In its proof of claim, the DOE asserts that Suniva purchased three pieces of equipment with proceeds of the DOE awards, including: (i) Meyer Burger MAiA PECVD, Serial Number 28167; (ii) Jonas and Redmann wafer handling unit for MAiA PECVD, Serial Number 500 100 2652; and (iii) Tempress Low Pressure Chemical Vapor Deposition furnace, Tempress Model Number TS-1254 RH Serial Number 15-G-950. On May 29, 2018, SQN acquired the Meyer Burger and Jonas and Redmann equipment through its credit bid at its foreclosure sale. The Debtor still owns the Tempress equipment. The DOE Claim with respect to DOE's interest in property acquired pursuant to DOE Awards, if any, and any liens securing it that attach to assets of the Debtor are unaffected by the Plan and shall be reinstated in full. The portion of the DOE Claim relating to asserted alleged overbilling by the Debtor under the DOE Awards shall be treated as a Class 4 - General Unsecured Claim to the extent allowed.

3.    **Class 3—Secured Tax Claims.**

i.    Description:    Claims filed by the Gwinnett County Tax Commissioner for prepetition personal property taxes in the amounts of $674,777.53 [Claims Register No. 58] and $109,133.50 [Claims Register No. 59] (the "Secured Tax Claims").

ii.    Class 3 consists of the Secured Tax Claims.

iii.    Treatment:  Pursuant to section 502(b)(3) of the Bankruptcy Code, the Secured Tax Claims are non-recourse claims that are fully-secured by statutory, first-priority liens on equipment owned by the Debtor on the Petition Date having an aggregate value in excess of the Secured Tax Claims. These liens shall be unaffected by the Plan and shall be retained by the holder of the Secured Tax Claims notwithstanding the confirmation of the Plan. In full satisfaction and discharge of the Secured Tax Claims, the holder of the Secured Tax Claims shall have recourse to its collateral through the enforcement of its liens pursuant to Georgia law after the Effective Date, and the Debtor shall not restrict the holder's access to its collateral. To the extent, if any, any stay of enforcement of these liens is in effect as of the Effective Date as a consequence of the pendency of the Chapter 11 Case, such stay shall be lifted on the Effective Date in accordance with the terms of the Confirmation Order.

4.    **Class 4—General Unsecured Claims.**

i.    Description:  Any unsecured Claim against the Debtor not entitled to priority in payment as specified in Bankruptcy Code section 507(a), except for Convenience Claims, 510 Claims, including Claims arising out of the rejection of Executory Contracts and Unexpired Leases.

ii.     Classification:  Class 4 consists of the General Unsecured Claims.

iii.    Treatment:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or elects to be treated as a holder of a Convenience Claim, in accordance with Section 5.20 of the Plan, in full satisfaction, settlement, and release of, and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro-Rata share of the Unsecured Creditor Distribution.

The term Unsecured Creditor Distribution means the right to a portion of the Net Specified Proceeds received by the Debtor or the Reorganized Debtor (or any successors or assigns), as follows: (i) 3% of any Net Specified Proceeds up to $150,000,000.00; (ii) 5% of any Net Specified Proceeds from $150,000,000.01 to $175,000,000.00; (iii) 10% of any Net Specified Proceeds from $175,000,000.01 to $200,000,000.00; (iv) 15% of any Net Specified Proceeds from $200,000,000.01 to $225,000,000.00; (v) 50% of any Net Specified Proceeds from $225,000,000.01 to $250,000,000.00; (vi) 66.5% of any Net Specified Proceeds from $250,000,000.01 to $300,000,000.00; and (vii) 15% of any Net Specified Proceeds above 300,000,000.01.

The term Net Specified Proceeds means the Specified Distribution, net of any (i) government-related liabilities including but not limited to expected taxes, including those calculated or incurred (a) at the Reorganized Debtor corporate level (if the Reorganized Debtor is a corporation or other taxable entity) at the highest marginal tax rate for such applicable entity, and (b) at the limited partner/owner level, in respect of any limited partner or any other person or entity having any economic or ownership interest, whether direct or indirect, in the Reorganized Debtor or in any direct or indirect parent company of the Reorganized Debtor (at the highest marginal tax rate applicable to an individual resident in New York City), as well as any other taxes, obligations, contractual or otherwise, required to be incurred as condition to a Specified Distribution (for example:  sums to reinvest in capital assets; to hire workers; to start-up operations; or similar costs); provided that the Net Specified Proceeds will be increased or decreased promptly following payment of any such expected corporate level taxes referred to in clause (a) above in this paragraph by the amount, if any, that such expected taxes exceeded or underestimated the actual taxes paid by the Reorganized Debtor, (ii) incentives (including those granted to the Norcross Landlord) subject to a cap of $12,500,000.00, and (iii) consulting, accounting, legal fees, and other expenses incurred by the Equity Purchaser and/or the Debtor relating to the pursuit of the Specified Distribution, subject to a cap of $10,000,000.00.

There is no guaranty that the Debtor will receive a Specified Distribution of any amount or that a Specified Distribution will occur within a certain period.  In other words, the Debtor may never receive a Specified Distribution, and even if it does receive a Specified Distribution, it may be several years from now.  Due to the fact that there is no cap on the government-related liabilities that will be netted against the Specified Distribution, it is impossible to estimate the size of the Unsecured Creditor Distribution based solely on the size of the Specified Distribution, as the amount of such government-related liabilities is unknown.  Similarly, it is impossible to determine the amounts of incentives that may be conditions for receiving the Specified Distribution or the amounts of expenses that might be incurred by the Equity Purchaser and/or the Debtor.  (Unlike the government liabilities, the amounts of incentives and expenses that may be netted against the Specified Distribution are capped at $12,500,000 and

26

$10,000,000, respectively.)  Furthermore, the Debtor is not able to estimate the likely size of the Specified Distribution.  What is known is that if the Debtor does not receive the Specified Distribution, then there is no chance of an Unsecured Creditor Distribution.

            The term Specified Distribution means any distribution of pooled funds collected through any imposition of federal duties pursuant to CSPV AD/CVD 1[19] and CSPV AD/CVD 2[20] and any settlement related thereto that is paid to the Debtor or the Reorganized Debtor (or any successors or assigns).[21]  Any settlement of CSPV AD/CVD 1 and CSPV AD/CVD 2 is within the discretion of the United States government.

            By way of example, if the Reorganized Debtor receives a Specified Distribution of $55 million, and the Specified Distribution is conditioned upon the Reorganized Debtor providing $3 million in incentives, and the Reorganized Debtor has spent $2 million in consulting, accounting, and legal fees pursuing the Specified Distribution, the Net Specified Distribution will be $50 million.  In such a scenario, the Unsecured Creditor Distribution will be $1,500,000.  Such a distribution would represent a return to General Unsecured Creditors of approximately 3% (assuming all filed Class 4 General Unsecured Claims are Allowed Claims).[22]

            The foregoing example is provided merely to show how the Unsecured Creditor Distribution would be calculated assuming certain variables.  It is not meant to imply this example reflects a likely outcome or that this example reflects an outcome that is any more likely to happen than any other potential outcome with respect to the Specified Distribution.

            iv.     Subject to certain conditions set for the in the Plan, the SQN Deficiency Claim shall be an Allowed Class 4 General Unsecured Claim in the amount of $33,750,000.00, unless the holder of such claim agrees to reduce such amount.

            On the Effective Date, unless otherwise agreed to by a holder of an allowed SQN Deficiency Claim, each holder of an allowed SQN Deficiency Claim shall receive its pro rata share of the Unsecured Creditor Distribution; provided, however, that holders of SQN Deficiency Claims shall release such claims in the event that the Reorganized Debtor or the Equity Purchaser exercises the Purchase Option or the Extension Option (as defined in the Settlement

---

[19]      The term CSPV AD/CVD 1 means collectively, (i) that certain antidumping/countervailing duty investigation and determination A-570-979 (Crystalline Silicon Photovoltaic Cells, Whether Or Not Assembled Into Modules from the People's Republic of China) and (ii) that certain antidumping/countervailing duty investigation and determination C-570-980 (Crystalline Silicon Photovoltaic Cells; Whether Or Not Assembled Into Modules from the People's Republic of China).

[20]      The term CSPV AD/CVD 2 means collectively, (i) that certain antidumping/countervailing duty investigation and determination A-570-010 (Crystalline Silicon Photovoltaic Products from the People's Republic of China), (ii) that certain antidumping/countervailing duty investigation and determination C 570-011 (Crystalline Silicon Photovoltaic Products from the People's Republic of China) and (iii) that certain antidumping/countervailing duty investigation and determination A-583-853 (Crystalline Silicon Photovoltaic Products from Taiwan).

[21]      Under the terms of the Court's orders approving the LP Secured DIP Motion and the LP Unsecured DIP Motion, "[a]ny right of the United States to assert a claim for set off against the proceeds of the [AD/CVD Settlement] is preserved, and the right of any party to contest that the United States has a valid right of set off against the proceeds of the [AD/CVD Settlement] is preserved."

[22]      The Settlement Agreement provides SQN and Wanxiang shall not be entitled to a distribution on account of their respective deficiency claims.  Therefore, such claims do not dilute the distributions to other holders of Allowed Class 4 General Unsecured Claims.

Agreement) (whichever is earlier) in accordance with the terms of the Settlement Agreement, and upon such release, holders of SQN Deficiency Claims (or any subsequent transferee) shall not be entitled to any distribution (whether from the Debtor, the Reorganized Debtor or the Equity Purchaser) to be made on account of SQN Deficiency Claims, or any security, financial instrument or entitlement received as consideration for SQN Deficiency Claims.

v.      Subject to certain conditions set for the in the Plan, the WX Deficiency Claim shall be an Allowed Class 4 General Unsecured Claim in an amount to be agreed upon pursuant to the terms of the Settlement Agreement, which claim is estimated to be approximately $10,500,000.

On the Effective Date, unless otherwise agreed to by a holder of an allowed WX Deficiency Claim, each holder of an allowed WX Deficiency Claim shall receive its pro rata share of the Unsecured Creditor Distribution; provided, however, that holders of WX Deficiency Claims shall release such claims in the event that the Reorganized Debtor or the Equity Purchaser exercises the Purchase Option or the Extension Option (as defined in the Settlement Agreement) (whichever is earlier) in accordance with the terms of the Settlement Agreement, and upon such release, holders of WX Deficiency Claims (or any subsequent transferee) shall not be entitled to any distribution (whether from the Debtor, the Reorganized Debtor or the Equity Purchaser) to be made on account of WX Deficiency Claims, or any security, financial instrument or entitlement received as consideration for WX Deficiency Claims.

5.      **Class 5—Convenience Claims.**

i.      Description: any Claim that would otherwise be a General Unsecured Claim and that is (i) greater than $0 and less than or equal to $25,000.00 in amount or (ii) greater than $25,000.00 and irrevocably reduced to $25,000.00, at the election of the holder of the Claim as evidenced on the ballot submitted by such holder; *provided, however*, that (i) a General Unsecured Claim (or multiple Claims held by the same holder) may not be subdivided into multiple Claims of $25,000.00 or less for purposes of receiving treatment as a Convenience Claim and (ii) no Convenience Claim shall exceed the Allowed Claim amount of $25,000.00.

ii.      Classification:  Class 5 consists of the Convenience Claims.

iii.      Treatment:  Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, as soon as reasonably practicable after such Claim is Allowed, each holder of an Allowed Convenience Claim shall receive from the Plan Administrator, in full satisfaction, settlement, release and discharge of, and in exchange for such Convenience Claim, its Pro-Rata share of $150,000.

6.      **Class 6—510 Claims.**

i.      Description: Claims against the Debtor that are subordinated pursuant to Bankruptcy Code section 510(b) or (c).

ii.      Classification: Class 6 consists of the 510 Claims, if any, against the Debtor.

iii.      Treatment: There shall be no distribution to the holders of 510

Claims on account of such Claims.

      7.    **Class 7—Interests.**

      i.    Description: An ownership interest in the Debtor, represented by shares of common or preferred stock or any other instrument, whether or not certificated, transferable, voting or denominated "stock" or a similar equity security, or any option, warrant (including any DIP Lender Warrant), or right, contractual or otherwise, to acquire any such ownership interest

      ii.    Classification: Class 7 consists of all Interests.

      iii.    Treatment:  On the Effective Date, all Interests shall be deemed canceled and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to the holders of Interests on account of such Interests.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTOR AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**NOTHING IN THE DISCLOSURE STATEMENT SHALL AFFECT THE RIGHTS OF THE DEBTOR, THE REORGANIZED DEBTOR, OR THE PLAN ADMINISTRATOR, AS APPLICABLE, TO OBJECT TO ANY PROOF OF CLAIM OR PROOF OF INTEREST ON ANY GROUND OR FOR ANY PURPOSE, INCLUDING IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE PLAN.**

    C.    <u>**Treatment of Unclassified Claims**</u>

      1.    **Administrative Expense Claims**

      i.    **Administrative Expense Claims in General -** Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, and subject to 10.2.7 of the Plan, on the later of 30 days after the Effective Date or 30 days after such Claim becomes an Allowed Claim, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed Administrative Expense Claim shall receive (a) payment of such Administrative Expense Claim in full in Cash by the Reorganized Debtor or (b) other treatment consistent with Bankruptcy Code section 1129(a)(9); *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor may be paid by the Debtor or Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to such liabilities.

      ii.    **Statutory Fees -** All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the Chapter 11 Case under section 1112 of the Bankruptcy Code or the closing of the Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

iii.    **First DIP Facility Claims.**

(a)    The First DIP Facility Claims shall be an Allowed Claim in the amount of $10,570,120.60 plus the amount of interest and fees accrued under the First DIP Credit Documents.

(b)    On the Effective Date, Lion Point will contribute the First DIP Facility Claims to the Equity Purchaser in exchange for a pro rata share in membership interests in the Equity Purchaser on the Effective Date.

(c)    Upon the making of such contribution, all Liens and security interests granted to secure such obligations shall be terminated and immediately released, and the holder of such Allowed Claim  shall execute and deliver to the Reorganized Debtor such instruments of release, satisfaction, and/or assignments (in recordable form) as may be reasonably requested by the Reorganized Debtor.

iv.    **LP Secured DIP Facility Claims.**

(a)    The LP Secured DIP Facility Claims shall be an Allowed Claim in the amount of $1,999,605.00 plus the amount of interest and fees accrued under the LP Secured DIP Credit Documents.

(b)    On the Effective Date, Lion Point will contribute the LP Secured DIP Facility Claims to the Equity Purchaser in exchange for a pro rata share in membership interests in the Equity Purchaser on the Effective Date

(c)    Upon the making of such contribution, all Liens and security interests granted to secure such obligations shall be terminated and immediately released, and the holder of such Allowed Claim  shall execute and deliver to the Reorganized Debtor such instruments of release, satisfaction, and/or assignments (in recordable form) as may be reasonably requested by the Reorganized Debtor.

v.    **LP Unsecured DIP Facility Claims.**

(a)    The LP Unsecured DIP Facility Claims shall be an Allowed Claim in the amount of $2,172,762.00 plus the amount of interest and fees accrued under the LP Unsecured DIP Credit Documents.

(b)    On the Effective Date, Lion Point will contribute the LP Unsecured DIP Facility Claims to the Equity Purchaser in exchange for a pro rata share in membership interests in the Equity Purchaser on the Effective Date.

(c)    Upon the making of such contribution, the LP Unsecured DIP Facility Claims shall be immediately released, and the holder of such

Allowed Claim shall execute and deliver to the Reorganized Debtor such instruments of release, satisfaction, and/or assignments (in recordable form) as may be reasonably requested by the Reorganized Debtor.[23]

      vi.    **Fee Claims -** All Allowed Fee Claims shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court upon the later of (x) the Effective Date, and (y) ten (10) Business Days after the date upon which the order relating to the allowance of any such Fee Claim is entered.  On the Effective Date, the Debtor shall pay to Debtor's counsel Cash in an amount equal to all accrued but unpaid Fee Claims as of the Effective Date (including all amounts reasonably estimated by any Professional Person), which Cash shall be held in an attorney trust account by Debtor's counsel and shall be disbursed solely to the holders of Allowed Fee Claims pursuant to an Order of the Bankruptcy Court with the remainder to be reserved until Fee Claims either have been determined to be Allowed Fee Claims and paid in full or Disallowed Fee Claims by Final Order in which case Debtor's counsel shall return to the Reorganized Debtor the amounts related to the Disallowed Fee Claims.

      Any Professional Person seeking allowance of a Fee Claim must file and serve on the Debtor or the Reorganized Debtor, the Committee, Lion Point, the U.S. Trustee and any other Person entitled to notice pursuant to Bankruptcy Rule 2002 of an application for final allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than twenty (20) days after the Effective Date; *provided, however,* that the Debtor or Reorganized Debtor, as applicable, shall pay retained professionals of the Debtor or Reorganized Debtor in the ordinary course of business for any work performed on and after the Effective Date in furtherance of the Plan or as authorized hereunder.  Objections to such Fee Claims, if any, must be filed and served no later than forty-five (45) days after the Effective Date.

      vii.    **Bar Dates for Administrative Expense Claims –** As discussed above, the Bankruptcy Court entered an Order [D.I. 507] establishing the First Administrative Expense Claim Bar Date of March 28, 2018 for certain Administrative Expense Claims that arose during the period from the Petition Date through and including January 31, 2018.

      Except as otherwise provided in the Plan, requests for payment of Administrative Expense Claims that were not required to be filed by the First Administrative Expense Claim Bar Date and that are not: (a) 503(b)(9) Claim; (b) an Administrative Expense Claim that has become an Allowed Administrative Expense Claim on or before the Effective Date; (c) an Administrative Expense Claim for an expense or liability incurred and paid on or before the Effective Date in the ordinary course of business by the Debtor; (d) an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtor pursuant to an order of the Bankruptcy Court; or (e) an Administrative Expense Claim arising out of the employment by the Debtor of an individual in the ordinary course of business from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses); must be filed on the Debtor by the Second Administrative

---

[23]     Lion Point shall receive 100% of the membership interests in the Equity Purchaser in exchange for (i) contributing the LP DIP Facility Claims to the Equity Purchaser, and (ii) the Cash Purchase Price.

Expense Claim Bar Date, which is forty-five (45) days after the Effective Date.

**Holders of Administrative Expense Claims not subject to the First Administrative Expense Claim Bar Date that fail to file a request for payment of an Administrative Expense Claim by the Second Administrative Expense Claim Bar Date if such Holder is required to do so pursuant to the Plan, shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim against the Debtor or its property and such Administrative Expense Claims shall be disallowed in full as of the Effective Date.**

2.      **Priority Tax Claims** – Except to the extent that the Debtor or the Reorganized Debtor, as applicable, and the holder of an Allowed Priority Tax Claim otherwise agree, on the later of the Effective Date or ten (10) Business Days after such Claim becomes an Allowed Claim, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed Priority Tax Claim shall receive, in the Debtor's discretion, on account of such Claim:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) deferred Cash payments following the Effective Date over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the amount of such Allowed Priority Tax Claim.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Allowed Claim shall be paid in full in Cash in the ordinary course of business in accordance with the terms of any agreement between the applicable Reorganized Debtor and the holder of such Allowed Claim or otherwise in accordance with applicable non-bankruptcy law.

D.      **Treatment of Executory Contracts and Unexpired Leases**

1.      General Treatment

Effective as of the Effective Date, all Executory Contracts and Unexpired Leases are hereby rejected, except for an Executory Contract or Unexpired Lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically designated as an Executory Contract or Unexpired Lease to be assumed on the Schedule of Assumed Contracts and Leases or is otherwise expressly assumed pursuant to the Plan, (iii) is the subject of a separate assumption motion filed by the Debtor or Reorganized Debtor (in either case with the consent of the Equity Purchaser) under section 365 of the Bankruptcy Code, or (iv) is the subject of a pending objection regarding a Cure Dispute.

Subject to resolution of any Cure Dispute, any monetary amounts by which any Executory Contract and Unexpired Lease to be assumed hereunder is in default shall be satisfied pursuant to Bankruptcy Code section 365(b)(1), by payment of the Cure Amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may agree.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. Any proofs of claim filed with respect to an

Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

        2.      <u>Cure Disputes</u>

The Debtor shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and Leases and shall serve, not less than twenty (20) days prior to the commencement of the Confirmation Hearing, a notice on parties to Executory Contracts and Unexpired Leases to be assumed reflecting the Debtor's intention to assume the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any). The proposed Cure Amount for any Executory Contract or Unexpired Lease not listed on the schedule shall be $0.00.

To the extent that a Cure Dispute is asserted in an objection filed not less than ten (10) days prior to the commencement of the Confirmation Hearing and properly served on the Debtor, such Cure Dispute shall be scheduled for a hearing by the Bankruptcy Court. Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable Executory Contract or Unexpired Lease shall be deemed assumed effective as of the Effective Date, provided that the Debtor, with the consent of the Equity Purchaser and the Committee, reserve the right to reject any Executory Contract or Unexpired Lease following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection within ten (10) Business Days of the entry of such Final Order.

To the extent that an objection is not timely filed and properly served on the Debtor with respect to a Cure Dispute, then the counterparty to the applicable Executory Contract or Unexpired Lease shall be deemed to have assented to (a) the Cure Amount proposed by the Debtor and (b) the assumption of such contract or lease, notwithstanding any provision thereof that (i) prohibits, restricts or conditions the transfer or assignment of such contract or lease, or (ii) terminates or permits the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtor or terminated or modifying such contract on account of transactions contemplated by the Plan.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed will be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court.

        3.      <u>Claims Based on Rejection of Executory Contracts and Unexpired Leases</u>

All Claims arising from the rejection of Executory Contracts or Unexpired Leases must be filed with the Claims Agent according to the procedures established for the filing of proofs of

33

claim or before the later of (i) the applicable Bar Date, (ii) thirty (30) days after the entry of the order approving the rejection of such Executory Contract or Unexpired Lease, and (iii) if such Executory Contract is rejected pursuant to the Plan, thirty (30) days after the Effective Date. All Claims arising from the rejection of Executory Contracts or Unexpired Leases that are evidenced by a timely filed proof of claim will be treated as a Class 4 Claim, and any objections to such Claims shall be served and filed on or before the later of (a) the date that is 180 days after the Effective Date, or (b) such other deadline set by the Bankruptcy Court or by consent of the applicable parties. Upon receipt of the Plan Distribution provided in Section 7.3 of the Plan, all such Claims shall be satisfied, settled, and released as of the Effective Date, and shall not be enforceable against the Debtor, the Estates, the Reorganized Debtor, or their respective properties or interests in property.

Any Person that is required to file a proof of claim arising from the rejection of an Executory Contract or Unexpired Lease that fails timely to do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor, the Estate, the Reorganized Debtor, or its respective properties or interests in property, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

### E. Cancellation of Securities and Instruments

On the Effective Date, except as otherwise specifically provided for in the Plan, (a) the obligations of the Debtor under the documents related to the LP DIP Claims and any certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder and (b) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically reinstated or assumed pursuant to the Plan) shall be released and discharged.

### F. Management Incentive Plan

The New Board (as defined herein) may, in its sole discretion, adopt a Management Incentive Plan following the Effective Date, the terms of which would be determined by the New Board. The New Board shall, in its sole discretion, determine any allocations with respect to awards under the Management Incentive Plan.

### G. Establishment of a Plan Administrator

On the Effective Date, a Plan Administrator shall be appointed and take effect pursuant to the terms of the Plan Administrator Agreement. The Plan Administrator shall, in accordance with

the Plan Administrator Agreement, be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) object to and to otherwise resolve and settle Convenience Claims and General Unsecured Claims as appropriate;(iii) make distributions to holders of Allowed Convenience Claims and Allowed General Unsecured Claims as provided for in the Plan; (iv) enforce the rights of Holders of Allowed General Unsecured Claims to receive the Unsecured Creditor Distribution in accordance with the Plan (including any additional amounts attributable to the Unsecured Creditor Distribution as a result of an adjustment to Net Specified Proceeds); (v) employ professionals to represent it with respect to its responsibilities; and (vi) exercise such other powers as deemed by the Plan Administrator to be necessary and proper to implement the provisions of the Plan. All compensation for the Plan Administrator will be paid from the Plan Administrator Account, and except as otherwise provided in the Plan Administrator Agreement, shall not exceed the Plan Administrator Budget, in accordance with the Plan and the Plan Administrator Agreement. The rights, duties and responsibilities of the Plan Administrator under the Plan are specified in the Plan Administrator Agreement, a copy of which is substantially in the form contained in the Plan Supplement.

## H.    Estate Causes of Action

The Reorganized Debtor is generally retaining all Causes of Action belonging to the Debtor except for Avoidance Actions and Causes of Action released under the Plan.

## I.    Releases and Exculpations

The Plan will provide for standard releases and exculpations of the Debtor and Reorganized Debtor, the Chief Restructuring Officer, the Committee and its members, Lion Point, the Equity Purchaser, SQN and Wanxiang, as well as each of their respective advisors, to the extent permitted by law. For the avoidance of doubt, except for the releases by and among the Released Parties and exculpation of the Exculpated Parties, the Plan will not provide for third-party releases, including releases for the benefit of the Debtor's shareholders and directors and officers.

## J.    Indemnification Provisions and D&O Liability Insurance

Notwithstanding anything to the contrary in the Plan, as of the Effective Date, all Indemnification Provisions belonging or owed to directors, officers and employees of the Debtor except for Indemnification Provisions under the Aurora Retention Order shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Bankruptcy Code section 365 under the Plan.

Neither the Debtor, nor the Reorganized Debtor (after the Effective Date), shall let lapse, terminate, or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including tail coverage liability insurance) in effect as of the Petition Date, solely as it relates to covered claims under such policy that arose prior to the Petition Date

## K.    Miscellaneous Provisions

Articles 12 and 13 of the Plan contain several miscellaneous provisions, including: (i) the retention of jurisdiction by the Bankruptcy Court over certain matters following the Confirmation

Date; (ii) the dissolution of the Committee; and (iii) modifications of the Plan. Additionally, Section 11.6 of the Plan governs the exculpation and limitation of liability of certain parties with respect to the Chapter 11 Case.

**L.       Conditions Precedent to Confirmation of the Plan**

Confirmation of the Plan shall be subject to the satisfaction of certain conditions precedent described herein, including, without limitation, the following:

- The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of Bankruptcy Code section 1125; *provided, however*, that the order approving the Disclosure Statement will be deemed to be a Final Order even if an appeal has been or may be taken, or a petition for certiorari has been or may be filed, and not been resolved so long as the Confirmation Order has not been reversed, stayed, modified or amended; and

- All provisions, terms and conditions in the Plan shall have been approved in the Confirmation Order.

**M.      Conditions Precedent to Effective Date of the Plan**

The occurrence of the Effective Date and the obligation of the Equity Purchaser to purchase the New Ownership Interests of the Reorganized Debtor on the Effective Date shall be subject to the satisfaction of certain conditions precedent customary in transactions of the type described herein, including, without limitation, the following:

- The Bankruptcy Court shall have entered an order confirming the Plan in form and substance acceptable to the Debtor, the Equity Purchaser, and the Committee (the "Confirmation Order") and such Confirmation Order shall be final and nonappealable and no stay shall be in effect with respect thereto.

- All definitive documents required by the Plan, including those comprising the Plan Supplement and contemplated by the Settlement Agreement, shall have been executed and remain in full force and effect, which definitive documentation shall be in form and substance acceptable to the Debtor, the Equity Purchaser, and the Committee (the "Document Condition").

- All requisite filings with governmental authorities and third parties shall have become effective, and all governmental authorities and third parties shall have approved or consented to the Restructuring, to the extent required.

- The Equity Purchaser shall have funded the undrawn balance of the LP Unsecured DIP facility to the Debtor to be paid, distributed, escrowed, or otherwise disbursed under this Plan on or before the Effective Date (the "Funding Condition").

- The Aggregate Administrative/Priority Claims shall not exceed the Aggregate Administrative/Priority Claim Cap of $1,000,000.

The conditions to the Effective Date may be waived in whole or part at any time by the Debtor with the consent of the Equity Purchaser, and with respect to the Document Condition and the Funding Condition, with the consent of the Equity Purchaser and the Committee.

### N.    Non-Occurrence of Effective Date

Unless the Debtor, the Equity Purchaser and the Committee agree otherwise, if the Effective Date does not occur on or before April 10, 2019, (i) the Confirmation Order shall be vacated, (ii) no Plan Distributions shall be made, (iii) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iv) the Debtor's obligations with respect to Claims and Interests and the First DIP Facility, including the Trade Case Success Fee, shall remain unchanged, and (v) the Plan shall be null and void in all respects.  If the Confirmation Order is vacated pursuant to Section 10.4 of the Plan, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtor; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any other Person with respect to any matter set forth in the Plan.

### V.

### IMPLEMENTATION AND EXECUTION OF THE PLAN

### A.    Effects of Confirmation of the Plan

1.    Cancellation of Securities and Agreements.  On the Effective Date, except as otherwise specifically provided for in the Plan, (a) the obligations of the Debtor under the documents related to the LP DIP Claims and any certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically reinstated pursuant to the Plan), shall be cancelled as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder and (b) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically reinstated or assumed pursuant to the Plan) shall be released and discharged.

On the Effective Date, the Reorganized Debtor shall be a private, non-reporting company, and the New Ownership Interests shall not be registered or listed on any national securities exchange.

The issuance or execution and delivery of Reorganized Debtor and the distribution thereof under the Plan will be exempt from registration under applicable securities laws pursuant to section

1145(a) of the Bankruptcy Code and/or any other applicable exemptions. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan will become and will remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

2. <u>Continued Corporate Existence; Vesting of Assets</u>. Except as otherwise provided herein, in the New Corporate Governance Documents, or elsewhere in the Plan Supplement, the Reorganized Debtor shall exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtor is incorporated or formed. The New Corporate Governance Documents shall be substantially in the form contained in the Plan Supplement.

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated therein, on the Effective Date, any and all property in the Estate and all Retained Causes of Action shall vest in the Reorganized Debtor free and clear of all Liens, Claims, interests, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or Retained Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

3. <u>New Equity</u>. On the Effective Date, and without any further corporate action, the Reorganized Debtor shall issue 100% of the New Ownership Interests to the Equity Purchaser in exchange for the Equity Purchase Price[24] and in accordance with the terms of the Plan.

**B. <u>Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements</u>**

1. <u>The New Corporate Governance Documents and Corporate Existence</u>. Except as otherwise provided in the Pan, in the New Corporate Governance Documents, or elsewhere in the Plan Supplement, the Reorganized Debtor shall exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtor is incorporated or formed. The New Corporate Governance Documents shall be substantially in the form contained in the Plan Supplement. On or immediately before the Effective Date, the Reorganized Debtor will file its Amended Certificate of Incorporation with the applicable

---

[24]     Equity Purchase Price is defined as (a) the LP DIP Claims, plus (b) $1,150,000.00 less any amounts advanced under the LP Unsecured DIP Credit Documents in excess of $2,400,000.00.

Secretary of State or other applicable authorities in its state of incorporation in accordance with the corporate laws of such state of incorporation. Pursuant to Bankruptcy Code section 1123(a)(6), the Amended Certificate of Incorporation with respect to the Reorganized Debtor will prohibit the issuance of nonvoting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate the Amended Certificate of Incorporation and Amended By-laws and other constituent documents as permitted by the laws of the Reorganized Debtor's state of incorporation, the Amended Certificate of Incorporation and Amended By-laws.

       2.    <u>Directors and Officers of Reorganized Suniva</u>. On the Effective Date, the initial board of directors (the "<u>New Board</u>") shall be appointed and shall be composed of three (3) members designated by the Equity Purchaser. Members of the New Board shall be identified in the Plan Supplement. On the Effective Date, the terms of the current members of the board of directors of the Debtor shall expire. On the Effective Date, the Committee shall designate one additional non-voting member to the New Board in an observer capacity for a single two-year term.

       3.    <u>Employment-Related Agreements and Compensation Programs</u>. Except as otherwise provided in the Plan, as of the Effective Date, Reorganized Debtor will have authority to: (i) maintain, reinstate, amend, or revise existing employment, retirement, welfare, incentive, severance, indemnification, and other agreements with its active and retired directors, officers, and employees, subject to the terms and conditions of any such agreement and applicable nonbankruptcy law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification, and other agreements for active and retired employees. From and after the Effective Date, Reorganized Debtor will continue to administer and pay the Claims arising before the Petition Date under the Debtor's workers' compensation programs in accordance with their prepetition practices and procedures.

       4.    <u>Other Matters</u>. Notwithstanding anything to the contrary in the Plan, no provision in any contract, agreement, or other document with the Debtor that is rendered unenforceable against the Debtor or Reorganized Debtor pursuant to sections 541(c), 363(l), or 365(e)(1) of the Bankruptcy Code, or any analogous decisional law, will be enforceable against the Debtor or Reorganized Debtor as a result of the Plan.

    **C.**    **<u>Preservation of Causes of Action; Compromise and Settlement of Disputes.</u>**

       1.    <u>Preservation of all Causes of Action Not Expressly Settled or Released</u>. In accordance with Bankruptcy Code section 1123(b), and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases provided by Section 11.5 of the Plan), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Plan Supplement or the Retained Causes of Action to any Causes of Action against them as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue any and all available Retained Causes of Action against them.

2.    <u>Comprehensive Settlement of Claims and Controversies</u>.    Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtor or the Plan Administrator, as applicable, may compromise and settle Claims against, and Interests in, the Debtor and its Estate and the Reorganized Debtor may compromise and settle Retained Causes of Action.

### D.    <u>Discharge of Claims and Interests</u>

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests arising or existing on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  From and after the Effective Date, the Debtor will be discharged from any and all Claims and Interests that arose or existed prior to the Effective Date, subject to the obligations of the Debtor under the Plan.

### E.    <u>Release of Liens</u>

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Article 3 of the Plan, all mortgages, deeds of trust, liens or other security interests, including any liens granted as adequate protection against the property of any Estate, will be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date, the Reorganized Debtor will be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of Article 5 of the Plan.

### F.    <u>Injunctions</u>

**The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits,**

40

judgments, damages, demands, debts, rights, Causes of Action or liabilities released in Section 11.5 and 11.6 of the Plan.

G.     **Exculpations**

To the extent permissible under applicable law, including, without limitation, Bankruptcy Code section 1125(e), none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtor's restructuring, including without limitation, the negotiation, implementation and execution of the Plan, the Chapter 11 Case, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court, *provided, however*, notwithstanding anything to the contrary herein, the following shall not release or exculpate: (i) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (ii) any failure to comply with the Confirmation Order.

H.     **Releases**

1.     **Releases**.  For good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Released Parties shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than their respective rights to enforce this Plan and the contracts, instruments, releases, indentures and other agreements or documents executed and/or delivered in connection therewith) against each other, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or this Plan or the Disclosure Statement, that could have been asserted by or on behalf the Debtor or its Estate or the Reorganized Debtor or any other Released Parties, whether directly, indirectly, derivatively or in any representative or any other capacity, other than claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud, willful misconduct or breach of fiduciary duty (if any).  For the avoidance of doubt, notwithstanding anything to the contrary contained in Section 11.5.1 of the Plan, no holder of a Claim, whether such claim is allowed either prior to or after the Effective Date of the Plan, shall be deemed to release its rights under Section 3.2 of the Plan, including any rights to receive Plan Distributions, rights or other treatment on account of such Allowed Claim.

Except for the releases by and among the Released Parties and

41

**exculpation of the Exculpated Parties, the Plan will not provide for third-party releases, including releases for the benefit of the Debtor's shareholders and directors and officers.**

> **2.**    **Releases of Avoidance Actions**. **For good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise provided in this Plan or the Confirmation Order, as of the Effective Date, the Debtor in its individual capacity and as debtor in possession, and the Reorganized Debtor shall be deemed to forever release, waive and discharge all Avoidance Actions against any holder of a Claim that votes to accept the Plan.**

### I.    Dissolution of Committee

The Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Committee (including each officer, director, employee, agent, consultant, or representative thereof) and each Professional Person retained by the Committee shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to the Debtor and the Chapter 11 Case, *provided, however,* that the foregoing shall not apply to any matters concerning any Fee Claims held or asserted by any Professional Persons retained by the Committee.

### J.    Provisions Governing Distributions

> **1.**    Satisfaction of Claims.  Unless otherwise provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete satisfaction, settlement, and release of such Allowed Claims. Holders of Allowed Claims may assert such Claims against the Debtor; *provided, however,* that in no case shall the aggregate value of all property received or retained under the Plan (or from third parties) by a holder of an Allowed Claim exceed 100% of such holder's Allowed Claim.

> **2.**    Distributions on Account of Claims Allowed as of Effective Date.  Except as otherwise provided in the Plan or by Final Order, the Reorganized Debtor shall make initial distributions under the Plan on the Effective Date on account of Claims that are Allowed as of the Effective Date.  The Plan Administrator will create a reserve from the Convenience Class Consideration for any disputed Convenience Claims.

> **3.**    Distributions on Account of Claims Allowed After Effective Date.  Except as otherwise provided in the Plan or by Final Order, Plan Distributions on account of a Claim that becomes an Allowed Claim after the Effective Date shall be made by the Reorganized Debtor or Plan Administrator, as applicable, no later than ten (10) Business Days after the Claim becomes an Allowed Claim.

> **4.**    Delivery of Plan Distributions.

> > **i.**    Distribution Record Date. As of the close of business on the Distribution Record Date, the Claims Register shall be closed and there shall be no further changes in the record holders of any Claims or Interests. The Reorganized Debtor or the Plan Administrator, as applicable, shall have no obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of records as of the close of business on the

Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and assignment of the Debtor's Executory Contracts and Unexpired Leases, neither the Debtor nor the Reorganized Debtor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

    ii. <u>Setoffs</u>. In the event that the value of the Debtor's claim, right, or Causes of Action against a particular claimant is undisputed, resolved by settlement, or has been adjudicated by Final Order of any court, the Reorganized Debtor or Plan Administrator, as applicable, may set off such undisputed, resolved, or adjudicated amount against any Plan Distributions that would otherwise become due to such claimant. Neither the failure to effectuate such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any claims, rights, or Retained Causes of Action that the Debtor or the Reorganized Debtor may possess against such claimant.

    iii. <u>De Minimis and Fractional Plan Distributions</u>. Notwithstanding anything herein to the contrary, the Reorganized Debtor or the Plan Administrator, as applicable, shall not be required to make on account of any Allowed Claim (a) partial Plan Distributions or payments of fractions of dollars or (b) any Plan Distribution if the amount to be distributed is less than $25.00. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions.

    iv. <u>Undeliverable Plan Distributions</u>. If any Plan Distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until the Reorganized Debtor or Plan Administrator, as applicable, has been notified of the then-current address of such holder, at which time such Plan Distribution shall be made as soon as reasonably practicable thereafter without interest, dividends, or accruals of any kind; *provided, however*, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) and forfeited at the expiration of the later of six (6) months from (i) the Effective Date and (ii) the Distribution Date after such holder's Claim first becomes an Allowed Claim. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtor (notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for redistribution in the same Class in accordance with the terms of the Plan, if applicable, and the Claim of any holder to such property or interest in property shall be forever barred, estopped, and enjoined from asserting any Claim against the Debtor, the Estate, the Reorganized Debtor or the Plan Administrator. Nothing contained herein shall require the Reorganized Debtor or Plan Administrator, as applicable, to attempt to locate any holder of an Allowed Claim.

    v. <u>Failure to Present Checks</u>. Any check issued by the Reorganized Debtor or the Plan Administrator, as applicable, on account of an Allowed Claim shall be null and void if not negotiated within 120 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Reorganized Debtor or Plan Administrator, as applicable, by the holder of the relevant Allowed Claim with respect to which such check originally was issued. If any holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within six (6) months after the date the check was mailed or otherwise

delivered to the holder, that Allowed Claim shall be released and the holder thereof shall be forever barred, estopped, and enjoined from asserting any Claim against the Debtor, Reorganized Debtor or Plan Administrator, as applicable.  In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtor free of any Claims of such holder with respect thereto, and if applicable, shall be redistributed to the other holders of Allowed Claims in the same Class in accordance with the Plan.

        5.     <u>No Post-Petition Interest on Claims</u>.  Other than as specifically provided in the Plan, the Confirmation Order, the Cash Collateral Order, or other order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any pre-petition Claim, and no holder of a pre-petition Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

        6.     <u>Withholding and Reporting Requirements</u>.  In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all distributions hereunder shall be subject to such withholding and reporting requirements.  The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such distribution.  The Reorganized Debtor or Plan Administrator, as applicable, has the right, but not the obligation, not to make a distribution until such Holder has made arrangements satisfactory to the Reorganized Debtor for payment of any such tax obligations.  The Reorganized Debtor or Plan Administrator, as applicable, may require, as a condition to the receipt of a distribution, that the Holder of an Allowed Claim complete the appropriate Form W-8 or Form W-9, as applicable to each Holder.  If such Holder fails to comply with such request within six (6) months, such distribution shall be deemed an unclaimed distribution, shall revert to the Reorganized Debtor and such Holder shall be forever barred from asserting any such Allowed Claim against the Debtor or its Assets, the Reorganized Debtor or its Assets, the Plan Administrator or any other Assets transferred pursuant to the Plan, and if applicable, any such unclaimed distribution shall be redistributed to the other holders of Allowed Claims in the same Class in accordance with the Plan.

**K.**      **<u>Term of Injunctions or Stays</u>**

      Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**L.**      **<u>Final Fee Hearing and Final Decree</u>**

        1.     <u>Professional Fee Claims</u>.  Sections 2.4.1 and 2.4.2 of the Plan describes the payment of Fee Claims and the time for filing Fee Claims.  The Debtor will also file and post on

the Noticing Agent Website[25] a notice concerning the time for filing Fee Claims and the hearing date for the Fee Claims.  You will not receive further notice of the time to file Fee Claims or the Fee Claims hearing date and should monitor the Noticing Agent Website for such notice.

        2.      <u>Entry of the Final Decree and Closing of the Chapter 11 Case</u>.  Subsequent to the Effective Date, the hearing on Fee Claims and the Debtor's fulfillment of the standards for the closing of the Chapter 11 Case, Debtor's counsel shall file a proposed form of order under certification of counsel (the "<u>Final Decree Certification</u>") requesting the entry of a Final Decree pursuant to section 350(a) of the Bankruptcy Code.  Such Final Decree shall close the Chapter 11 Case.  At that time, the Debtor believes that the Debtor's estate will be fully administered as: (i) the Confirmation Order will be a Final Order; and (ii) all motions, contested matters and adversary proceedings will be resolved.

        Section 350(a) of the Bankruptcy Code provides that a case shall be closed "after an estate is fully administered and the court has discharged the trustee."  11 U.S.C. § 350(a).  Likewise, Rule 3022 of the Bankruptcy Rules provides that, "after an estate is fully administered in a Chapter 11 reorganization, the court . . . shall enter a final decree closing the case." Fed. R. Bankr. P. 302.  Further, Local Rule 5009-1 provides that, "upon written motion, a party in interest may seek the entry of a final decree at any time after the confirmed plan has been substantially consummated provided that all fees under 28 U.S.C. § 1930 have been paid." Del. Bankr. L.R. 5009-1(a).  Based upon the foregoing, the Debtor believes that the Bankruptcy Court's entry of the Final Decree shall be appropriate and necessary subsequent to the Effective Date upon submission of the Final Decree Certification.  See In re Anne, 2005 WL 1668396, at *2 (Bankr. D. Del. June 24, 2005) (citations omitted).

**VI.**

**CONFIRMATION OF THE PLAN**

        The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing at which it will hear objections (if any) and determine whether to confirm the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

        Among the requirements for Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan does not discriminate unfairly and is fair and equitable as to such Class; (2) is feasible; and (3) is in the best interests of creditors and stockholders that are impaired under the Plan.

        1.      <u>Requirements of Section 1129(a) of the Bankruptcy Code</u>.  A moneyed, business or commercial corporation or trust must satisfy the following requirements pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm its reorganization plan:

---

[25]     The Noticing Agent Website is http://cases.gardencitygroup.com/snv/.

45

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponent(s) of the plan complies with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent(s) of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and equity security holders and with public policy.

- The proponent(s) of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

- With respect to each impaired class of claims or interests—

   - each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

   - if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not impaired under the plan (subject to the cramdown provisions discussed below; see Confirmation of the Plan — Requirements of Section 1129(b) of the Bankruptcy Code).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

    o with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim, unless such holder consents to a different treatment;

    o with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim, unless such holder consents to a different treatment;

    o with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, unless the holder of such a claim consents to a different treatment, the holder of such claim will receive on account of such claim, regular installment payments in cash, of a total value, as of the effective date of the plan, equal to the allowed amount of such claim over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303 of the Bankruptcy Code and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

    o with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in the immediately preceding bullet points above.

- If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code,

6104222V.1

at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtor believes that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code other than those pertaining to voting, which has not yet taken place.

2.    Requirements of Section 1129(b) of the Bankruptcy Code.  The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

*"Fair and Equitable"*

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

- Secured Creditors. A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (a) that each holder of a secured claim included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

- Unsecured Creditors. A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (a) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

- Holders of Interests. A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that: (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any

48

fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Debtor believes the Plan is fair and equitable as to unsecured creditors and Holders of Interests because no Holders of Claims or Interests junior to such parties are receiving any distributions under the Plan on account of such claims or interests. In light of the substantial support obtained from the Supporting Parties, the Debtor does not believe it will be required to seek non-consensual Confirmation of the Plan as to secured creditors.

*"Unfair Discrimination"*

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests. The Debtor carefully designed the Plan to ensure that the Plan did not result in unfair discrimination among similarly situated Classes. The Debtor does not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests. The Debtor believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for "cramdown," or non-consensual Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## VII.

## FEASIBILITY

The Debtor believes that the Reorganized Debtor will be able to perform its obligations under the Plan and continue to operate its businesses without further financial reorganization or liquidation. In connection with Confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible in accordance with section 1129(a)(11) of the Bankruptcy Code (which section requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor).

## VIII.

## BEST INTERESTS OF CREDITORS AND ALTERNATIVES TO PLAN

### A.    Chapter 7 Liquidation

1.    Bankruptcy Code Standard.  Notwithstanding acceptance of a plan by the requisite number of creditors in an impaired class, the Bankruptcy Court must still independently determine that such plan provides each member of each impaired class of claims and interests a recovery that has a value at least equal to the value of the recovery that each such Person would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code on the effective date of such plan.

2.      <u>Plan is in the Best Interests of Creditors</u>.  Notwithstanding acceptance of the Plan by a voting Impaired Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Impaired Class which has not voted to accept the Plan.  Accordingly, if an Impaired Class does not vote unanimously to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each Holder of a Claim in such Impaired Class a recovery on account of the Holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

As set forth in the Liquidation Analysis, attached hereto as Exhibit C, the Debtor believes that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a Chapter 7 liquidation

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens.  If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Liquidating the Debtor's estate under Chapter 7 would not provide a timely distribution to holders of Unsecured Claims and would likely provide a smaller distribution to Holders of Allowed Unsecured Claims because of the fees and expenses that would be incurred during a Chapter 7 liquidation, including potential added time and expense incurred by the trustee and any retained professionals in familiarizing themselves with the Chapter 11 Case.  Furthermore, in a Chapter 7 liquidation, little if any funds will be available to distribute to any claims other than the more than $14.7 million in LP DIP Claims.  Moreover, if the Debtor's Chapter 11 Case were to convert to a Chapter 7 liquidation, the Debtor is of the opinion that the Debtor's Chapter 7 estate would have virtually no chance of receiving a Specified Distribution, because, among other things, the U.S. Government would almost certainly make the Debtor's creation of jobs in the United States a condition of any such distribution.

Accordingly, the Debtor believes that the Plan is in the best interests of Creditors.

**B.      <u>Alternative Plan(s)</u>**

The Debtor does not believe that there are any alternative plans.  The Debtor believes that the Plan, as described herein, enables Holders of Claims to realize the greatest possible value under the circumstances, and that, compared to any alternative plans, the Plan has the greatest chance to be confirmed and consummated.

**IX.**

**RISK FACTORS**

HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE FOLLOWING FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

### A.    Classifications of Claims and Interests

Parties in interest may object to the Debtor's classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.    Non-Occurrence of the Effective Date

If the conditions precedent to the Effective Date, which are set forth in the Plan, have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED.  In the event that the conditions precedent to the Effective Date have not been timely satisfied or waived, the Plan would be deemed null and void and (i) the Debtor or another party-in-interest may propose or solicit votes on an alternative plan that may not be as favorable to parties-in-interest as the current Plan, (ii) the Chapter 11 Case could be converted to a case under Chapter 7 of the Bankruptcy Code; or (iii) the Chapter 11 Case could be dismissed.

### C.    Failure to Receive Requisite Accepting Votes

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In order for the Plan to be accepted, of those holders of Claims who cast ballots, the affirmative vote of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims in each voting Class is required.

If the requisite votes are not received, the Chapter 11 Case could be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed.  There can be no assurance that the distributions under a Chapter 7 liquidation or dismissal would be similar to or as favorable to holders of Claims as those proposed in the Plan.  The Debtor believes that distributions to holders of Claims would be significantly reduced and delayed under a Chapter 7 liquidation, as discussed herein, above.

### D.    Nonconsensual Confirmation

The Debtor intends to seek Confirmation over the deemed rejection of the Plan by Class 6 and Class 7.  Furthermore, if any other Class votes to reject the Plan, the Debtor will seek

51

Confirmation over such Class's rejection of the Plan. Although the Debtor believes that the Plan satisfies the nonconsensual Confirmation requirements of section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In addition, the pursuit of nonconsensual Confirmation or consummation of the Plan may result in, among other things, delay and increased expenses relating to Administrative Expense Claims of professionals.

E.    **Failure to Confirm the Plan**

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity holder of the Debtor might challenge the confirmation of the Plan or the balloting procedures or voting results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes and that the value of distributions to non-accepting holders of Claims or Equity Interests within a particular Class under the Plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtor believes that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all administrative expense claims and costs associated with any such Chapter 7 case.

If the Plan is not confirmed, it is unclear what holders of Claims or Interests ultimately would receive with respect to their Claims and Interests. If an alternative Chapter 11 plan could not be agreed to, it is possible that the Debtor would convert the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or dismiss the Chapter 11 Case, in which case it is likely that holders of Claims or Interests would receive substantially less favorable treatment than they would receive under the Plan.

In addition, in the event that the Plan is not confirmed, the Debtor could incur substantial expenses related to the development and confirmation of a new plan and possibly the approval of a new disclosure statement. This would only unnecessarily prolong the administration of the Debtor's assets and negatively affect creditors' recoveries on their Claims.

Similarly, as described above, in the event the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, the Debtor will incur substantial expenses related to hiring additional professionals and paying the fees of the Chapter 7 trustee. The additional costs will only serve to reduce distributions to creditors.

F.    **Risk of Additional or Larger Claims**

The Disclosure Statement necessarily includes estimates, including estimates of future events and unliquidated Claims. These estimates include estimates as to the total amount of Claims that will be asserted against the Debtor. The Debtor believes that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks are the following: (i) additional prepetition or Administrative Expense Claims may be asserted; (ii) Disputed Claims may be resolved at higher amounts than expected; or (iii) the resolution of Claims may require the expenditure of unanticipated professional fees.

### G.    Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtor or another party-in-interest may attempt to formulate an alternative Chapter 11 plan. However, the Debtor believes that such an alternative Chapter 11 plan will necessarily be significantly inferior to the Plan proposed herewith. The prosecution of an alternative Chapter 11 plan would unnecessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims and Interests than are currently provided for in the Plan. Accordingly, the Debtor believes that the Plan will enable all holders of Claims to realize the greatest possible recovery on their respective Claims and with the least delay.

### H.    Variances from Projections

The projections reflect assumptions concerning, among other things, the Debtor's operations prior to the Effective Date and on-going business operations following the Effective Date. The Debtor believes that the assumptions underlying the projections are reasonable; however, unanticipated events occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtor or the Reorganized Debtor. The projections have not been compiled, audited, or examined by independent accountants and the Debtor makes no representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

### I.    Certain Tax Considerations

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims should carefully review Section X hereof, "Tax Consequences of the Plan," regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and the Reorganized Debtor and certain holders of Claims.

### J.    The Debtor's Emergence From Chapter 11 is Not Assured

While the Debtor expects to emerge from Chapter 11, there can be no assurance that the Debtor will successfully reorganize or when this reorganization will occur, irrespective of the Debtor's obtaining Confirmation of the Plan.

# X.

## TAX CONSEQUENCES OF THE PLAN

The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, the Debtor cannot provide assurance as to the tax consequences of the Plan.  Each holder of a claim or equity interest is urged to consult its own tax advisor for the federal, state, local, and other tax consequences applicable under the Plan.

# XI.

## CONCLUSION

It is important that you exercise your right to vote on the Plan.  It is the Debtor's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against and Interests in the Debtor and is preferable to all other alternatives.

IN WITNESS WHEREOF, the Debtor has executed this Disclosure Statement this 6th day of March, 2019

SUNIVA, INC.

By: */s/  David M. Baker*
          Name: David M. Baker
          Title: Chief Restructuring Officer

**EXHIBIT A**

**Plan of Reorganization**

**EXHIBIT B**

**Disclosure Statement Order**

**EXHIBIT C**

**Liquidation Analysis**

**Suniva, Inc. Liquidation Analysis**

(1) This Liquidation Analysis assumes a Plan Confirmation date of April 9, 2019.

| Note | | Estimated Book Value at Confirmation [(1)] | Estimated Liquidation Value High | Estimated Liquidation Value Low |
|---|---|---|---|---|
| | **Assets** | | | |
| 1 | Cash | 1,064,895 | 1,064,895 | 1,064,895 |
| 2 | Accounts Receivable | - | - | - |
| 3 | Inventory | - | - | - |
| 4 | Fixed Assets, Net | 114,511 | 1 | - |
| 5 | Specified Distribution and Other Non-Current Assets | - | - | - |
| | **Total Assets Available for Distribution** | | 1,064,896 | 1,064,895 |
| | | | | |
| | **Secured Claims:** | | | |
| 6 | Secured Tax Claims | 783,911 | 783,911 | 783,911 |
| 7 | Other Secured Claims | - | - | - |
| 8 | First DIP Loan | 10,570,121 | 10,570,121 | 10,570,121 |
| 9 | LP Secured DIP Loan | 1,999,605 | 1,999,605 | 1,999,605 |
| | **Total Secured Claims** | 13,353,637 | 13,353,637 -   | 13,353,637 |
| 10 | Assets Available for Secured Tax Claims | | - | |
| | Assets Available for Other Secured Claims | | - | - |
| 11 | Assets Available for First DIP Loan | | (1,054,896) | (1,054,895) |
| | Assets Available for LP Secured DIP Loan | | - | - |
| | **Deficiency Claims** | | 11,514,830 | 11,514,831 |
| | | | | |
| | **DIP, Chapter 7 and Chapter 11 Administrative Claims:** | | | |
| 12 | First DIP Loan Superiority Claim | | 10,262,659 | 10,262,659 |
| 13 | LP Secured DIP Loan Superpriority Claim | | 1,999,605 | 1,999,605 |
| 14 | LP Unsecured DIP Loan | | 2,172,762 | 2,172,762 |
| 15 | Chapter 7 Trustee and Other Chapter 7 Expenses | | 500,000 | 250,000 |
| 16 | Chapter 11 Accrued and Unpaid Administrative Claims | | 1,383,175 | 1,383,175 |
| | **Total DIP, Chapter 7 and Chapter 11 Administrative Claims:** | | 16,318,201 | 16,068,201 |
| | | | | |
| | Assets Available for First DIP Loan Superiority Claim | | - | - |
| | Assets Available for LP Secured DIP Loan Superpriority Claim | | - | - |
| | Assets Available for LP Unsecured DIP Loan Claim | | - | - |
| 17 | Assets Available for Chapter 7 and Other Chapter 7 Expenses | | 10,000 | 10,000 |
| | **Total DIP, Chapter 7 and Chapter 11 Administrative Claims Shortfall** | | (16,308,201) | (16,058,201) |
| | | | | |
| | **Priority Claims** | | | |
| 18 | Priority Claims | | 2,363,491 | 2,363,491 |
| | Assets Available for Priority Claims | | - | - |
| | **Total Priority Claims Shortfall** | | (2,363,491) | (2,363,491) |
| | | | | |
| | **General Unsecured Claims** | | | |
| 19 | General Unsecured Claims- Filed | | 50,898,247 | 50,898,247 |
| 20 | SQN and WX Deficiency Claims | | 41,164,228 | 41,164,228 |
| | **Total General Unsecured Claims** | | 92,062,475 | 92,062,475 |
| | | | | |
| | **Assets Available for General Unsecured Claims and Deficiency Claims** | | - | - |
| | | | | |
| | **Assets Available for Equity** | | 0 | 0 |

**EXHIBIT C-1**

**Note 1 Cash.**  This is the estimated remaining cash the Debtor will have on hand on the conversion date.  It is primarily comprised of the estimated remaining proceeds from the DIP loans.  The Debtor expects that it will receive a *de minimis* refund on its workers compensation insurance policy upon the scheduling and completion of an audit.  Support for the cash calculation is attached hereto as **Exhibit 1**.

**Note 2 Accounts Receivable.**  The Debtor does not have any remaining accounts receivables.

**Note 3 Inventory.**  The Debtor does not have any remaining inventory.

**Note 4 Fixed Assets, Net.**  Fixed assets consist of primarily of research and development. equipment. The estimated recovery range in a liquidation would be $22,902 to $11,451.

**Note 5 Specified Distribution and Other Non-Current Assets.** The Debtor does not have any remaining Other Non-Current Assets.  If the Debtor's Chapter 11 case were to convert to a Chapter 7 liquidation, the Debtor is of the opinion that the Debtor's Chapter 7 estate would have virtually no chance of receiving a Specified Distribution.  Furthermore, the Debtor is of the opinion that a Chapter 7 trustee would conclude that it is not worth pursuing causes of action, including avoidance actions.

**Note 6 Secured Tax Claims.**  The Secured Tax Claims are the claims filed by the Gwinnett County Tax Commissioner for prepetition personal property taxes in the amounts of $674,777.53 and $109,133.50.

**Note 7  Other Secured Claims.**  Reflects the Debtor's estimate of amounts due to the other parties that have filed secured claims.

**Note 8 First DIP Loan.**  Amount estimated due as of the Conversion Date.

**Note 9 LP Secured DIP Loan.**  Amount estimated due as of the Conversion Date.

**Note 10 Assets Available for Secured Tax Claims**.  Pursuant to section 502(b)(3) of the Bankruptcy Code, the Secured Tax Claims are non-recourse claims that are fully secured by statutory, first-priority liens on equipment by the Debtor as of the Petition Date having an aggregate value in excess of the Secured Tax Claims.  The Gwinnett County Tax Commissioner has recourse to its collateral through enforcement of its liens pursuant to Georgia law.  Such collateral is not owned by the Debtor.

**Note 11 Assets Available for First DIP Loan.**  The assets available for the First DIP Loan are the estimated cash on hand net of $10,000 available for use by a chapter 7 trustee.

**Note 12 First DIP Loan Superpriority Claim.**  Reflects the amount of the First DIP Loan Superiority Claim, net of cash on hand, net $10,000 for use by a Chapter 7 trustee.

**Note 13 LP Secured DIP Loan Superpriority DIP Loan Claim.** Equals the amount of LP Secured DIP Loan claim as there is no collateral to satisfy the secured claim.

**Note 14 LP Unsecured DIP Loan.** Amount estimated due as of the Conversion Date.

**Note 15 Chapter 7 Trustee and Other Chapter 7 Expenses**. The Liquidation Analysis assumes the conversion of the case to a Chapter 7 and estimates a Trustee and other professional expenses of between $500,000 and $250,000.

**Note 16 Chapter 11 Accrued and Unpaid Administrative Expenses.** The amount of accrued Chapter 11 administrative expenses estimated to be unpaid as of the Conversion Date.

**Note 17 Assets Available for Chapter 7 and Chapter 11 Administrative Claims**. Presently only $10,000 of cash on hand is available for use by a chapter 7 trustee.

**Note 18 Priority Claims.** Estimated total priority claims, including estimated amount of WARN Act claims that might be entitled to priority and estimated priority tax claims (does not include Secured Tax Claims).

**Note 19 General Unsecured Claims.** This includes general unsecured claims as of the proof of claim bar date, lease rejection damages related to the Debtor's lease for approximately 400 MW of manufacturing equipment, and lease rejection damages for its Norcross, Georgia facility as capped by Section 502(b)(6).

**Note 20 SQN and WX Deficiency Claims.** The Settlement Agreement provides that SQN and WX are entitled to deficiency claims, and that these claims would be released under certain circumstances. If the Debtor's case converted to Chapter 7, it is unlikely that such claims would be released. The Settlement Agreement provides that SQN's deficiency claim is $33,750,000. The Debtor estimates that WX's deficiency claim would equal $7,414,228.

**Global Note** – The Liquidation Analysis is being prepared in connection with confirmation of the Debtor's plan of reorganization. It is provided for informational purposes only. In no way should it be deemed an admission as to the amount, priority, or validity of any claim against the Debtor. In the event the Debtor's case were to convert to a Chapter 7 liquidation, the actual amounts distributed to any class of claims may differ.

**Book Cash Balance 3/6/2019**

| | | |
|---|---|---:|
| Positive variances from first DIP & misc. cash receipts | $ | 187,458 |
| Amounts in separate account for utility deposits from first DIP | $ | 44,000 |
| Positive professional fee variances from first DIP | $ | 76,449 |
| Current LP DIP operational account balance due to positive variances | $ | 123,498 |
| Current LP DIP professional account balance due to timing of funding's versus payments and positive variances to date | $ | 739,747 |
| Total | $ | 1,171,152 |
| | | |
| Projected incoming draws until April 9th, 2019 | $ | 777,478 |
| Projected cash outflows until April 9th, 2019 | $ | (883,735) |
| | | |
| Estimated cash balance at April 9th, 2019 | $ | 1,064,895 |